# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA
## CHARLESTON DIVISION

| | |
|---|---|
| DANA SPIRES and GLENN GRANT, on Behalf of Themselves and All Others Similarly Situated, | |
| Plaintiffs, | |
| vs. | CASE NO. 2:16-cv-616-CWH |
| DAVID R. SCHOOLS, WILLIAM A. EDENFIELD JR., ROBERT G. MASCHE, JOSEPH T. NEWTON III, BURTON R. SCHOOLS, PIGGLY WIGGLY CAROLINA COMPANY, INC. & GREENBAX ENTERPRISES, INC. EMPLOYEE STOCK OPTION PLAN AND TRUST PLAN COMMITTEE, JOANNE NEWTON AYERS, MARK A. AYERS, ESTATE OF SEAN AYERS, MARION NEWTON SCHOOLS, SCOTT SCHOOLS, STEPHEN M. SCHOOLS, JOHN KIZER, and JOHN DOES 1-10, | **COMPLAINT** |
| Defendants. | |

INTRODUCTION ................................................................................................... 1

JURISDICTION AND VENUE .............................................................................. 5

PARTIES ................................................................................................................ 6

CLASS ACTION ALLEGATIONS ...................................................................... 10

FACTUAL ALLEGATIONS ................................................................................ 12

    I.      BACKGROUND ............................................................................... 12
          A.    The Plan ................................................................................... 12
          B.    History of the Company and the Plan's Acquisition of Company
                Stock ....................................................................................... 13
          C.    Continuing Control of the Company and Plan by Newton Family
                and Related Parties ................................................................. 16
          D.    Plan Participants Were Kept Ignorant of Financial Conditions and
                Operations of Piggly Wiggly Group ...................................... 17

    II.     COLLAPSE IN COMPANY VALUE AND FAILURE OF
          FIDUCIARIES TO RESPOND .......................................................... 18
          A.    Collapse in Company Value .................................................... 19
          B.    Comparable Grocery Store Chains Experience Growth in Value ........... 24
          C.    Plan Fiduciaries Make No Changes in Company Managers or
                Officers Despite the Decline ................................................... 26

    III.    CORRUPT PRACTICES, MISMANAGEMENT, AND INSIDER
          DEALS CONTRIBUTE TO COMPANY'S DECLINE ..................................... 28
          A.    Overcompensation and Excessive Benefits Paid to Company
                Management and Directors ...................................................... 28
          B.    Entry into Above-Market Leases ............................................. 31
          C.    Mismanagement of the Company During the Collapse ........................... 34

    IV.    COMPANY RESPONDS TO DOWNTURN ONLY AFTER THE
          PERSONAL INTERESTS OF INSIDERS BECOME AT RISK........................ 38
          A.    Piggly Wiggly Management and Board are Prompted to Take
                Action Only When Payments on Notes Payable Stop .............................. 39
          B.    2013 Sales of Company Assets Proceed Without Approval from
                Participants .............................................................................. 41
          C.    Defendant Plan Fiduciaries and Defendant Note Holders Collude
                 on a Large and Unjustified Settlement of the Notes Payable in
                 Early 2014 ............................................................................... 43
          D.    Company Seeks Approval in late 2014 for a Sale of Substantially
                All Assets and Winding Down of the Company....................... 46

THE LAW UNDER ERISA .................................................................................. 48

CAUSES OF ACTION .................................................................................................... 51

    Count One      (Breach of Fiduciary Duty against the Defendant Plan Fiduciaries) ........ 51

    Count Two     (Breach of Fiduciary Duty Against the Defendant Plan Fiduciaries
                       – Failure to Bring Derivative Actions) ..................................................... 52

    Count Three   (Co-Fiduciary Liability Under ERISA § 405 Against Defendant
                       Plan Fiduciaries) .................................................................................... 54

    Count Four    (Prohibited Transaction Under ERISA § 406 Against Defendant
                       Plan Fiduciaries) .................................................................................... 55

    Count Five     (Equitable Relief Under ERISA § 502(a)(3) Against All
                       Defendants) ............................................................................................ 56

PRAYER FOR RELIEF ................................................................................................. 57

**CLASS ACTION COMPLAINT**
**FOR VIOLATIONS OF THE EMPLOYEE RETIREMENT**
**INCOME SECURITY ACT**

Dana Spires and Glenn Grant ("Plaintiffs"), participants in the Piggly Wiggly Carolina

Company, Inc. and Greenbax Enterprises Inc. Employee Stock Ownership Plan and Trust (the

"Plan"), individually and on behalf of all others similarly situated (the "Participants"), allege as

follows on behalf of the Plan:

**INTRODUCTION**

1.      This is a class action brought pursuant to Sections 409 and 502 of the Employee

Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. § 1132, against the

Plan's fiduciaries and certain other defendants.

2.      The Plan is a non-contributory defined contribution plan covering substantially all

employees and former employees of Piggly Wiggly Carolina Company, Inc. ("PWCC") and

Greenbax Enterprises, Inc. ("Greenbax") (collectively, the "Plan Sponsors").  The Plan Sponsors

together with their affiliates and subsidiary companies are heretofore referred to as the "Piggly

Wiggly Group" or the "Company."[1]  The Plan is administered by the Plan Committee (as

hereinafter defined) which is appointed by the Board of Directors of the Piggly Wiggly Group.

3.      Plaintiffs' claims arise from the failures of the Plan fiduciaries to act solely in the

interest of the Participants of the Plan and their beneficiaries ("Beneficiaries"), and to exercise

the required skill, care, prudence and diligence in administering the Plan and the Plan's assets

during the Class Period of March 1, 2008, to the present (the "Class Period").

---

[1] Plaintiffs lack complete knowledge of the organizational structure of Piggly Wiggly Group but understand
Greenbax to be the parent company of the Piggly Wiggly Group, with subsidiaries including Piggly Wiggly
Holdings, LLC, and PWCC.  Plaintiffs further understand upon information and belief that the Board of Directors of
Greenbax also functions as the Board of Directors of PWCC, and effectively functions as the Board of Directors of
the entity referred to herein as the Piggly Wiggly Group.

4.      Defendants David Schools, Edenfield, Masche, Newton, and Burton Schools, together with other members of the Plan Committee and other Plan fiduciaries whose identities are currently not known but will be ascertained through discovery, (collectively, the "Defendant Plan Fiduciaries") owe to the Plan's Participants and Beneficiaries the fiduciary obligations of trustees of an express trust, obligations described as "the highest known to the law." *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982). As Justice Cardozo famously put it,

> **Many forms of conduct permissible in a workaday world for those acting at arm's length, are forbidden to those bound by fiduciary ties. A trustee is held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior.**

*Meinhard v. Salmon,* 164 N.E. 545, 546 (N.Y. 1928).

5.      To this end, Defendant Plan Fiduciaries were required to sign a document entitled "Fiduciary Acknowledgment" upon their appointment as fiduciaries that set forth some of their duties. This Acknowledgment includes specific responsibilities and guidance, including the following: "Avoid conflicts of interests and prohibited transactions. If any transaction/investment decision is not made solely for the benefit of the plan participants and their beneficiaries, a breach is likely to have occurred and the fiduciary may be personally liable."

6.      Rather than acting consistently with their acknowledged duties and this "highest" of obligations, the Defendant Plan Fiduciaries, whose identities overlapped with those of Company management and directors, constantly prioritized protecting and enhancing their own personal interests and financial positions, including their interest in retaining their positions as managers and directors of the Company, instead of the interests of Plan Participants and Beneficiaries.

7.      Specifically, Plaintiffs allege in Count One that Defendant Plan Fiduciaries breached their fiduciary duties by essentially standing by and doing nothing as the value of the Plan's chief asset—Piggly Wiggly Group stock—plummeted by nearly 90% over a sustained period of time, devastating the retirement accounts of thousands of Company employees. Despite clear evidence that the value of the Company was in decline and that the Company was being mis-managed, the Defendant Plan Fiduciaries retained the Plan's investment in Company stock year after year, failed in a timely manner to change the management and business practices to reverse the operational and financial direction of the Piggly Wiggly Group, did nothing to remove entrenched directors and management in the foundering Company, misled Plan Participants about the condition of the Company and Company stock,  sold assets without the necessary approval from the Plan Participants,  and failed to provide complete and accurate information to Plan Participants concerning the ultimate sale of Company assets.

8.      In Count Two, Plaintiffs allege that the Defendant Plan Fiduciaries had full knowledge of mismanagement, conflicts of interest, overcompensation to management and directors, and rife insider deals orchestrated by the management and directors of Piggly Wiggly Group, all of which caused severe harm to the Company and contributed to a severe loss in the Company's value, yet the Defendant Plan Fiduciaries failed to bring a derivative action seeking to enjoin and remedy such behavior, in breach of their fiduciary duties pursuant to ERISA.

9.      In Count Three, Plaintiffs allege that the Defendant Plan Fiduciaries are also liable as co-fiduciaries with respect to the violations cited in the other counts, in that the Defendant Plan Fiduciaries participated knowingly in their co-fiduciaries' breaches, knowingly undertook to conceal those breaches, enabled their co-fiduciaries to commit the breaches, and failed to make any reasonable efforts to remedy the breaches.

10.     In Count Four, Plaintiffs allege that the Defendant Plan Fiduciaries engaged or caused the Company and/or the Plan to engage in numerous transactions that are categorically prohibited under ERISA as especially likely to harm retirement plans and their participants.  The ERISA "prohibited transactions" complained of here involved direct and indirect transactions between the Plan and the Defendant Plan Fiduciaries themselves as well as entities controlled by or affiliated with the Defendant Plan Fiduciaries.

11.     In Count Five, Plaintiffs seek equitable relief for the foregoing allegations of ERISA as well as for a specific transaction in which the Defendant Plan Fiduciaries and Defendants Joanne Newton Ayers, Mark A. Ayers, Estate of Sean Ayers, Marion Newton Schools, Scott Schools, Stephen M. Schools, and John Kizer, colluded to orchestrate a huge payout of Company and Plan assets in settlement of certain Notes Payable (as hereinafter defined) held by Defendants Newton, Burton Schools, Joanne Newton Ayers, Mark A. Ayers, Estate of Sean Ayers, Marion Newton Schools, Scott Schools, Stephen M. Schools, and John Kizer.  This payout was far in excess of the actual value of the Notes Payable and in breach of the Defendant Plan Fiduciaries' fiduciary duties.  Further, this payout occurred as the Company was hemorrhaging money and the value of Participants' retirement accounts was plummeting. The holders of the Notes Payable knew or should have known that the payout breached ERISA and the Defendant Plan Fiduciaries' fiduciary duties.

12.     This action is brought on behalf of the Plan and seeks losses to the Plan for which Defendant Plan Fiduciaries are personally liable pursuant to ERISA §§ 409 and 502(a)(2), 29 U.S.C. § 1109 and 1132(a)(2).  In addition, under § 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3), Plaintiffs seek other equitable relief from all Defendants, including without limitation, as available under applicable law, constructive trust, restitution, and other monetary relief.

13.    As a result of Defendant Plan Fiduciaries' breaches of fiduciary duty, as hereinafter enumerated and described, the Plan has suffered substantial losses, resulting in the depletion of millions of dollars of the retirement savings and anticipated retirement income of the Plan's Participants.  Under ERISA, the breaching fiduciaries are obligated to restore to the Plan the losses resulting from their fiduciary breaches.

14.    Because Plaintiffs' claims apply to Participants and Beneficiaries as a whole, and because ERISA authorizes participants such as Plaintiffs to sue for plan-wide relief for breach of fiduciary duty and related wrongful conduct, Plaintiffs bring this as a class action on behalf of all Participants and Beneficiaries of the Plan during the Class Period.  Plaintiffs also bring this action as Participants seeking Plan-wide relief for breach of fiduciary duty and other breaches of ERISA on behalf of the Plan.

## JURISDICTION AND VENUE

15.    **Subject Matter Jurisdiction**.  This is a civil enforcement action for breach of fiduciary duty brought pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a).  This Court has original, exclusive subject matter jurisdiction over this action pursuant to the specific jurisdictional statute for claims of this type, ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).  In addition, this Court has subject matter jurisdiction pursuant to the general jurisdictional statute for "civil actions arising under the . . . laws . . . of the United States."  28 U.S.C. § 1331.

16.    **Personal Jurisdiction**.  ERISA provides for nationwide service of process, ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2).  All of the Defendants are residents of the United States, and this Court has personal jurisdiction over them.  This Court also has personal jurisdiction over them pursuant to Fed. R. Civ. P. 4(k)(1)(A), because they all would be subject to the jurisdiction of a court of general jurisdiction in the District of South Carolina.

17.    **Venue**.  Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because the Plan was administered in this District, some or all of the fiduciary breaches for which relief is sought occurred in this District, and/or some or all of the Defendants reside or maintain their primary place of business in this District.

**PARTIES**

**Plaintiffs**

18.    **Plaintiff Dana Spires** is a resident of Berkeley County, South Carolina.  At all relevant times Plaintiff Dana Spires was a PWCC employee and Participant in the Plan.

19.    **Plaintiff Glenn Grant** is a resident of Charleston County, South Carolina.  At all relevant times Plaintiff Glenn Grant was a PWCC employee and Participant in the Plan.

**Defendants**

20.    **Defendant David R. Schools ("David Schools")** was, at relevant times, a Trustee of the Plan as well an officer and/or director of the Piggly Wiggly Group.  During the Class period, Defendant David Schools was a fiduciary within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised discretionary authority or discretionary control respecting management of the Plan and/or exercised authority or control respecting management of the Plan's assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plan.

21.    **Defendant William A. Edenfield Jr. ("Edenfield")** was, at relevant times, a Trustee of the Plan as well an officer and/or director of the Piggly Wiggly Group. During the Class period, Defendant Edenfield was a fiduciary within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised discretionary authority or discretionary control respecting management of the Plan and/or exercised authority or control respecting management

6

of the Plan's assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plan.

22.     **Defendant Robert G. Masche ("Masche")** was, at relevant times, a Trustee of the Plan as well an officer and/or director of the Piggly Wiggly Group. During the Class Period, Defendant Masche was a fiduciary within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised discretionary authority or discretionary control respecting management of the Plan and/or exercised authority or control respecting management of the Plan's assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plan.

23.     **Defendant Joseph T. Newton III ("Newton")** was, at relevant times, a Trustee of the Plan as well an officer and/or director of the Piggly Wiggly Group.  During the Class Period, Defendant Newton was a fiduciary within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised discretionary authority or discretionary control respecting management of the Plan and/or exercised authority or control respecting management of the Plan's assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plan.

24.     **Defendant Burton R. Schools ("Burton Schools")** was, at relevant times, a Trustee of the Plan as well an officer and/or director of the Piggly Wiggly Group.  During the Class Period, Defendant Burton Schools was a fiduciary within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised discretionary authority or discretionary control respecting management of the Plan and/or exercised authority or control respecting management of the Plan's assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plan.

25.     **Defendant Piggly Wiggly Carolina Company, Inc. and Greenbax Enterprises, Inc. Employee Stock Option Plan and Trust Plan Committee (the "Plan Committee")** was at all relevant times the administrator of the Plan, within the meaning of ERISA § 3(16)(A), 29 U.S.C. § 1002(16)(A), and therefore also a fiduciary of the Plan, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), because it exercised discretionary authority or discretionary control respecting management of the Plan and/or exercised authority or control respecting management of the Plan's assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plan.   Sandra S. Rabon, to the extent if any she served as a member of the Committee, is excluded as a Defendant.

26.     **Defendants John Does 1-10** include members of the Plan Committee, directors and officers of the Piggly Wiggly Group, and other persons and/or entities that serve or served as Plan fiduciaries during the Class Period, with the exception of Sandra S. Rabon, whose identities are currently unknown to Plaintiffs.  Plaintiffs reserve the right to seek leave to join these defendants under their true names once their identities have been ascertained through discovery.

27.     **Defendant Joanne Newton Ayers** was a former holder of Company stock and knowingly aided and/or abetted Defendant Plan Fiduciaries in a fiduciary breach and/or knew or should have known she participated with Defendant Plan Fiduciaries in a fiduciary breach or ERISA breach in which Plan assets were taken and the value of Plan assets was reduced as a result of excessive, improper payments to her for her Note Payable, as hereinafter alleged.

28.     **Defendant Mark A. Ayers** was a former holder of Company stock and knowingly aided and/or abetted Defendant Plan Fiduciaries in a fiduciary breach and/or knew or should have known he participated with Defendant Plan Fiduciaries in a fiduciary breach or

ERISA breach in which Plan assets were taken and the value of Plan assets was reduced as a result of excessive, improper payments to him for his Note Payable, as hereinafter alleged .

29.    **Defendant Estate of Sean Ayers** was a former holder of Company stock and knowingly aided and/or abetted Defendant Plan Fiduciaries in a fiduciary breach and/or knew or should have known it participated with Defendant Plan Fiduciaries in a fiduciary breach or ERISA breach in which Plan assets were taken and the value of Plan assets was reduced as a result of excessive, improper payments to it for its Note Payable, as hereinafter alleged .

30.    **Defendant Marion Newton Schools** was a former holder of Company stock and knowingly aided and/or abetted Defendant Plan Fiduciaries in a fiduciary breach and/or knew or should have known she participated with Defendant Plan Fiduciaries in a fiduciary breach or ERISA breach in which Plan assets were taken and the value of Plan assets was reduced as a result of excessive, improper payments to her for her Note Payable, as hereinafter alleged.

31.    **Defendant Scott Schools** was a former holder of Company stock and knowingly aided and/or abetted Defendant Plan Fiduciaries in a fiduciary breach and/or knew or should have known he participated with Defendant Plan Fiduciaries in a fiduciary breach or ERISA breach in which Plan assets were taken and the value of Plan assets was reduced as a result of excessive, improper payments to him for his Note Payable, as hereinafter alleged .

32.    **Defendant Stephen M. Schools** was a former holder of Company stock and knowingly aided and/or abetted Defendant Plan Fiduciaries in a fiduciary breach and/or knew or should have known he participated with Defendant Plan Fiduciaries in a fiduciary breach or ERISA breach in which Plan assets were taken and the value of Plan assets was reduced as a result of excessive, improper payments to him for his Note Payable, as hereinafter alleged.

33.     **Defendant John Kizer** was a former holder of Company stock and knowingly aided and/or abetted Defendant Plan Fiduciaries in a fiduciary breach and/or knew or should have known he participated with Defendant Plan Fiduciaries in a fiduciary breach or ERISA breach in which Plan assets were taken and the value of Plan assets was reduced as a result of excessive, improper payments to him for his Note Payable, as hereinafter alleged .

## CLASS ACTION ALLEGATIONS

34.     Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and the following class of persons similarly situated (the "Class"):

> All persons, other than Defendants and Sandra S. Rabon, who were participants in or beneficiaries of the Plan at any time between March 1, 2008, and the present (the "Class Period").

35.     The members of the class are so numerous that joinder of all members is impracticable. While the exact number of class participants is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, the class is estimated to number well over 5,000 persons.

36.     Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class.  Among the questions of law and fact common to the Class are:

a.     Whether Defendant Plan Fiduciaries breached their fiduciary duties to Plaintiffs and members of the Class by failing to act prudently and solely in the interests of the Plan's participants and beneficiaries; and

b.     Whether all Defendants violated ERISA.

37.     Plaintiffs' claims are typical of the claims of members of the Class because Plaintiffs and the other members of the Class each sustained a diminution of vested benefits arising out of the Defendants' wrongful conduct in violation of federal law as complained herein, and because Plaintiffs and the other members of the Class all have the right to bring action to recover on behalf of the Plan.

38.     Plaintiffs will fairly and adequately protect the interests of the Class and have retained counsel competent and experienced in class actions, ERISA, and complex civil and commercial litigation.   Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

39.     Class action status in this ERISA action is warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the actions, or substantially impair or impede their ability to protect their interests.

40.     Class action status is also warranted under other subsections of Rule 23(b) because (i) prosecuting separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants; (ii) Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole; and (iii) questions of law or fact common to members of the Class predominate over any questions affecting only individual members and a class action is superior to the other available methods for the fair and efficient adjudication of this controversy.

## FACTUAL ALLEGATIONS

I.     **BACKGROUND**

A.     **The Plan**

41.     The Plan is a non-contributory, "defined contribution" or "individual account"
plan within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34), in that the Plan provides for
individual accounts for each Participant and for benefits based solely upon the amount
contributed to those accounts and any income, expenses, gains and losses which may be
allocated to a Participant's account.

42.     The Plan is administered by the Plan Committee, which is appointed by the Board
of Directors of the Piggly Wiggly Group.

43.     Substantially all of the Plan's assets are and have been invested in the common
stock of Greenbax, one of the Plan Sponsors, and Greenbax in turn owns 100% of PWCC, the
other Plan Sponsor.

44.     Prior to April 1, 2014, each Participant's individual account was credited as of the
last day of each plan year with an allocation of shares of the Plan Sponsors' common stock,
based on a Participant's eligible compensation, relative to total eligible compensation.

45.     The Plan was frozen to new employees as of April 1, 2014, and all Participants as
of that date became fully vested in their account balances as of April 1, 2014.

46.     The right of a Participant to diversify his or her account is limited. A Participant
has no right whatsoever to diversify his or her account until reaching the age of 55. At that point,
and provided the employee has at least 10 years of participation in the Plan, he or she may
diversify up to 25% of certain allocated shares for the following five years, and in the sixth year
this percentage increases to 50%.  Given these parameters, the net effect has been that for the

vast majority of Participants, their retirement futures have been tied either exclusively or nearly exclusively to the financial strength of Piggly Wiggly Group stock.

47.     The voting rights of Participants with respect to their Greenbax stock are similarly limited.  For most practical purposes relating to the governance of Piggly Wiggly Group, the Plan's shares of stock are voted by the Plan's Trustees or Trustee, in accordance with the direction of the Plan Committee. Participants are allowed to vote their allocated shares of stock only on questions related to approval or disapproval of a corporate merger or consolidation, recapitalization, reclassification, liquidation, dissolution, sale of substantially all assets, or any similar transaction.

48.     The Plan's chief asset—Piggly Wiggly Group stock—is not publicly traded, and the stock's fair value is required to be determined each year based on an independent appraisal. This fair value is then required to be reported on the Plan's financial statements, which are filed each year with the United States Department of Labor.

49.     The Plan Committee, under the supervision of the Piggly Wiggly Group's Board of Directors, determines the fair value measurement policies and procedures in consultation with the Company's officers.

**B.**     **History of the Company and the Plan's Acquisition of Company Stock**

50.     Since its founding, the Piggly Wiggly Group has been under the domination and control of members of the Newton family, including Defendants David Schools, Burton Schools, Newton, and Edenfield.

51.     The Piggly Wiggly Group traces its origins to 1947, when Joseph T. Newton, Jr. founded Piggly Wiggly Wholesale as a family-owned and managed company specializing in the operation of a chain of grocery stores.  These stores were primarily located in South Carolina and

later in coastal Georgia.  Since that time, the Company has grown and organized itself into various affiliated and subsidiary companies referred to herein collectively as the "Piggly Wiggly Group."  The Piggly Wiggly Group includes Plan Sponsors PWCC and Greenbax.

52.    Many of the individual defendants are related either by blood or marriage to founder Joseph T. Newton, Jr.:  Defendant Newton is his son, Defendant Burton Schools his son-in-law, Defendant David Schools his grandson, and Defendant Edenfield his nephew.

53.    The Piggly Wiggly Group remained exclusively or nearly-exclusively family-owned until approximately 1985, when Newton family members including Defendants Newton and Burton Schools, among others, began selling or otherwise transferring their common stock to the Plan.

54.    Further sales of family-owned stock to the Plan occurred in 2002, when the Plan purchased the then-remaining outstanding shares of PWCC, aside from those PWCC shares held by Greenbax.  The Plan financed this purchase through a $16 million loan from PWCC.

55.    In 2003, PWCC, Greenbax, and the Plan undertook a reorganization, which resulted in the ownership by Greenbax of 100% of PWCC and the Plan's ownership of 69.5% of Greenbax.

56.    Finally, in September 2005, the Plan purchased 32,032.44 shares of Greenbax common stock, resulting in the Plan's ownership of over 99% of outstanding Greenbax common stock, or 129,658.52275 total shares.  The Plan acquired these shares in conjunction with the issuance of notes payable totaling approximately $23,382,000 to approximately 9 individuals who sold their Greenbax shares to the Plan (the "Notes Payable").

57.    Nearly all of the shareholders who sold their shares to the Plan in 2005 in exchange for the Notes Payable were descendants of founder Joseph T. Newton, Jr. or related to

2:16-cv-00616-RMG    Date Filed 02/26/16    Entry Number 1    Page 18 of 62

the Newton family by marriage.  Defendant Newton received a Note Payable in the principal

amount of $7,704,847.11, Defendant Burton Schools a Note Payable in the principal amount of

$2,521,868.38, Defendant Joanne Newton Ayers a Note Payable in the principal amount of

$6,806,358.62, Defendant Mark A. Ayers a Note Payable in the principal amount of

$358,442.83, Defendant Estate of Sean Ayers a Note Payable in the principal amount of

$358,442.83, Defendant Marion Newton Schools a Note Payable in the principal amount of

$4,137,168.70, Defendant Scott Schools a Note Payable in the principal amount of $593,507.49,

Defendant Stephen M. Schools a Note Payable in the principal amount of $593,507.49, and

Defendant John Kizer a Note Payable in the principal amount of $307,676.  Collectively, the

Defendants who held the Notes Payable are referred to herein as the "Defendant Note Holders"[2].

58.    The Notes Payable were issued on September 19, 2005, had a 25-year term, and

required monthly payments including principal and accrued interest.  The interest rate was

recalculated annually and was based on the preceding five-year average of the Company's return

on equity.

59.    As initially structured, the amounts payable by the Plan under the Notes Payable

were guaranteed by Greenbax and collateralized by the unallocated portion of the shares of

Greenbax stock sold to the Plan, which unallocated shares were held in trust by the Plan.  As the

Plan made payments on the principal of the Notes Payable, an amount of the unallocated stock

was then allocated to the employee Participants' individual accounts.

60.    By their express terms the Notes Payable were non-recourse.  The only remedy

that a Defendant Note Holder had against the Plan in the event that the Plan defaulted on its

_____
[2] Defendants Burton Schools and Newton are included among both the Defendant Plan Fiduciaries and the
Defendant Note Holders.

payment obligations was to sell the remaining unallocated shares of Company stock pledged as collateral for the Notes Payable.

### C.   Continuing Control of the Company and Plan by Newton Family and Related Parties

61.     Despite technical ownership of the Piggly Wiggly Group being gradually transferred to the Plan through the Plan's acquisition of PWCC and Greenbax stock from the mid-1980s through the mid-2000s, actual day-to-day control of the Plan and the Piggly Wiggly Group remained largely with members of the Newton family, including Defendants Newton, Burton Schools, David Schools, and Edenfield, and certain additional individuals related to the Newton family or longtime friends of the Newton family, including Defendant Masche.

62.     When founder Joseph T. Newton Jr. retired as President of PWCC in 1979, he became Chairman of the Board of the Piggly Wiggly Group, a position he held until his death in 1997.

63.     Defendant Burton Schools served as an officer of Piggly Wiggly Group until retiring in 1998, when he became chairman of the Board of the Piggly Wiggly Group, taking over this position following the death of his father-in-law Joseph T. Newton Jr.

64.     Defendant Newton became the President of PWCC following his father Joseph T. Newton Jr.'s retirement in 1979, and later, in 1998, Defendant Newton also became the President of Greenbax. Defendant Newton held both these positions until 2007, when he retired from the Company and became its Chairman of the Board, taking over that position from his brother-in-law, Burton Schools.

65.     Defendant David Schools took over the Presidency of Piggly Wiggly Group from his uncle Defendant Newton in 2007 and continues to hold this position today.

66.     Defendant Edenfield, the cousin of Defendants David Schools, Burton Schools, and Newton, has at relevant times served as an Executive Vice-President of the Piggly Wiggly Group.

67.     Upon information and belief, additional members of the Board of Directors of the Piggly Wiggly Group aside from those mentioned above were also members of the Newton family by blood or marriage or were longtime friends of the Newton family.

68.     With respect to governance of the Plan, Defendants Newton and Burton Schools served as Trustees of the Plan beginning on or before 2000 and continued serving in that role through May 31, 2012.

69.     Defendant Edenfield served as a Plan Trustee from approximately 2005 through May 31, 2012. He was re-appointed as a Trustee on December 12, 2014 and continues to serve as a Trustee to the present.

70.     Defendants David Schools and Masche served as Plan Trustees from 2006 to May 31, 2012, and both were re-appointed as Plan Trustees on December 12, 2014, and continue to serve as Trustees to the present.

D.     **Plan Participants Were Kept Ignorant of Financial Conditions and Operations of Piggly Wiggly Group**

71.     During the Class Period communications to Plan Participants provided extremely limited information concerning the financial conditions and results of operations of the Plan and Piggly Wiggly Group.  Annually, following the end of each Plan fiscal year, each Plan Participant was sent an ESOP certificate that listed the number of shares allocated to his or her account, as well as the account's value and a vested account balance.   In addition, each Participant received a short—typically one-page—individual account statement that provided an "account summary" including figures for contributions, transfers, and withdrawals from the

17

individual's account, as well as an "asset summary" listing the total number of allocated shares, a value per share, and a total account value of the shares.

72.     The annual ESOP certificate was accompanied by a one-page letter from the Piggly Wiggly Group president, and during the Class Period from 2008 to the present, this letter has been signed by Defendant David Schools.  As further detailed below, Defendant David Schools's letters typically included an exhortation to the employee about the importance of hard work, as well as an explanation for the mostly poor performance of the company that shifted blame away from the company and its management and onto external causes, like market and economic conditions.

73.     Despite being effectively the owners of the Piggly Wiggly Group, Plan Participants were not regularly provided with sufficient material information about the financial conditions, results of operations, or future plans of the Company, were not regularly told the identities of the full membership of the Board of Directors of the Company or the compensation paid to management and directors of the Company, and, upon information and belief, were not informed about the Company's related party transactions described herein. Nor were the Plan Participants given a meaningful opportunity to be involved in electing the Board of Directors of the Company.

## II.    COLLAPSE IN COMPANY VALUE AND FAILURE OF FIDUCIARIES TO RESPOND

74.     During the Class Period, the Company experienced a precipitous decline in its reported value, and consequently the overall reported value of the net assets of the Plan also sharply declined. The Plan's Form 5500 Annual Reports (the "Annual Reports"), which are filed with the Department of Labor and correspond to Plan fiscal years ending on March 31, document the downturn in the value of the Company and the Plan.

75.     In the face of this calamity, Defendant Plan Fiduciaries did nothing, keeping in place the existing Company board and management, despite a long and sustained period of demonstrated managerial and directorial incompetence.

76.     For much of the same time, and particularly from 2010 to 2015, the values of comparable grocery store chains were either increasing or maintaining their value, in direct contrast with the fortunes of the Company.

A.     **Collapse in Company Value**

77.     As set out on the Annual Reports, over an 8-year period from March 31, 2008, to March 31, 2015, the total reported value of the Piggly Wiggly stock held by the Plan— essentially the Plan's only asset—fell from $88,773,300 in 2008 to $9,026,267 in 2015.  This represents a drop in stock value over eight years of $79,747,033, or over 89% of the reported 2008 stock value.  Over the same period, the net assets of the Plan declined from $59,153,834 in 2008 to $13,623,177 in 2015—a decline of $45,530,657, or nearly 77% of the reported net assets in 2008.

78.     This catastrophic decline decimated the retirement savings of thousands of Piggly Wiggly employees, a large percentage of whom, upon information and belief, made salaries of less than $40,000 per year.

79.     As of March 31, 2008, the reported value of Company stock held by the Plan was $88,773,300, and the net Plan assets stood at $59,153,834. A precipitous and steady decline from these numbers followed.

80.     In the fiscal year ending March 31, 2009, the reported value of the Plan-held Company stock dropped to $72,005,861, a loss of $16,767,439—or almost 19%— in a single year.  The reported value of net Plan assets likewise declined over $15,000,000 to $43,582,020.

81.    In September or October 2009, Defendant David Schools communicated the
following to Plan Participants:

> The fiscal year that ended in March of 2009 was particularly challenging
> for <u>our</u> company and the economy as a whole. . . . Some parts of the economy are
> showing improvement, but, one of the most important economic indicators,
> unemployment, is still too high.   This has a direct negative impact on the
> supermarket industry in general and our company in particular.   However, we
> strongly believe in our future. . . . Like stock in every company, the price of ours
> will rise and fall from time to time.   Our goal is to see our company turn around
> this negative stock-value trend with improved performance and growth.   To
> contribute to that outcome, we must think like owners.   Business success is never
> guaranteed, but our team has never been stronger as we work together to improve
> our company's performance.   Only by doing that – working together – will we
> achieve the true potential of our company and our ESOP.

82.    The following fiscal year saw another decline, with reported total share value
falling to $68,222, 425, a drop of $3,783,436—or over 5%—by March 31, 2010.  The reported
value of net plan assets similarly declined to $41,906,983.

83.    Despite these numbers, Defendant David Schools wrote to Plan Participants in
October 2010, explaining:

> There is no avoiding the fact that the last two fiscal years have been
> challenging for our company and the economy as a whole. . . . However through
> aggressive cost management and well thought out operational changes, including
> the introduction of the Pig Way, ***we have greatly improved our financial
> performance during the most recent fiscal year. . . . Our stock price
> performance is not where we would like to see it, but the trend is improving.*** . . .
> I could not be more proud of the progress we, as owners, have made in continuing
> to improve the financial performance of our company.  Our work is not done and
> many rewards are yet to come.  But, <u>remember these things:  your work and
> ownership of Piggly Wiggly/Greenbax has enabled you to continue to help
> support your families, educate your children, and give you some level of financial
> security in a time in our nation's history during which those things could not be
> taken for granted.</u> (Emphasis Added in Boldface)

84.    Despite the manner in which the plan participants were being misled by such
statements, a similar decline followed in the 2010-2011 fiscal year, with the reported total stock

value dropping $3,419,095 to $64,803,330, again a decline of approximately 5%. The reported

net plan assets also dropped again, falling to $40,523,681.

85.    Notwithstanding this continued decline, Defendant David School wrote to plan

participants in September 2011, proclaiming

> Our stock price performance is still not where we would like to see it, ***but
> the trend continues to improve***. . . We must continue to think like owners. Only
> by working together will we achieve the true potential of our company and our
> ESOP. . . . ***Our current fiscal year through July is showing improvement over
> our last fiscal year. Let's keep up this momentum and continue to focus on
> immediate improvements that translate into long-term success for Our company
> and Our ESOP***." **(Emphasis added)**

86.    But worse was yet to come, with the next two fiscal years seeing declines

unmatched since the period of 2008 to 2009. In the fiscal year ending March 31, 2012, the total

reported value dropped $11,610,921—or nearly 18%—to $53,192,409. The reported net plan

assets fell also to $32,532,521.

87.    In the fiscal year ending March 31, 2013, the total reported value dropped a

shocking $21,873,393—or 41%—to $31,319,016. The reported net Plan assets experienced a

similar sharp decline to $12,341,592, a drop of some $20 million. As is generally the case, the

only indication Plan Participants would have received about this drop would have come

approximately 7 months later, when they received an annual communication from the Plan

noting the decline in the value per share of Company stock.

88.    In the fiscal year ending March 31, 2014, the reported total stock value dropped

again to $27,837,685, a decline in overall value of $3,481,331, or 11%. The reported net Plan

assets experienced a similar decline to $8,936,174.

89.    Finally, in the fiscal year ending March 31, 2015—the final year for which data is

available, the reported total stock value dropped yet again to $9,026,267, a decline in overall

value of $18,811,418, or nearly 68%. The reported value of plan assets over the same period rose to $13,623,177, primarily due to the reduction in the Plan's liabilities with the payoff of the Notes Payable, as described below.

90.     The charts that follow document this dramatic decline in the reported value of Company stock and the net assets of the Plan. From 2008 to 2014, the reported value of Company stock in the Plan's Form 5500s trended as follows, declining from a per share value of $684.67 per share in 2008 to $98.12 per share in 2015:



|  | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 |
|---|---|---|---|---|---|---|---|---|
| Total Value | $88,773,300 | $72,005,861 | $68,222,425 | $64,803,330 | $53,192,409 | $31,319,016 | $27,837,685 | $9,026,267 |
| Per Share | $684.67 | $555.35 | $526.17 | $499.80 | $410.25 | $241.55 | $214.70 | $98.12 |

91.     Reflecting a like trend, the net Plan assets as reported on the Plan's Form 5500s declined as follows:



| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 |
|---|---|---|---|---|---|---|---|---|
| Net Plan Assets | $59,153,834 | $43,582,020 | $41,906,983 | $40,523,681 | $32,532,521 | $12,341,592 | $8,936,174 | $13,623,177 |

92.    Some of the declines in net plan assets were due, of course, to distributions to Plan Participants and Beneficiaries.  But even adding back these annual distributions to the reported net Plan assets, there was nevertheless a sharp decline in the value of the Plan, as reflected on the chart and table below:



| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 |
|---|---|---|---|---|---|---|---|---|

| Net Plan Assets Plus Distributions | $59,153,834 | $48,393,474 | $47,904,658 | $48,205,071 | $40,233,128 | $21,369,971 | $21,285,932 | $30,552,196 |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |

### B.     Comparable Grocery Store Chains Experience Growth in Value

93.     At the same time at the value of Piggly Wiggly Group was in sharp decline from 2010 to 2015, the value of other comparable grocery store chains was actually ***increasing***.  The growth in the value of these comparable companies demonstrates how other grocery store chains fared during the same time as Piggly Wiggly was sliding into financial ruin.

94.     For example, the value of Ingles stock, as reported on Ingles' most recent 10-K filed with the United States Securities and Exchange Commission ("SEC") increased over the period of 2010 to 2015 from $14.42 per share in 2010 to $56.39 in 2015.  (A company's Form 10-K commonly will report the stock performance of the company over a 5-year period as compared with both a peer group of comparable companies and the S&P 500, showing how an investment of $100 would fare in each case.)  An investment of $100 with Ingles in 2010 would have fared well:



Source: Ingles Markets, Inc., Annual Report (Form 10-K) p. 16 (Dec. 10, 2015).

95.    Similarly, the per share value of Kroger increased some 400% between 2010 and 2015, from $10.68 in 2010 to over $40.00 today.  The five-year trend for $100 invested in Kroger stock shows a similar positive trajectory:



Source:  The Kroger Co., Annual Report (Form 10-K) p. 8 (March 31, 2015).

96.    Similarly, the per-share value of Weiss Markets, a regional grocery store chain the Mid-Atlantic states, while increasing somewhat more modestly, nevertheless increased, as reflected on Weiss's most recent 10-K:



Source: Weiss Markets, Inc., Annual Report (Form 10-K) p. 8 (Dec. 12, 2015).

25

97.    The same trend holds for Publix, where $100 invested in 2009 would have grown to 237.04 by the same time in 2014.



|  | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|---|
| ● Publix | $100.00 | 124.81 | 130.12 | 150.63 | 205.80 | 237.04 |
| p S&P 500 | 100.00 | 113.82 | 116.31 | 132.68 | 177.94 | 206.01 |
| ■ Peer Group [1] | 100.00 | 101.29 | 104.03 | 99.46 | 155.04 | 202.64 |

Source: Publix Super Markets, Inc., Annual Report (Form 10-K) p. 8 (March 2, 2015).

### C.    Plan Fiduciaries Make No Changes in Company Managers or Officers Despite the Decline

98.    Rather than replace the Board of the Company or force the Board to bring on competent management, Defendant Plan Fiduciaries including Defendants David Schools, Burton Schools, Newton, Edenfield, and Masche, essentially did nothing meaningful to prevent or arrest the Company's steady financial decline during the Class Period, ignoring their duties under ERISA, as the retirement savings of the Participants were decimated.

99.    The results of comparable companies show that with competent management , it is reasonable to believe the Company could have increased its value, similar to the positive growth and increase in value that was experienced by chains like Ingles, Kroger, Weiss, and

2:16-cv-00616-RMG     Date Filed 02/26/16     Entry Number 1     Page 30 of 62

Publix, as set forth above. At the very least, the value of Piggly Wiggly Group might at least have remained constant and not fallen so significantly.

100.    Despite the precipitous declines in the reported value of the Company during the Class Period, Defendants Newton, Burton Schools, David Schools, Edenfield, and Masche retained their positions as officers and/or directors of the Piggly Wiggly Group.

101.    Upon information and belief, no new senior management or board members from outside the Company were brought on during the Class Period, nor were any senior managers or board members removed despite the poor performance of the Company.

102.    The Defendant Plan Fiduciaries, including Defendants David Schools, Burton Schools, Newton, Edenfield, and Masche, further permitted the Plan to continue to hold Company stock year after year, notwithstanding its precipitous decline.

103.    This inactivity of the Defendant Plan Fiduciaries in the face of the Company's decline is not surprising given that the ability of the Defendant Plan Fiduciaries to enrich themselves at the expense of the Participants would have been jeopardized had the Company's Board of Directors and management been replaced or had the Company's stock been sold to an investor.

104.    Moreover, the Defendant Plan Fiduciaries failed to seek any remedy through a derivative action for this inactivity during the Class Period by the Company's Board of Directors and management.

105.    Defendant Plan Fiduciaries were therefore constantly looking out for themselves, prioritizing their personal self-interest in keeping Company cash flowing into their own pockets over the interests of the Plan and its Participants and Beneficiaries, contrary to the requirements of ERISA.

III.    **CORRUPT PRACTICES, MISMANAGEMENT, AND INSIDER DEALS CONTRIBUTE TO COMPANY'S DECLINE**

106.    Defendants Newton, Burton Schools, David Schools, Edenfield, Masche were also involved in Company-wide corruption, including over-compensation, insider deals, and mismanagement during the Class Period as further detailed below, all of which contributed to the financial downturn of the Company.

107.    Despite having knowledge of these practices, Defendant Plan Fiduciaries, including Defendants Newton, Burton Schools, David Schools, Edenfield, and Masche, did nothing to attempt to remove the Company's Board or Management.

108.    Further, despite having knowledge of these practices, Defendant Plan Fiduciaries, including Defendants Newton, David Schools, Burton Schools, Edenfield, and Masche, failed to bring derivative actions on behalf of the Company against themselves as directors and managers in order to recover the substantial losses to the Company caused by these practices.

A.    **Overcompensation and Excessive Benefits Paid to Company Management and Directors**

109.    During the Class Period—and at the same time as the Company was hemorrhaging money—Defendants Newton, Burton Schools, David Schools, Edenfield, and Masche, and other top Company management and directors were paid grossly exorbitant compensation and received excessive benefits.

110.    The excessive benefits provided to top Company management and directors, including Defendants Newton, Burton Schools, David Schools, Edenfield, and Masche, included perks such as luxury automobiles leased by the Company.

111.    Among the luxury vehicles that the Company has leased for Defendant Newton is a new Mercedes in 2014; the Company has paid the property taxes on this car every year to the

28

present. The Company provided Jerry Durham, who served as a Company executive, with a Jaguar convertible during the Class Period and, upon information and belief, provided other luxury cars to other Defendants.

112.    Top Company management and directors, including Defendants Newton, Burton Schools, David Schools, Edenfield, and Masche, continued to receive their exorbitant compensation and benefits even as the Piggly Wiggly Group lost millions of dollars and some 90% of its value between 2007 and 2015.

113.    Members of the Company's Board of Directors were paid excessive compensation for minimal services, with Defendants Newton and Burton Schools receiving compensation of $100,000 per year solely for their service as directors.

114.    During the Class Period, the Company restructured the retirement benefits it offered to top Company management solely to benefit management.

115.    Historically the Company had offered top management "golden handcuff" deferred compensation agreements that included handsome benefits during retirement, including 15 years of full salary following retirement, provided the employee was actually still employed by the Company at the age of 65.

116.    As the Company began to collapse financially, current top management who were parties to these deferred compensation agreements, including Defendants David Schools, Masche, and Edenfield, realized their benefits would never vest because the Company would probably no longer exist when they reached age 65, and the Company agreed to renegotiate the golden handcuff agreements.

117.    Defendants David Schools, Masche, and Edenfield were all parties to renegotiated deferred compensation agreements.

118.    Under these renegotiated deferred compensation agreements, the Company agreed to accelerate deferred compensation payments to top management notwithstanding the age 65 vesting requirement.

119.    As of May 30, 2014, Defendants David Schools, Edenfield, and Masche alone received approximately $1,460,000 pursuant to renegotiated deferred compensation agreements.

120.    During the Class Period, top Company management, including Defendants David Schools, Edenfield, and Masche, also received stay bonuses at various times.

121.    As of May 30, 2014, 12 persons in Company management who were members of a so-called "Executive Leadership Team", including Defendants David Schools, Masche, and Edenfield, had received severance "stay bonuses" totaling well over $500,000. Defendants David Schools, Edenfield and Masche alone received approximately $200,000 in such bonuses.

122.    The total amount of severance, accelerated deferred compensation payments, and bonuses paid by the Company to Defendant David Schools up to May 30, 2014 was approximately $690,000, the total amount paid to Defendant Edenfield was approximately $750,000, and the total amount paid to Defendant Masche was approximately $675,000.

123.    In total the Company had paid out as of that date over $3.7 million in severance, bonuses, and accelerated deferred compensation to the members of the Executive Leadership Team, including Defendants David Schools, Edenfield, and Masche.

124.    At the same time as the Company was providing its management and directors with grossly excessive compensation and benefits and renegotiating golden handcuff retirement agreements for top management, the Company was hemorrhaging money, laying off employees, freezing employee salaries, ceasing the prior practice of paying employee bonuses, failing to

30

maintain and improve stores, and generally sliding into financial ruin as detailed heretofore and below.

125.    Defendant Plan Fiduciaries did nothing to attempt to replace the Board, force out management, or otherwise pressure the Board to rein in the excessive compensation, benefits, and accelerated retirement plans being provided to Company officers and directors as heretofore alleged.  Furthermore, Defendant Plan Fiduciaries did not pursue any derivative actions against the Company's directors and officers for breach of their duties of loyalty, care and good faith.

**B.    Entry into Above-Market Leases**

126.    Corrupt practices among top management were not limited to the payment of excessive compensation and benefits.  During the Class Period, Defendants David Schools, Edenfield, and Masche, with the cooperation and/or acquiescence of other Piggly Wiggly Group officers and directors, also participated in insider real estate deals that benefitted their own personal interests while harming Piggly Wiggly Group.

127.    Pursuant to these insider deals, PWCC was the lessee on certain leases that included rates substantially in excess of market rates during the Class Period.  The resulting above-market rent payments were funneled through a network of entities that ultimately paid money into the pockets of Defendants David Schools, Edenfield, and Masche.

128.    At times, this scheme was effected in collaboration with the Columbia, SC, development firm Asbill-Christopher.

129.    Piggly Wiggly Group insiders, including Jerry Durham, who served as a Company executive, Defendants David Schools, Edenfield, and Masche, were directors of and/or shareholders in an entity known as the Dallas Cotton Club, Inc. (the "Dallas Cotton Club"), a

South Carolina corporation founded in 1993 and for which Defendants Burton Schools, David Schools, and Edenfield have at various times served as registered agents.

130.    Upon information and belief, the Dallas Cotton Club was an owner or member, direct or indirect, in another entity, A-C Development Club, LLC ("ACDC"), a South Carolina limited liability company formed in 1996 and for which Defendants Burton Schools served as a registered agent and Defendant Edenfield is the current registered agent.

131.    Beginning in the 1990s, ACDC or LLCs controlled directly or indirectly by or affiliated with ACDC acquired numerous properties, particularly near the South Carolina Coast, and developed these properties to be leased to PWCC to serve as Piggly Wiggly stores.  ACDC or LLCs affiliated with ACDC owned the underlying property, and PWCC was a tenant on the properties pursuant to long-term leases.

132.    At the direction of Piggly Wiggly Group officers and directors including Jerry Durham and Defendants Newton, Burton Schools, David Schools, and Edenfield, PWCC entered into these long-term leases, which were at substantially above-market rates.

133.    Some of the properties developed by ACDC and rented to PWCC at above-market rates included Company stores in Georgetown, Hollywood, Moncks Corner, Folly Beach, Bluffton, and Pawley's Island, South Carolina.

134.    PWCC entered into and/or remained a party to these long-term leases at above market rates during the Class Period and did not attempt to renegotiate them to fair market value, despite the continuing financial pressures on the Company and the effective control of the lessors by Piggly Wiggly Group insiders.

135.     These above-market rates harmed Piggly Wiggly Group but benefitted ACDC, the LLCs affiliated with ACDC, and ultimately the Dallas Cotton Club and its owners, including Jerry Durham and Defendants David Schools, Edenfield, and Masche.

136.     During the Class Period, the difference between market-rates and the above-market rates paid pursuant to the lessee was ultimately funneled each month into the Dallas Cotton Club.

137.     Defendants David Schools, Edenfield, and Masche, as well as Jerry Durham, in turn received monthly payments from the Dallas Cotton Club. During the Class Period these monthly payments at times totaled $7,000 or more to each recipient.

138.     Defendant David Schools provided monthly instructions on what the payments to the owners of the Dallas Cotton Club should be, and signed the checks paid out to those owners, including himself.

139.     On a date unknown during the Class Period, Greenbax bought out Jerry Durham's interest in the Dallas Cotton Club and began receiving his share of the payments.

140.     In 2012 and 2013, when BiLo and Harris Teeter were negotiating with Piggly Wiggly Group to purchase some of the stores subject to the above-market leases, both BiLo and Harris Teeter refused to pay the existing lease rates, recognizing that the leases were substantially above market rates.

141.     In order to finalize the deals with BiLo and Harris Teeter for the sale of the stores, PWCC, at the direction of Defendants David Schools, Edenfield, and Masche, agreed to remain a tenant or otherwise obligated under the leases and sublet (or otherwise allowed the lease of) the stores to BiLo and Harris Teeter at fair market rates.  PWCC further agreed or otherwise

remained obligated to pay the difference under the leases between the new market-rate rents and the required above-market rates rather than attempting to re-negotiate the leases with ACDC.

142.    PWCC made this decision, rather than attempting to re-negotiate the leases, so as not to interfere with the money being funneled through the Dallas Cotton Club to Piggly Wiggly Group insiders including Defendants David Schools, Edenfield, and Masche.

143.    For example, the Company's store at Folly Beach was paying $63,000 a month in rent to an entity controlled by ACDC prior to the store's sale to Harris Teeter.  After that sale, Harris Teeter was paying only $45,000 per month in rent, and upon information and belief, the Company remained liable each month for the $18,000 difference.

144.    Upon information and belief, PWCC remains to this day a party to or otherwise obligated under the above-market leases, and payments continue to members of the Dallas Cotton Club, including Defendants David Schools, Edenfield, and Masche.

145.    During the Class Period, Defendant Plan Fiduciaries did nothing to remove the Company management or directors that caused or acquiesced in the entry and continuance by PWCC in the above-market leases, despite the fiduciaries' knowledge of both the fact that PWCC entered into the above-market leases and the harm that these leases were doing to the Company by sucking out its money into the hands of Piggly Wiggly Group insiders, including Defendants David Schools, Edenfield, and Masche.  Furthermore, Defendant Plan Fiduciaries did not pursue any derivative actions against the Company's directors and officers for breach of their duties of loyalty, care and good faith.

### C.    Mismanagement of the Company During the Collapse

146.    The mismanagement of the Company by Defendants David Schools, Edenfield, and Masche—and the failure of the Company's Board members, including Defendants Burton

Schools, Newton, David Schools, Edenfield and Masche to redress this mismanagement—bears much of the responsibility for the Company's financial deterioration during the Class Period. This mismanagement involved significant losses to the Company due to, among other things, poor site-selection for new stores, counterproductive expense reductions and flawed company policies and initiatives that drove away customers.

147.    Company management's mismanagement led the Company to enter into disadvantageous arrangements with lenders in order to support the carelessness and imprudent manner in which the Company had been and was being run and its assets deployed.

148.    Upon information and belief, in the mid-2000s, the Company took out significant loans from Wells Fargo to meet its cash flow needs.

149.    Upon information and belief, in approximately 2007 or 2008, Wells Fargo sought to remove itself as the Company's lender, given the decline in value of the Company.

150.    Upon information and belief, the Company negotiated with Crystal Financial to refinance the Wells Fargo Loan, and Crystal Financial provided a high interest rate, asset-based loan to the Company, which provided the Company with a daily line of credit based in part on Company accounts receivable and inventory.  The accounts receivable were held by Crystal Financial as collateral, and Crystal Financial had a security interest in the Company's inventory.

151.    Upon information and belief, the interest rate for these loans with Crystal Financial varied between 9.33% and 11% in 2010 alone, at the same time as the prime rate was at 3.25%.

152.    Upon information and belief, a financial consultant required by Crystal Financial, Carl Marks, reviewed the Company accounts receivable and other financial indicators each day

and helped Crystal Financial determine what amounts to loan the Company at the high interest rates Crystal Financial offered.

153.    Upon information and belief, around 2010, the Company began dipping into the reserve accounts historically kept by each individual store to pay annual real estate taxes and insurance premiums in order to make the Company's loan payments to Crystal Financial.

154.    The depletion of these reserve accounts in turn left little money for regular maintenance and upgrades at Company stores, and the appearance to customers of the stores declined as a result.

155.    Upon information and belief, the Company also made a decision in or around 2010 to raise its grocery prices. This, combined with the decline in store appearance, resulted in a significant loss of customers—including the Company's own employees—many of whom began buying groceries at other grocery stores that offered lower prices.

156.    Upon information and belief, Company management also displayed repeated and marked incompetence in selecting sites for new Company stores in the late 2000s. Upon information and belief, Defendant Masche was the member of management most involved in this process, and his missteps were many and seemingly without any consequence to his salary or job status at the Company.

157.    Upon information and belief, at the direction of Defendant Masche, the Company entered into agreements that put a disproportionate share of the costs for store site selection and development on the Company, rather than the developer.

158.    Upon information and belief, Company management caused highly excessive amounts to be paid to design and build new stores, which led to over-market rental rates and operating costs. For example, to develop the Company's store at Market Common in Myrtle

36

Beach, which opened in April 2008, over $11 million was spent—a figure far in excess of a reasonable amount to spend on developing a new store.

159.    Upon information and belief, Defendant Masche similarly mismanaged the Company's efforts in selecting a site for and building a store in Sunset Beach, NC.  The Sunset Beach store was such a spectacular failure that it was closed in April 2008, less than a year after opening, and was then sold to Lowes Foods.  Upon information and belief, the sale to Lowes Foods resulted in a huge loss to the Company.

160.    The mismanaged efforts in developing the stores in Myrtle Beach, SC, and Sunset Beach, NC, were not isolated.  Upon information and belief, many of the other stores developed by the Company in the late 2000s were unable to break even due to massive overhead costs and poor site selection.

161.    Upon information and belief, during this time of mismanagement, certain members of management at corporate headquarters privately spoke of the Company being "on the verge of bankruptcy."

162.    Despite the internal warnings of management that the Company was at risk of bankruptcy, and despite the repeated and demonstrated incompetence of management, Defendant Plan Fiduciaries including Defendants David Schools, Newton, Burton Schools, Edenfield, and Masche, did nothing to remove or change the Board or force the Board to remove management.

163.    Further, despite knowledge of all these practices giving rise to meritorious derivative claims, Defendant Plan Fiduciaries, including Defendants David Schools, Newton, Burton Schools, Edenfield, and Masche, took no steps to bring such claims on behalf of the Company against themselves as Company managers and directors.

164.    Upon information and belief, Sandra S. Rabon, in her capacity as both a Company manager and Plan trustee, from time to time recommended expenditure reductions and questioned and objected to the mismanagement of the Company as hereinabove alleged that contributed to its financial collapse, but her concerns were rebuffed by other Company managers and directors and Plan Fiduciaries, including Defendants David Schools, Newton, Burton Schools, Edenfield, and Masche.

IV.    **COMPANY RESPONDS TO DOWNTURN ONLY AFTER THE PERSONAL INTERESTS OF INSIDERS BECOME AT RISK**

165.    The Company's response to its continued decline in value during the Class Period came belatedly in late 2012 and was prompted only by the fact that Plan payments to the Defendant Note Holders who held the Notes Payable became in jeopardy.

166.    This risk to Defendant Note Holders then led to a series of actions, including an unauthorized  significant sale of Company assets in 2013 and another sale of substantially all the then-remaining assets of the Company in late 2014.

167.    With the cash the Company received from the 2013 sale, the Defendant Plan Fiduciaries improperly colluded with the Defendant Note Holders to perpetrate a substantial insider payoff of the Notes Payable.  In this collusion, the Defendant Plan Fiduciaries paid the Defendant Note Holders an amount far in excess of the actual value of the Notes Payable in return for a settlement of the Notes.

168.    In addition to perpetrating this improper collusion, Company management and directors, with the cooperation and consent of the Defendant Plan Fiduciaries, ignored the rights of Plan Participants in both the 2013 and 2014 sales. In the 2013 sale the Company never sought the approval of the Plan participants as is required under applicable law when a Company adopts a plan to sell substantially all its assets.  Further, in the 2014 sale, the financial information the

38

Company provided to Participants when it did seek approval for a sale of assets was woefully inadequate, in violation of applicable law.

A.  **Piggly Wiggly Management and Board are Prompted to Take Action Only When Payments on Notes Payable Stop**

169.    Calendar year 2012 saw one of the steepest declines in reported Company value during the Class Period as well certain actions by the Board of the Company and the Plan that were related to that decline, including the appointment of a directed Trustee and the engagement of what the Company described in official correspondence as an "investment banking advisor".

170.    Defendants Newton, Burton Schools, David Schools, Edenfield, and Masche, as well as Sandra S. Rabon, all served as Plan Trustees until May 31, 2012, when they resigned upon the appointment by the Piggly Wiggly Group Board of Reliance Trust Company ("Reliance") to serve as a directed Trustee of Plan.

171.    Despite the appointment of Reliance, the Defendant Plan Fiduciaries, including Defendants Newton, Burton Schools, David Schools, Edenfield and Masche, retained power to direct most of the decisions of Reliance with respect to the Plan, including decisions regarding Plan investments, Plan administration, whether to bring legal claims, and the voting of shares of Company stock in Board elections.

172.    Sometime around September 2012, after five straight years of losses in which nearly half the value of the Company was squandered and in the midst of a fiscal year in which the Company's value would later be reported as having declined another 41%, the Board of Piggly Wiggly Group engaged an outside consultant, Mark Gross, the principal of Surry Investment Advisors, LLC, to assist the Board in evaluating the Company and the strategic alternatives available to it.

173.    Also in September 2012, payments from the Plan on the Notes Payable were suspended.  On information and belief, the payments were suspended when the Company's lender, Crystal Financial, insisted that the Company cease funding Plan payments on the Notes Payable.  Promptly following the pay-off of the Crystal Financial loan, payments on the Notes Payable recommenced in June 2013.

174.    Plan documents termed Mr. Gross an "investment banking advisor," but in reality, upon information and belief, Mr. Gross was primarily a broker who had previously worked with the Company in a sale of some of its warehouse assets.

175.    On information and belief, the Company's Board chose to seek out Mr. Gross's assistance in September 2012 only because continuing payments on the Notes Payable due to Defendants Newton, Burton Schools and the other Defendant Note Holders were seen as jeopardized.

176.    Upon information and belief, the Board made a strategic decision around or shortly following the time it engaged Mr. Gross in 2012 to begin the process of selling all or substantially all of the Company's assets, and it instructed Mr. Gross to begin shopping these assets in an effort to find a buyer or buyers.  As stated in the Company's October 2014 Information Statement sent to the Plan Participants:  "Based upon this analysis [i.e., the analysis undertaken by the Board and Company management following the September 2012 engagement of the investment banking advisor], the Board, in consultation with its advisors, concluded that [Greenbax] should pursue exiting the retail grocery market and the wholesale grocery business and liquidate all of its remaining assets."

177.    Despite making this decision, the Board waited over two years, in contravention of state and federal law and the terms of the Plan, to seek approval for such a transaction from the Plan Participants, who had a right to instruct how the Plan would vote on such a decision.

178.    Specifically, pursuant to Internal Revenue Code ("IRC") 401(a)(22), 26 U.S.C. § 401(a)(22), in order to be a qualified retirement plan, an employee stock option plan like the Plan must meet the requirements of IRC 409(e). Section 409(e) provides that for an employer that does not have registered securities (such as the Piggly Wiggly Group), participants and beneficiaries must be entitled to vote with respect to "any corporate matter which involves the voting of such shares with respect to the approval or disapproval of any corporate merger or consolidation, recapitalization, reclassification, liquidation, dissolution, sale of substantially all assets of a trade or business or such similar transactions as the Secretary may prescribe in regulations." The Plan itself includes nearly mirror language to IRC § 409(e), establishing this right of Plan participants in Article 9.12(c). Pursuant to South Carolina Code Section 33-12-102, shareholder approval is required for the sale of all or substantially all of a corporation's property otherwise than in the usual and regular course of business.

**B.    2013 Sales of Company Assets Proceed Without Approval from Participants**

179.    The sale of Company assets in liquidation of the Company began in earnest in 2013, when the Company sold 30 stores and an additional location under construction to 2 different grocery store chains, BiLo and Harris Teeter. The Company also sold another 5 stores, 4 to an independent operator and 1 to another grocery chain. Proceeds from these sales (collectively, the "2013 Asset Sales") were used in part to repay debts of the Company, including all amounts owed under the Company's loan from Crystal Financial.

180.    Commenting on the 2013 Asset Sales, Defendant David Schools later observed in a letter to the Company's directed Trustee on September 29, 2014, that the "the Company's most desirable retail stores were sold in 2013," and that the stores that remained after this sale "[were] largely either unprofitable or in rural locations and have not attracted interest by the larger grocery store market chains."

181.    The 2013 Asset Sales were a clear first step towards a sale of substantially all the assets of the Company, but Company management did not bother to seek approval from the Plan Participants at this time for such a transaction, despite the Participants' right, as established in federal and state law and in the Plan itself, to vote on whether or not to approve such a sale.  This unlawful exclusion from involvement of Plan Participants was consistent with the long-standing practice of the Defendant Plan Fiduciaries to keep Plan Participants locked out of any information about the true financial state of the Company.

182.    The Company also began a massive round of layoffs in 2013, as it announced in November 2013 that it would close certain of its warehouse and distribution centers and outsource these services to other companies.

183.    Even as the Company continued its steady decline, excessive compensation paid to management and insiders continued as set forth in hereinabove, as did payments on above-market leases as set forth hereinabove, and payments from the Plan to Newton family members on the Notes Payable resumed in June 2013.

184.    Members of the Executive Leadership Team also received substantial "stay bonuses" resulting from the 2013 Asset Sales as set forth in greater detail in hereinabove.  Upon information and belief, these "stay bonuses" arrangements would not have been entered into if the Company had not already decided to commence its own liquidation.

42

**C.    Defendant Plan Fiduciaries and Defendant Note Holders Collude on a Large and Unjustified Settlement of the Notes Payable in Early 2014**

185.    With cash assets from the 2013 Asset Sales in hand—and while the Company was still in financial distress—Company insiders and Plan fiduciaries, whose identities constantly overlapped, began orchestrating a scheme in or around early 2014 to drain assets from the Company and the Plan into the hands of the Defendant Note Holders, all of whom were either Company insiders or members of the Newton Family.

186.    This scheme involved a settlement of the Notes Payable between the Company (and effectively the Plan) on the one hand and the Defendant Note Holders on the other, and the ultimate cancellation of the Notes.

187.    This scheme was effected in several steps.  First, in March 2014 the Defendant Note Holders entered into agreements to sell and assign the Notes Payable, together with their security agreements and other loan documents, to the Company, and the Company replaced the Defendant Note Holders as the holder of the Notes Payable as of March 31, 2014.

188.    Subsequent to March 31, 2014, the Company then settled the Notes Payable with the Defendant Note Holders for an aggregate cash payment of $9,079,440, using assets that belonged not only to the Company but also effectively the Plan, since the Plan owned nearly 100% of the Company.

189.    Finally, on December 12, 2014, the Company and the Plan entered into a redemption agreement, pursuant to which the unallocated shares of Company stock pledged as collateral for the Notes Payable were redeemed and cancelled by the Company and the outstanding loans owed by the Plan were forgiven.  Upon information and belief, the Defendant Plan Fiduciaries postponed the closing of this stock redemption from approximately March 2014 (when the Notes Payable were acquired by the Company) until December 2014 (when this stock

redemption occurred) in order to dilute the Plan Participants' upcoming vote, as described below, on the sale of the Company's wholesale business and related matters. The postponement allowed the unallocated shares held by the Plan (and to be voted by the Plan Trustee) to remain outstanding for voting purposes.

190.    By early 2014, the actual value of the Notes Payable was far less than both the outstanding principal amount that remained on the Notes and far less than the $9,079,440 the Company—and effectively the Plan—paid for them in settlement. That lower actual value resulted from the legal requirement that the Notes Payable be without recourse by their express terms.

191.    ERISA regulations provide that any loan obligations of an ESOP be without recourse against the ESOP and that the only assets of the ESOP that may be given as collateral are certain qualifying employer securities, such as Piggly Wiggly Group unallocated stock. 29 C.F.R. § 2550.408b-3(e).

192.    Therefore, had the Plan defaulted on its payment obligations on the Notes Payable, the sole recourse against the Plan was for the holders of the Notes Payable to sell the unallocated shares of Company stock that were pledged as collateral for the Notes Payable.

193.    By early 2014, 19,463.52 shares were unallocated and held by the Plan as security for the Notes Payable. The reported value of these shares as of March 31, 2014, based upon the reported value in the Plan's Form 5500 of $214.70 per share, was $4,178,818.

194.    Upon information and belief, Company management provided faulty financial information for the appraisals upon which this per share value was based, and even this valuation was likely inflated.

195.    But even assuming the accuracy of the reported value of $214.70 per share and a resulting value of $4,178,818 for the Notes Payable, the Company's over $9 million payout to the  Defendant Note Holders was  ***$4,900,622 more than the reported value*** of the unallocated Company stock pledged as collateral for the Notes.

196.    The cash that effected this settlement, while technically structured by the Defendant Plan Fiduciaries as coming from the Company, was also a Plan asset.  As the nearly 100% owner of the Company, the Plan was the ultimate owner of all Company assets, and after the Company effectively decided in 2013 to embark on a sale of substantially all assets and pursue a winding down, there was no material difference between Company assets and Plan assets, as any Company assets that remained following a winding down would necessarily flow to the Plan, unless the Defendants found other ways to appropriate those assets for themselves.

197.    Structuring the settlement of the Notes Payable as they did, the Defendant Plan Fiduciaries did an "end run" around ERISA's requirement that Plan borrowing be without recourse against the Plan beyond the unallocated employer securities held as collateral. Nearly $5 million in Plan assets were drained away to the insiders at a time of acute financial stress for both the Company and the Plan.

198.    Defendant Note Holders were well aware or should have been well aware of the essential facts of this improper transaction, in that they knew or should have known the value of the Company had been in constant decline, knew or should have known that the value of their Notes was much diminished from the stated principal still owed by the Plan, and knew or should have known that payments on the Notes had been suspended for some 10 months from September 2012 to June 2013 because the Plan could not meet its payment obligations on the

Notes.  Despite this, the Defendant Note Holders still negotiated an arrangement that gave them over $9 million dollars in settlement of the Notes Payable.

**D.    Company Seeks Approval in late 2014 for a Sale of Substantially All Assets and Winding Down of the Company**

199.    Having looted Company and Plan assets in settlement of the Notes Payable with themselves and their family members and friends who made up the Defendant Note Holders, Company management and directors, including Defendants David Schools, Newton, Burton Schools, Masche, and Edenfield agreed on September 5, 2014, for the Company to enter into an asset purchase agreement with C&S Wholesale Grocers, Inc. ("C&S") for a sale of substantially all of the then-remaining assets of the Company.

200.    Until they were forced by the Company's deteriorated financial state to come to the deal table with C&S, Company insiders, including Defendants David Schools, Newton, Burton Schools, Masche, and Edenfield, had no interest in pursuing such a sale, as it would have brought to an end their lucrative sinecures that were draining the Company of precious resources.

201.    Because they waited so long to shop the Company through years of financial losses, the sale to C&S was effectively a fire sale at a bargain basement price, far lower than the amount the Company could have received for its assets had a sale been conducted earlier in the Class Period.

202.    On October 1, 2014, Argent Trust Company ("Argent"), which had by that time replaced Reliance as the directed Plan Trustee, distributed to participants a "Notice of Action" that requested approval from Plan participants for both the proposed sale to C&S and a winding down of the Company. The Notice further indicated that the Board of the Piggly Wiggly Group had voted unanimously in favor the proposed transaction and the winding down and was recommending that participants vote in favor also.

203.    The Notice of Action was accompanied by a short Information Statement concerning the proposed sale and dissolution.  The Information Statement discussed in general terms the strategic factors that first led the Company Board to consult with an "investment banking advisor" in September 2012, as well as the Board's decision to exit the grocery store business and pursue a winding down of the Company.

204.    The Information Statement also discussed some of the material terms of the proposed sale agreement. One of these terms was a 4-year covenant not to compete that would be required of senior Piggly Wiggly Management that did not become employees of C&S.  The consideration to be paid for the covenant not to compete was $700,000, and upon information and belief, this consideration has been paid to senior Company management, including Defendants David Schools, Edenfield, and Masche.

205.    The Information Statement was facially deficient in that it provided no or scanty information concerning the value of the Company, its financial statements or financial performance, management's discussion and analysis of the Company's financial results of operation and financial condition, the results of any independent appraisals of or reports concerning the Company, its business or financial prospects, the history leading up to the transactions to be approved, the fairness opinion received by the Plan's trustee, the sales prices contemplated by the verbal commitments that the Company had received to sell seventeen of its remaining 19 grocery stores, or the portion of the proceeds to be received by Company directors and management for the A-C Development real estate portfolio sales contemplated by the letter of intent referred to in the Information Statement.  Participants were therefore unable to evaluate for themselves whether the proposed terms of the sale agreement with C&S and the other transactions that they were being asked to approve were fair or appropriate.

47

206.    Upon information and belief, the sale agreement with C&S and the winding down of the Company were approved by vote of the Company's shareholders, with Argent voting the shares of those Participants who did not respond to the Notice of Action and all shares that were unallocated.

207.    Following approval of the sale and winding down of the Company, on December 12, 2014, the Company's Board met and removed Defendant Argent as the Plan's independent directed Trustee.  Defendants David Schools, Edenfield and Masche were appointed successor Trustees, and continued to serve as the Plan Committee.

208.    The Company is currently being wound-down under the continued management of Defendants David Schools, Edenfield, and Masche.

209.    Upon information and belief, as of the date of filing of this Complaint, Company insiders, including Defendants David Schools, Newton, and Edenfield, are preparing to receive a substantial payout in connection with the sale by ACDC or entities affiliated with ACDC and the Dallas Cotton Club of some 13 different properties on which Piggly Wiggly stores are or were located. The buyer in this sale is Wheeler Real Estate Investment Trust, a real estate investment firm based in Virginia, and the reported sale value is approximately $71 million. Upon information and belief, the sale will close in the near future.

## THE LAW UNDER ERISA

210.    At all relevant times, Defendant Plan Fiduciaries were and served as fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

211.    ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), provides, in pertinent part, that a civil action may be brought by a participant for relief under ERISA § 409, 29 U.S.C. § 1109.

212.    ERISA § 409(a), 29 U.S.C. § 1109(a), "Liability for Breach of Fiduciary Duty," provides, in pertinent part, that any person who is a fiduciary with respect to a plan and breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by ERISA shall be personally liable to restore to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

213.    ERISA § 404(a)(1)(A) and (B), 29 U.S.C. § 1104(a)(1)(A) and (B), provides, in pertinent part, that a fiduciary shall discharge his or its duties with respect to a plan solely in the interest of the participants and beneficiaries, for the exclusive purpose of providing benefits to participants and their beneficiaries, and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

214.    These fiduciary duties under ERISA § 404(a)(1)(A) and (B) are referred to as the duties of loyalty, exclusive purpose, and prudence and are the "highest known to the law." *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982).  They entail, among other things:

(a) A duty to conduct an independent and thorough investigation into, and continually monitor, the merits of all the investment alternatives of a plan;

(b) A continuing duty to remove imprudent investments;

(c) A duty to administer and manage a plan with an "eye single" to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor.  This duty is applicable, among other instances, where fiduciaries exercise voting rights on plan investments;

49

(d) A duty to take such actions as are necessary to protect Plan investments, including a duty to bring derivative actions where a fiduciary becomes aware of corporate action giving rise to such a claim;

(e) A duty to disclose and inform, which encompasses: (1) a negative duty not to misinform; (2) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and (3) a duty to convey complete and accurate information material to the circumstances of participants and beneficiaries.

215.    ERISA § 405(a), 29 U.S.C. § 1105(a), "Liability for breach by co-fiduciary," provides, in pertinent part, that:

> [I]n addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances; (A) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; (B) if, by his failure to comply with section 404(a)(1), 29 U.S.C. § 1104(a)(1), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or (C) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

216.    Plaintiffs therefore bring this action against the Defendant Plan Fiduciaries under the authority of ERISA §502(a) for Plan-wide relief under ERISA § 409(a) to recover losses sustained by the Plan arising out of the breaches of fiduciary duties by Defendants for violations under ERISA § 404(a)(1) and ERISA § 405(a).

217.    ERISA further provides in § 502(a)(3), 29 U.S.C. § 1132(a)(3), that a participant may bring a civil action "(A) to enjoin any act or practice which violates [ERISA Subchapter 1] or the terms of the plan or (B) to obtain other appropriate equitable relief (i) to redress such violations or  (ii) to enforce  any provision of [ERISA Subchapter 1] or the terms of the plan."

218.    The U.S. Supreme Court has repeatedly held § 502(a)(3) allows for civil actions against non-fiduciaries who knowingly participate in a breach of fiduciary duty, and that such non-fiduciaries can be subjected to traditional equitable remedies, including being compelled to make restitution.  *Mertens v. Hewitt Associates*, 508 U.S. 248 (1993); *Harris Trust & Savings Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238 (2000).

219.    Plaintiffs therefore bring this action against the Defendant Note Holders under the authority of ERISA § 502(a) for Plan-wide equitable relief against the Defendant Note Holders to remedy the losses to the plan that resulted from their collusion with the Defendant Plan Fiduciaries to violate ERISA.

## CAUSES OF ACTION

### Count One
**(Breach of Fiduciary Duty against the Defendant Plan Fiduciaries)**

220.    The foregoing allegations are incorporated herein by reference.

221.    As set forth above, the Individual Defendants and the Defendant Plan Committee owe to the Plan, its participants and beneficiaries, and the Class extensive fiduciary duties.

222.    As set forth in detail above, these Defendants breached their fiduciary obligations to the Plan, Plan participants and beneficiaries, and the Class by, among other conduct to be proven at trial:

      a.    Failing to remove the Board of Piggly Wiggly Group despite the continued and demonstrated poor performance of the company between 2007 and the present;

      b.    Failing to remove the Board of Piggly Wiggly Group despite knowledge of those facts giving rise to derivative claims as set forth in Sub-Paragraph 229 (a) to (j) below and elsewhere hereinabove;

c.  Failing to force the Company Board to remove the incompetent management that caused or contributed to the Company's financial collapse;

d.  Failing to appropriately monitor and evaluate Plan investments and remove inappropriate ones, including Company stock;

e.  Failing to sell Company stock either before or during its precipitous decline;

f.  Continuing to hold Company stock year after year despite the decline in stock value between 2007 and 2015; and

g.  Colluding with the Defendant Note Holders in arranging for the overpayment in settlement of the Notes Payable.

223.  As set forth in detail above, as a result of these breaches, the Plan, Plaintiffs, and the Plan's Participants and beneficiaries have suffered financial losses and damages.

224.  Pursuant to ERISA §§ 409 and 502(a), 29 U.S.C. §§ 1109 and 1132(a), the Individual Defendants are personally liable to restore to the Plan the losses it experienced as a result of these breaches of fiduciary duty.

225.  Pursuant to ERISA §§ 409 and 502(a), the Individual Defendants are personally liable for any other available and appropriate equitable relief, including prospective injunctive relief, declaratory relief, and attorney's fees.

### Count Two
### (Breach of Fiduciary Duty Against the Defendant Plan Fiduciaries –
### Failure to Bring Derivative Actions)

226.  The foregoing allegations are incorporated herein by reference.

227.  As set forth above, the Individual Defendants owe to the Plan, its Participants and Beneficiaries, and the Class extensive fiduciary duties.

228.    As set forth above, there was substantial overlap between the identities of the Plan fiduciaries and inside management and directors of the Piggly Wiggly Group, such that Plan fiduciaries were aware of the corporate actions of Piggly Wiggly Group, including the mismanagement, overcompensation to management, and insider deals hereinabove alleged, as well as such other misconduct to be proven at trial.

229.    Despite having full knowledge of corporate action and inaction by Piggly Wiggly Group directors and officers giving rise to various derivative claims, the Individual Defendants in their role as Plan fiduciaries failed to bring derivative actions on behalf of the Piggly Wiggly Group against the management and Board of Piggly Wiggly Group on the basis of the following, among other conduct to be proven at trial:

a.    The overcompensation and excessive benefits paid to Company management and directors;

b.    The entry into and/or continuance of Piggly Wiggly Group long-term leases at above-market rates in order to benefit lessors controlled by Company insiders and the beneficiaries of payments from the Dallas Cotton Club;

c.    The failure of Piggly Wiggly Group to seek to modify the related-party long-term leases;

d.    The mismanagement that led the Piggly Wiggly Group to enter into high interest rate loans in order to fund Company operations and payments to insiders;

e.    The Board of Directors' failure to nominate qualified independent directors to serve on and control the Board of Directors;

f.    The Board of Directors' failure to select new management;

53

g. The Company's failure to hire a financial consultant regarding sale of the company assets until September 2012, by which time the Company's value had already declined substantially from its value on March 31, 2008;

h. The involvement of Company management and directors in providing false information for stock appraisals;

i. The mismanagement in the site selection of new stores; and

j. The overpayment made in settlement of the Notes Payable with the Defendant Note Holders.

230.    Such failures to bring derivative actions constituted a breach of fiduciary duty.

231.    As set forth in detail above, as a result of these breaches, the Plan, Plaintiffs, and the Plan's Participants and beneficiaries have suffered financial losses and damages.

232.    Pursuant to ERISA §§ 409 and 502(a), 29 U.S.C. §§ 1109 and 1132(a), the Defendants are personally liable to restore to the Plan the losses it experienced as a result of these breaches of fiduciary duty.

233.    Pursuant to ERISA §§ 409 and 502(a), these Defendants are personally liable for any other available and appropriate equitable relief.

### Count Three
### (Co-Fiduciary Liability Under ERISA § 405 Against Defendant Plan Fiduciaries)

234.    The foregoing allegations are incorporated herein by reference.

235.    Pursuant to § 405 of ERISA, 29 U.S.C. § 1105, Defendant Plan Fiduciaries are also liable as co-fiduciaries with respect to the above and below-described violations where they participated knowingly in their co-fiduciaries' breaches, knowingly undertook to conceal those breaches, enabled their co-fiduciaries to commit the breaches and failed to make any reasonable efforts to remedy the breaches.

54

236.     As a proximate result thereof, the Plan has been damaged in an amount to be determined at or before trial.

237.     Pursuant to ERISA § 409, 29 U.S.C. § 1109, each of said Defendants are jointly and severally liable to restore to the Plan any losses of the Plan resulting from their co-fiduciary breaches and/or for restitution or disgorgement of the unjust benefits received and all profits generated from their wrongdoing.

## Count Four
### (Prohibited Transaction Under ERISA § 406 Against Defendant Plan Fiduciaries)

238.     The foregoing allegations are incorporated herein by reference.

239.     In addition to the general fiduciary duties set forth in ERISA § 404, ERISA also categorically prohibits certain types of transactions that are especially likely to harm plans or their participants—so called "prohibited transactions." ERISA § 406(a)-(b), 29 U.S.C. § 1106(a)-(b).

240.     ERISA § 406(a) prohibits "direct or indirect" transactions between plans (such as the Plan) and "parties in interest."  Parties in interest include fiduciaries, trustees and plan sponsors, amongst others, as well as entities controlled by parties in interest and their families. *See* ERISA § 3(14), 29 U.S.C. § 1002(14).

241.     Each of the Defendants was a party in interest to the Plan under ERISA § 3(14), and ACDC and the Dallas Cotton Club were also parties in interest with respect to the Plan. The Defendant Plan Fiduciaries caused the Plan to engage in the following "direct or indirect" transactions between the Plan and parties in interest:

    a.   The settlement of the Notes Payable with the Defendant Note Holders;

    b.   The entry of the Company and/or the continuance of the Company in leases with ACDC and entities controlled by ACDC and the Dallas Cotton Club;

55

    c.   Excessive compensation and benefits paid to the Defendant Plan Fiduciaries; and

    d.   Payment of certain of the Defendant Plan Fiduciaries for a covenant not to compete in connection with the 2014 Asset Sales as hereinabove alleged.

242.    ERISA § 406(b) prohibits certain self-dealing transactions where a fiduciary: (a) deals with assets of the plan in his own interest or for his own account; (b) in his individual or in any other capacity acts in any transaction involving the plan on behalf of a party (or represents a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries; or (c) receives any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.

243.    As set forth above, the Defendant Plan Fiduciaries caused the Plan to engage in numerous "direct or indirect" prohibited transactions under both § 406(a) and § 406(b).

244.    As a direct and proximate result thereof, the Plan has been damaged in an amount to be determined at or before trial.

245.    Pursuant to ERISA § 409, 29 U.S.C. § 1109, each of said Defendants are jointly and severally liable to restore to the Plan any losses of the Plan resulting from the prohibited transactions and/or for restitution or disgorgement of the unjust benefits received and all profits generated from their wrongdoing.

**Count Five**
**(Equitable Relief Under ERISA § 502(a)(3) Against All Defendants)**

246.    The foregoing allegations are incorporated herein by reference.

247.    ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), provides that plan participants—like Plaintiffs here—have standing to bring a civil action "to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or … to obtain other appropriate

equitable relief … to redress such violations or … to enforce any provisions of this subchapter or the terms of the plan."

248.    On information and belief, Defendants' misconduct is ongoing and threatens to further deplete the Company's assets and otherwise irrevocably harm the Plan.

249.    And, as set forth above, each of the Defendants, including the Defendant Note Holders, received benefits from or were otherwise transferees of ill-gotten assets that in good conscience belonged to the Plan.

250.    While the Defendants ultimately bear the burden of proof on the issue, Plaintiffs nevertheless affirmatively allege that the Defendant Note Holders either knowingly participated in the fiduciary breaches and prohibited transactions set forth above or in the alternative knew or should have known that such conduct amounted to a breach of trust.

251.    Plaintiffs are therefore entitled to all appropriate injunctive and equitable relief to prevent such further injury and to recover for the Plan the ill-gotten gains obtained by the Defendants, including the imposition of a constructive trust, disgorgement, restitution, surcharge, and any other appropriate remedy.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, respectfully pray on behalf of the Plan for relief as follows:

A.    a declaration that the Defendant Plan Fiduciaries, and each of them, have breached their ERISA fiduciary duties to the Plan and the Plan's Participants;

B.    an order compelling Defendant Plan Fiduciaries to restore to the Plan all losses to the Plan resulting from their breaches of their fiduciary duties and to restore the Plan to the position it would have been in but for the breaches of fiduciary duty;

C.      an order compelling the Defendant Note Holders to make restitution to the Plan for any amounts of money by which they were unjustly enriched at the expense of the Plan and ordering such other equitable relief against the Defendant Note Holders as may be appropriate;

D.      award actual damages in the amount of any losses the Plan suffered;

E.      imposition of a constructive trust on any amounts by which any Defendant was unjustly enriched at the expense of the Plan as the result of breaches of fiduciary duty, including any amounts any Defendant received as a result of any siphoning off of Company funds due to above-market leases, excessive compensation or benefits, and other breaches of ERISA;

F.      an order removing the individual Defendant Plan Fiduciaries as fiduciaries and/or permanently enjoining them from future breaches of ERISA;

G.      an order awarding costs pursuant to ERISA § 502(g), 29 U.S.C. § 1132(g);

H.      an order awarding attorneys' fees pursuant to ERISA § 502(g), 29 U.S.C. § 1132(g), and the common fund doctrine;

I.      an order for equitable restitution and all other appropriate equitable and/or monetary relief against any Defendants; and

J.      an order appointing an independent trustee of the Plan.

Respectfully submitted,

**WYCHE, P.A.**

s/Alice W. Parham Casey
John C. Moylan (D.S.C. Id. No. 5431)
Alice W. Parham Casey (D.S.C. Id. No. 9431)
801 Gervais Street, Suite B (29201)
P. O. Box 12247
Columbia, SC  29211-2247
Telephone: (803) 254-6542
Telecopier: (803) 254-6544
jmoylan@wyche.com;tcasey@wyche.com

Henry L. Parr, Jr. (D.S.C. Id. No. 2984)
Eric B. Amstutz (D.S.C. Id. No. 0942)
Wade S. Kolb, III (D.S.C. Id. No.11485)
44 East Camperdown Way
Greenville, S.C. 29601
Direct Dial: 864-242-8209
Telephone:  864-242-8200
Telecopier:  864-235-8900
E-mail:  hparr@wyche.com; eamstutz@wyche.com;
 wkolb@wyche.com

Dated:  February 26, 2016            ATTORNEYS FOR PLAINTIFFS

59