Dana Spires, *et al.*,                    )          Civil Action No. 2:16-616-RMG
                                          )
                    Plaintiffs,           )
                                          )
v.                                        )          **ORDER AND OPINION**
                                          )
David R. Schools, *et al.*,               )
                                          )
                    Defendants.           )
_____ )

This matter is before the Court on Defendants William A. Edenfield, Robert G. Masche,

Joseph T. Newton, III, Burton R. Schools, David R. Schools, the Piggly Wiggly Carolina

Company, Inc., and the Greenbax Enterprises, Inc., Employee Stock Ownership Plan and Trust

Committee (collectively the "Piggly Wiggly Defendants") motion to dismiss (Dkt. No. 59) and

Defendants Joanne Newton Ayers and Marion Newton Schools (collectively the "Noteholder

Defendants") motion to dismiss (Dkt. No. 66). For the reasons set forth below, the Court grants

in part and denies in part the Piggly Wiggly Defendants' motion to dismiss, and denies the

Noteholder Defendants' motion to dismiss.

## I.    **Background**

Plaintiffs are former employees of Piggly Wiggly Carolina Company, Inc. ("PWCC") or

Greenbax Enterprises, Inc. (collectively, the "Company"). They are participants in the PWCC and

Greenbax Employee Stock Ownership Plan and Trust (the "Plan") and assert various claims under

the Employee Retirement Income Security Act of 1974 ("ERISA"), Pub. L. 93-406, 88 Stat. 829,

for themselves and for others similarly situated. (Dkt. No. 50 ¶¶ 19–22.) Since September 2005,

the Plan has owned approximately 99.5% of the outstanding stock of Greenbax, and Greenbax

owns 100% of the outstanding stock of PWCC. (*Id.* ¶¶ 41, 55.) The Plan was established in 1985

-1-

"to reward, motivate, and provide retirement benefits" for the Plan's participants, who are current or former employees of the Company. (Dkt. No. 59-1 at 4.) The value of the stock and cash held by the Plan determined what funds were available in the Plan for participants' retirement. The value of the Plan's assets was determined primarily by the value of the Company stock held by the Plan. (Dkt. No. 50 ¶ 41.) The value of the Company stock held by the plan was established annually by appraisal, based on the Company's results of operations and financial condition. (*Id.* ¶¶ 46, 84–93.)

Defendants Robert G. Masche, William Edenfield, Joseph T. Newton, III, Burton R. Schools, and David R. Schools (the "Fiduciary Defendants") allegedly controlled the Company's board of directors, were the Company's top executives, and controlled the "Plan Committee," which directed the voting of Company stock held by the Plan. (*Id.* ¶¶ 23–28, 45.) Plaintiffs allege that the Fiduciary Defendants used their positions to enrich themselves by draining assets from the Company through excessive compensation and various insider dealings and that the Fiduciary Defendants engaged in "gross mismanagement." (*Id.* § III.) According to Plaintiffs, the losses created by the Fiduciary Defendants caused lenders to require repayment of outstanding loans and to decline to extend additional credit, ultimately forcing the Company to sell substantially all its assets, which in turn destroyed the value of Company stock held by the Plan. (*Id.* ¶¶ 171–75, 202– 07.) Plaintiffs further allege the Fiduciary Defendants deliberately concealed the true causes of the Company's financial losses from Plan participants. (*Id.* ¶¶ 74–79, 99, 101, 103.)

Plaintiffs also allege that the Fiduciary Defendants improperly moved assets from the Company to the Noteholder Defendants, who allegedly are Company insiders or family members of Company insiders. (*Id.* § IV.C.) The Noteholder Defendants had made loans to the Plan for the purchase of company stock, which were guaranteed by the Company. (*Id.*) In March 2014,

the Company purchased the notes from the Noteholder Defendants for approximately \$8.3 million in cash (which was less than the outstanding principal amount remaining on the notes). (*Id.*). Under ERISA, loans guaranteed by a party-in-interest must be without recourse to Plan assets other than unallocated Company shares pledged as security (*i.e.*, the shares purchased with the loans). 29 C.F.R. § 2550.408b-3(e). According to Plaintiffs, in March 2014 those shares were worth approximately \$4.2 million. (Dkt. No. 50 § IV.C.) Plaintiffs allege the difference between the amount paid to the Noteholder Defendants and the value of the security available to them—approximately \$4 million—was an improper transfer of Company assets to insiders and a transaction prohibited under ERISA.

Plaintiffs allege Company management and directors eventually agreed to wind down the company and to sell substantially all the Company's remaining assets to C&S Wholesale Grocers, Inc. on September 4, 2014. (*Id.* ¶ 225.) The sale and winding down was approved on December 12, 2014. (*Id.* ¶ 233.)

On February 26, 2016, Plaintiffs filed the present putative class action, asserting six causes of action against Defendants. In count one, Plaintiffs allege the Fiduciary Defendants breached their fiduciary duties under ERISA. The Fiduciary Defendants necessarily were aware of their own conduct in their capacities as Company executives. Had they acted properly in their fiduciary capacities, according to Plaintiffs, the Fiduciary Defendants would have exercised the Plan's voting rights to install independent management not engaged in the malfeasance Plaintiffs ascribe to the Fiduciary Defendants. In count two, Plaintiffs allege the Fiduciary Defendants breached their fiduciary duties under ERISA by failing to bring a derivative action against the Company's management and board of directors. In count three, Plaintiffs allege co-fiduciary liability under 29 U.S.C. § 1105 against the Fiduciary Defendants. In count four, Plaintiffs allege the Fiduciary

-3-

Defendants engaged in transactions prohibited by 29 U.S.C. § 1106. In count five, Plaintiffs seek equitable relief against all Defendants.

On June 20, 2016, the Piggly Wiggly Defendants (all Defendants other than the Noteholder Defendants) moved to dismiss the amended complaint. The Piggly Wiggly Defendants argue that Plaintiffs' claims are time barred under 29 U.S.C. § 1113, that the actions Plaintiffs complain of were corporate acts unrelated to the Plan, that Plaintiffs fail to meet the pleading standard for a stock-drop claim set forth in *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459 (2014), that Plaintiffs lack standing because they suffered no injury-in-fact, and that Plaintiffs fail to allege prohibited transactions. The Noteholder Defendants moved to dismiss on June 23, 2016, arguing that the transaction Plaintiffs complain of did not involve the Plan or Plan assets, and that Defendant Joanne Newton Ayers is not a party-in-interest under ERISA.

## II. Legal Standard

Rule 12(b)(6) of the Federal Rules of Civil Procedure permits the dismissal of an action if the complaint fails "to state a claim upon which relief can be granted." Such a motion tests the legal sufficiency of the complaint and "does not resolve contests surrounding the facts, the merits of the claim, or the applicability of defenses. . . . Our inquiry then is limited to whether the allegations constitute 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992) (quotation marks and citation omitted). In a Rule 12(b)(6) motion, the Court is obligated to "assume the truth of all facts alleged in the complaint and the existence of any fact that can be proved, consistent with the complaint's allegations." *E. Shore Mkts., Inc. v. J.D. Assocs. Ltd. P'ship*, 213 F.3d 175, 180 (4th Cir. 2000). However, while the Court must accept the facts in a light most favorable to the non-moving party, it "need not accept as true unwarranted inferences, unreasonable conclusions, or arguments." *Id.*

To survive a motion to dismiss, the complaint must state "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Although the requirement of plausibility does not impose a probability requirement at this stage, the complaint must show more than a "sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint has "facial plausibility" where the pleading "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

## III. Discussion

### A. Statute of Limitations

The argument that a statute of limitations bars a claim is an affirmative defense. Fed. R. Civ. P. 8(c)(1). Affirmative defenses may be raised on a motion under Rule 12(b)(6) of the Federal Rules of Civil Procedure when "the face of the complaint clearly reveals the existence of a meritorious affirmative defense." *Brooks v. City of Winston-Salem, N.C.*, 85 F.3d 178, 181 (4th Cir. 1996). When ruling on an affirmative defense raised in a Rule 12(b)(6) motion, courts "accept[] as true the well-pleaded facts in the complaint and view[] them in the light most favorable to the plaintiff." *Id.* ERISA's statute of limitations provides,

No action may be commenced under this subchapter with respect to a fiduciary's breach of any responsibility, duty, or obligation under this part, or with respect to a violation of this part, after the earlier of—

(1) six years after (A) the date of the last action which constituted a part of the breach or violation, or (B) in the case of an omission the latest date on which the fiduciary could have cured the breach or violation, or

(2) three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation;

except that in the case of fraud or concealment, such action may be commenced not later than six years after the date of discovery of such breach or violation.

29 U.S.C. § 1113.

The Piggy Wiggly Defendants argue any action for breach of fiduciary duties accrued in 2007 because that is when, according to the complaint, Greenbax stock began its decline in price, which was reported on publicly available Form 5500s. (Dkt. No. 59-1 at 9–11.) Thus, according to the Piggy Wiggly Defendants, Plaintiffs access to the "exact same information" that, according to Plaintiffs, should have forced the Piggly Wiggly Defendants to take action to replace Company management. (*Id.*) Because Plaintiffs knew the Piggly Wiggly Defendants did not replace Company management, Plaintiffs had actual knowledge of their purported breach of fiduciary duty more than three years before the present action was commenced.

The Piggly Wiggly Defendants' argument is unpersuasive. "Actual knowledge" means "knowledge of all material facts necessary to understand that an ERISA fiduciary has breached his or her duty." *In re Citigroup ERISA Litig.*, 104 F. Supp. 3d 599, 610 (S.D.N.Y. 2015).[1] Plaintiffs have not alleged that in 2007 they had actual knowledge of facts necessary to understand that the Plan Committee members had breached their fiduciary duties. Plaintiffs doubtless were aware of the beginning of the drop in Greenbax stock price and the failure to replace management as soon as it began, but these are not the fiduciary breaches Plaintiffs allege. Plaintiffs allege the Plan Committee members failed to take action in response to improper insider transactions and other specific acts of management malfeasance, of which the Plan Committee had actual knowledge. (*E.g.*, Dkt. No. 50 ¶¶ 129–68.) Plaintiffs also allege those transactions were undisclosed or

---

[1] There is a circuit split on whether "actual knowledge" requires the plaintiffs to know that the events constituting the breach supported a claim under ERISA. *See Browning v. Tiger's Eye Benefits Consulting*, 313 F. App'x 656, 660 (4th Cir. 2009). That issue, however, is not relevant to the Piggly Wiggly Defendants' statute of limitations argument because there is no allegation that there was any period when Plaintiffs knew all facts necessary to understand that there had been a fiduciary breach but did not realize that those facts supported an ERISA claim.

concealed from Plan participants. (*E.g.*, *id.* ¶¶ 74–79.)[2] Plaintiffs do not allege that they had actual knowledge of those transactions more than six years before the commencement of this action. The truth of Plaintiffs' allegations, and, if they are true, the dates on which they occurred and the dates on which Plaintiffs learned of them, are factual questions the Court cannot decide on a motion to dismiss.

The Piggly Wiggly Defendants also raise a cursory argument that the alleged fiduciary breaches were complete more than six years before this action was filed. (*See* Dkt. No. 59-1 at 11–12). That argument likewise is unpersuasive. The alleged breach of fiduciary duties in count one is an omission—the failure to take action to remedy managerial malfeasance. (Dkt. No. 50 ¶ 254.). The statutory six-year period for a breach by omission accrues from "the latest date on which the fiduciary could have cured the breach or violation." 29 U.S.C. § 1113. Plaintiffs have not alleged that the latest date on which the Plan Committee could have saved Plan asset value by replacing Company management was before February 2010. Further, they allege deliberate concealment, which extends the limitations period to six years "after the date of discovery of such breach or violation." *Id.*

In sum, when the "last action which constituted a part of the breach" occurred, when "the fiduciary could have cured the breach," whether Defendants engaged in "fraud or concealment," and when "the plaintiff had actual knowledge of the breach" are disputed questions of fact. The Court therefore denies the Piggly Wiggly Defendant's motion to dismiss as to the statute of

---

[2] The Piggly Wiggly Defendants argue Plaintiffs have not alleged "a course of conduct designed to conceal evidence" of wrongdoing and so cannot avail themselves of the extended statute of limitations applicable in a "case of fraud or concealment." (Dkt. No. 59-1.) To the contrary, Plaintiffs indeed have alleged "a course of conduct designed to conceal evidence." (*See, e.g.*, Dkt. No. 50 ¶¶ 76, 270.)

limitations argument, without prejudice to their ability to argue a statute of limitations defense

after discovery.

## B.    Fiduciary Duties Versus Corporate Acts

ERISA imposes a stringent fiduciary standard on plan fiduciaries:

[A] fiduciary shall discharge his duties with respect to a plan solely in the interest
of the participants and beneficiaries and—

> (A) for the exclusive purpose of:
>
>> (i) providing benefits to participants and their
>> beneficiaries; and
>>
>> (ii) defraying reasonable expenses of administering
>> the plan;
>
> (B) with the care, skill, prudence, and diligence under the circumstances then
> prevailing that a prudent man acting in a like capacity and familiar with such
> matters would use in the conduct of an enterprise of a like character and with like
> aims;

29 U.S.C. § 1104(a)(1). ERISA fiduciary standards, however, apply only to actions taken in when

in a fiduciary status. *Lockheed Corp. v. Spink*, 517 U.S. 882, 890 (1996) ("'[O]nly when fulfilling

certain defined functions, including the exercise of discretionary authority or control over plan

management or administration,' does a person become a fiduciary under [29 U.S.C. §

1102(21)(A)]." (quoting *Siskind v. Sperry Retirement Program, Unisys*, 47 F.3d 498, 505 (1995))).

The Piggly Wiggly Defendants argue Plaintiffs fail to allege the Fiduciary Defendants

breached their fiduciary duties because Plaintiffs confuse Defendants acts as corporate executives

with their acts as ERISA fiduciaries. (Dkt. No. 59-1 at 16–20.) The Piggly Wiggly Defendants

argue that when the purported malfeasance occurred, the Fiduciary Defendants were acting in their

capacity as corporate executives and not in their capacity as Plan fiduciaries.    Under the

settlor/fiduciary doctrine, only fiduciary acts are subject to ERISA's fiduciary requirements, while

settlor acts are unconstrained by ERISA fiduciary duties. *See Spink*, 517 U.S. at 890.    The

settlor/fiduciary doctrine typically addresses the distinction between the design, amendment, or termination of ERISA plans, which are settlor acts, and the implementation of ERISA plans, which is a fiduciary act. *See., e.g.*, *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 444 (1999). Here, Plaintiffs do not assert ERISA fiduciary duties apply to decisions to design, amend, or terminate the Plan. Rather, they allege Plan fiduciaries administered the Plan in a self-interested manner that was adverse to the interests of Plan participants. But the "two hats" principle means ERISA's fiduciary standards extend to employers "only when and to the extent that they function in their capacity as plan administrators, not when they conduct business that is not regulated by ERISA." *Amato v. W. Union Int'l, Inc.*, 773 F.2d 1402, 1416–17 (2d Cir. 1985) (internal quotation marks omitted) *abrogated on other grounds by Mead Corp. v. Tilley*, 490 U.S. 714 (1989). "[T]he ERISA scheme envisions that employers will act in a dual capacity as both fiduciary to the plan and as employer. ERISA does not prohibit an employer from acting in accordance with its interests as employer when not administering the plan or investing its assets." *Phillips v. Amoco Oil Co.*, 799 F.2d 1464, 1471 (11th Cir. 1986). Thus, according to the Piggly Wiggly Defendants, the corporate acts of corporate management are not subject to ERISA's fiduciary standards even if an ESOP owns the company.

The Court agrees. Mismanagement or malfeasance by the executives of an operating company is not in itself a breach of fiduciary duty under ERISA. But in this case, the alleged managerial malfeasance is not the alleged breach of fiduciary duty. The alleged breach of fiduciary duty is the failure of the Plan fiduciaries to take action to protect Plan assets by responding to managerial malfeasance that depleted the Plan assets of most of their value. Plaintiffs allege the Fiduciary Defendants failed to take action because they placed their personal interest in self-dealing with Company assets above their fiduciary duty to protect the value of Plan assets. Those

allegations are sufficient to state a claim under 29 U.S.C. § 1109 for violation of the fiduciary duties imposed by 29 U.S.C. § 1104(a)(1).

The Piggly Wiggly Defendants further contend Plaintiffs claims fail because the actions allegedly constituting managerial malfeasance were ordinary business decisions. (Dkt. No. 59-1 at 17.) That contention is unavailing. Plaintiffs do not merely allege the Fiduciary Defendants *qua* corporate management made poor decisions regarding real property leases or other poor business decisions. They also allege the Fiduciary Defendants deliberately colluded to transfer Company assets to themselves, necessarily depleting the value of Plan assets, and as Plan fiduciaries decided not to protect Plan participants because the Fiduciary Defendants' self-interest was adverse to the interests of Plan participants. Under ERISA, employers "owe a duty . . . [as] . . . trustees to avoid placing themselves in a position where their acts as officers or directors of the corporation will prevent their functioning with the complete loyalty to participants demanded of them as trustees of a pension plan." *Amato*, 773 F.2d at 1417 (internal quotation marks omitted).

Further, the authorities the Piggly Wiggly Defendants cite in support of the proposition that corporate executive's business decisions can never give rise to a breach of ERISA fiduciary obligations do not support that proposition. *DiFelice v. U.S. Airways* did not hold that "when not wearing a fiduciary hat, a corporation or its employees are free to act in furtherance of corporate interests." (Dkt. No. 59-1 at 16–17 (497 F.3d 410, 418–19 (4th Cir. 2007).) To the contrary,

[f]iduciaries must also scrupulously adhere to a duty of loyalty, and make any decisions in a fiduciary capacity with "an eye single to the interests of the participants and beneficiaries." *Kuper v. Iovenko*, 66 F.3d 1447, 1458 (6th Cir. 1995) (internal quotation marks omitted). Any fiduciary who wears two hats—e.g., by virtue of being a plan fiduciary as well as a corporate officer—must "wear only one at a time, and wear the fiduciary hat when making fiduciary decisions." *Pegram*, 530 U.S. [211,] 225 [2000], 120 S. Ct. 2143. Corporate officers must "avoid placing themselves in a position where their acts [or interests] as officers or directors of the corporation will prevent their functioning with the complete loyalty

> to participants demanded of them as trustees of a pension plan." *Donovan v.*
> *Bierwirth*, 680 F.2d 263, 271 (2d Cir. 1982).

*DiFelice*, 497 F.3d at 418–19. Here, Plaintiffs allege corporate officers did what *DiFelice* holds corporate officers may not do—that they placed themselves in a position where their interests prevented them from functioning with complete loyalty to the Plan participants. Similarly, 29 U.S.C. § 1002(21)(A) provides in relevant part, "a person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets." 29 U.S.C. § 1002(21)(A). Here, Plaintiffs allege that the Fiduciary Defendants breached their fiduciary duties by failing to exercise their discretionary control over Plan assets in various ways, *e.g.*, by failing to vote company stock to replace management. Nothing in the statute suggests that a person is relieved of his fiduciary duties under ERISA whenever his fiduciary duties touch upon his duties as a corporate officer.

In their reply brief, the Piggly Wiggly Defendants' cite *Grindstaff v. Green*, 133 F.3d 416 (6th Cir. 1999), to assert that the exercise of ESOP voting rights is not the use or management of ESOP plan asset, except "in certain extreme cases."[3] (Dkt. No. 67 at 5.) In *Grindstaff*, the Sixth Circuit held the right to vote or direct the voting of an ESOP's shares in an unopposed election is "simply an aspect of corporate control" that "does not, by itself, constitute a plan asset." 133 F.3d at 425. But this Court respectfully finds the reasoning of *Grindstaff* to be unpersuasive. The

---

[3] The Piggly Wiggly Defendants raise this argument for the first time in their reply brief. It is improper to raising a new argument in a reply brief. *See, e.g.*, *EEOC v. Freeman*, 961 F. Supp. 2d 783, 801 (D. Md. 2013); *Tyndall v. Maynor*, 288 F.R.D. 103, 108 (M.D.N.C. 2013). The Court's consideration of this new argument, however, does not prejudice Plaintiffs, because the Court rejects the new argument.

problem with the Sixth Circuit's reasoning has been ably set forth by Judge Rebecca R. Pallmeyer

of the Northern District of Illinois:

> The *Grindstaff* court relied on the outcome of the vote at issue, reasoning that
> because Congress anticipated that company managers would also run ESOPs, when
> those managers, acting as members of the ESOP committee, voted for themselves
> as managers in an uncontested election, they did not breach their fiduciary duty to
> the ESOP. [133 F.3d] at 424–25. From this narrow holding, the court extrapolated
> that "the right to vote, or direct the voting of an ESOP's shares, even when used to
> perpetrate one's own incumbency, does not, by itself, constitute a plan asset." *Id.*
> at 425. As the dissenting judge pointed out, though, the majority ignored ERISA §
> 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i), which defines fiduciary conduct under
> ERISA to include "any authority or control respecting management or disposition
> of" a plan's assets. *Grindstaff*, 133 F.3d at 432. Even if the right to vote a share is
> not a plan asset, the share itself is an asset, so voting that share must be
> "management" of the asset. *Newton[ v. Van Otterloo]*, 756 F.Supp. [1121,] 1128
> [(N.D. Ind. 1991)]; *O'Neill [v. Davis]*, 721 F. Supp. [1013,] 1015 [(N.D. Ill. 1989)].
> Moreover, the common law of trusts applies a duty of proper care to voting
> decisions by trustees, *Grindstaff*, 133 F.3d at 432 (citing Restatement (Second) of
> Trusts § 193, cmt. a (1959)), and courts routinely look to the common law to
> interpret ERISA. *Id.* (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101,
> 109–11, 109 S. Ct. 948, 103 L.Ed.2d 80 (1989)). Finally, in regulations interpreting
> ERISA, the Department of Labor has concluded that "[t]he fiduciary act of
> managing plan assets that are shares of corporate stock includes the voting of
> proxies appurtenant to those shares of stock." 29 C.F.R. § 2509.08–2 (2009); 29
> C.F.R. § 2509.94–2 (1995). For all these reasons, the court respectfully declines to
> adhere to the broad language of the majority opinion in *Grindstaff*. The reasoning
> of the dissenting judge as well as that of the courts in *Newton* and *O'Neill* is more
> convincing. Voting of shares held by the ESOP constitutes the "management" or
> "use" of plan assets.

*Neil v. Zell*, 677 F. Supp. 2d 1010, 1028–29 (N.D. Ill. 2009), *as amended* (Mar. 11, 2010). This

Court agrees with Judge Pallmeyer's analysis and holds that the voting of shares held by an ESOP

is the use or management of a Plan asset. The Court therefore denies the Piggly Wiggly

Defendants' motion to dismiss as to the arguments raised in section IV.B of their memorandum in

support of the motion.

## C.    Derivative Action Claims

The Piggly Wiggly Defendants devote much briefing to the argument that count two, which

alleges the Fiduciary Defendants' failure to bring a derivative suit was a breach of ERISA fiduciary

duties, is an attempt to avoid South Carolina's pleading requirements for derivative suits, specifically the statute of limitations and requirements of SCRCP Rule 23(b)(1). The purpose of their argument is obscure. Whether the Plan participants can now bring a derivative suit under South Carolina law has no bearing on whether the Fiduciary Defendants' past failure to bring a derivative suit was a breach of fiduciary duty under ERISA.

There appears to be no dispute that the Fiduciary Defendants could have brought a derivative suit under South Carolina law. Implicitly conceding that point, the Piggly Wiggly Defendants correctly assert that "[t]o proceed under the theory that a fiduciary breached its duties by failing to bring a corporate derviative action," the Plaintiffs must allege (1) that the Fiduciary Defendants had a duty to bring a derivative suit, and (2) that a derivative suit would have been successful. (Dkt. No. 59-1 at 29–30.) Beyond the fiduciary duty challenge addressed above, the Piggly Wiggly Defendants argue Plaintiffs fail plausibly to allege that any derivative action the Fiduciary Defendants might have taken would have been successful because they do not plead the elements of a derivative claim or facts satisfying those elements. The Court disagrees. Looking at the complaint as a whole, the Court finds that the extensive allegations contained in its 83 pages and 288 numbered paragraphs are sufficient to state with requisite detail why a derivative action would have been successful—*i.e.*, that the persons in control of the corporation acted in a manner unfairly prejudicial to the Company and the Plan as stockholder, and that corporate assets were wasted. It is not necessary for the complaint to include a legal memorandum on South Carolina derivative actions.

The Court therefore denies the Piggly Wiggly Defendants' motion to dismiss as to the arguments raised in section IV.D.2 of their memorandum in support of the motion.

## D. Stock-Drop Claims

An ESOP "stock-drop" claim is an allegation that ESOP plan fiduciaries breached their fiduciary duties under ERISA by continuing to invest in company stock or failing to warn employees of impending drops in stock price. In *Fifth Third Bancorp v. Dudenhoeffer*, the Supreme Court held that "the same standard of prudence applies to all ERISA fiduciaries" except "that an ESOP fiduciary is under no duty to diversify the ESOP's holdings," and that a claim for breach of the duty of prudence based on nonpublic information available to the fiduciaries must "allege an alternative action that the [fiduciary] could have taken." 134 S. Ct. 2459, 2467, 2472 (2014). The Piggly Wiggly Defendants argue Plaintiffs have failed to plead a "stock-drop" claim adequately, in light of that standard. Plaintiffs respond that this is not a stock-drop case and that the purpose of complaint allegations regarding declining stock prices is "to demonstrate the actual financial losses suffered by the Plan that resulted from Defendant Plan Fiduciaries' wrongful actions." (Dkt. No. 62 at 21.)

Plaintiffs, however, do allege a "stock-drop" claim, among other claims. Plaintiffs allege the Fiduciary Defendants breached their fiduciary duties by, *inter alia*,

c. Failing, as members of the Plan Committee and Plan Trustees, to appropriately monitor and evaluate Plan investments and remove inappropriate ones, including Company stock;

d. Failing, as members of the Plan Committee and Plan Trustees, to sell Company stock either before or during its steady decline in value;

e. Continuing, as members of the Plan Committee and Plan Trustees, to allow the Plan to hold Company stock year after year despite the decline in stock value between 2007 and 2015;

(Dkt. No. 50 ¶ 254.) Each of the above allegations asserts that the Plan should have diversified its assets in response to the Company stock's decline in value. But the Supreme Court has held "an ESOP fiduciary not obliged under § 1104(a)(1)(C) to 'diversif[y] the investments of the plan so as

-14-

to minimize the risk of large losses" or under § 1104(a)(1)(B) to act 'with the care, skill, prudence, and diligence' of a "prudent man' insofar as that duty 'requires diversification,'" and so "ESOP fiduciaries, unlike ERISA fiduciaries generally, are not liable for losses that result from a failure to diversify." *Fifth Third Bancorp*, 134 S. Ct. at 2466–67 (quoting 29 U.S.C. § 1104)).[4] Alleging that the Fiduciary Defendants should have found new directors to lead the Company may state a claim, but alleging that the Fiduciary Defendants should have found a new company (or other asset) for the ESOP to own cannot. The Court therefore grants the Piggly Wiggly Defendants' motion to dismiss as to paragraphs 254(c), 254(d), and 254(e) of the amended complaint.

## E. Standing

The Piggly Wiggly Defendants assert Plaintiffs lack standing to assert breach of fiduciary duty claims against the Fiduciary Defendants because they fail to allege that they have suffered injury-in-fact. (Dkt. No. 59-1 at 24–25.) That argument is without merit. Plaintiffs allege that "[c]orrupt practices among top management" caused a significant financial loss for Plan participants, including Plaintiffs, and that the Fiduciary Defendants knew of those practices but chose not to replace management because they placed their own interests above the Plan participants' interests. (*See, e.g.*, Dkt. No. 50 § III.) The gravamen of the Piggly Wiggly Defendants' argument seems to be an argument that Plaintiffs cannot prove causation—that the alleged actions of the Fiduciary Defendants caused any specific drop in the value of Plan-owned stock. The Court expresses no opinion on whether Plaintiffs can prove causation, but they have certainly alleged it, even by the pleading standard the Piggly Wiggly Defendants propose. (*See,*

---

[4] Plaintiffs suggest that *Fifth Third Bancorp* may not apply to privately held companies. (Dkt. No. 62 at 21 n.22.) Although *Fifth Third Bancorp*'s discussion of compliance with securities laws may be inapplicable to ESOPs that hold no publicly traded stocks, this Court discerns no reason why the holding "that an ESOP fiduciary is under no duty to diversify the ESOP's holdings" should not apply to private company ESOPs.

*e.g., id.* ¶ 255 (alleging replacement of board of directors would have "increase[d] the value of the Company's shares held by the Plan"), ¶ 263 (alleging derivative action would have been successful and would have recovered "significant assets").) The Court therefore denies the Piggly Wiggly Defendants' motion to dismiss as to the argument that Plaintiffs lack standing.

## F. Prohibited Transactions Claims

### 1. *Claims Under 29 U.S.C. § 1106(a)*

Title 29 U.S.C. § 1106(a) generally prohibits the direct or indirect transfer of plan assets to a party-in-interest. The definition of party-in-interest includes any plan fiduciary, relatives of plan fiduciaries, the employer, any director, officer, or employee of the employer. 29 U.S.C. § 1002(14). Relatives of parties-in-interest are defined as spouses, ancestors, descendants, and spouses of descendants. 29 U.S.C. § 1002(15). Siblings are not considered relatives of parties-in-interest. The prohibitions of 29 U.S.C. § 1106(a) do not apply to transactions that qualify for one of the many exemptions provided by 29 U.S.C. § 1108. 29 U.S.C. § 1106(a). Possibly, the exemption most relevant to this case is 29 U.S.C. § 1108(17), which provides that 29 U.S.C. § 1106(a) does not apply to transactions between the plan and a party-interest (other than a fiduciary) that constitute the sale or leasing of property, the lending of money, or transfer or use of plan assets, if the transaction is for adequate consideration. "The Department of Labor has identified two requirements for a transaction to be considered supported by adequate consideration: a substantive requirement that the value assigned reflect the fair market value of the asset, and a procedural requirement that the fiduciary actually determine the value assigned in good faith." *Fish v. GreatBanc Tr. Co.*, 749 F.3d 671, 680 (7th Cir. 2014).

### a. *The Plan Assets Regulation*

Plaintiffs allege the Fiduciary Defendants caused the Plan to engage with parties-in-interest in four transactions prohibited under 29 U.S.C. § 1106(a). Plaintiffs do not allege the Plan was a

-16-

party to the transactions. Rather, their allegations often are premised on the idea that Company assets like cash are, effectively, Plan assets because the Plan owned 99.5% of the Company. (*See, e.g.*, Dkt. No. 50 ¶ 220.) Under the "look-through" rule of the Plan Assets Regulation, when an ERISA plan invests in an entity, the plan generally is treated as owning not only an interest in the entity but also an undivided interest the assets held by the entity, unless an exception applies. 29 C.F.R. § 2510.3-101. If the entity assets are plan assets, then the assets of the entity are subject to ERISA's fiduciary standards.

One of the exceptions to the look-through rule, however, is the "operating company" exception. *Id.* An operating company is a company that manufactures or sells goods or provides services other than capital investment. *See* 29 C.F.R. § 2510.3-101(c). There is no dispute that the Company was an operating company (although the date the Company ceased to be an operating company appears disputed). The assets of an operating company are not plan assets, so, according to Defendants, cash held by the Company was not a Plan asset, and Defendants were not dealing in Plan assets when they allegedly engaged in the transactions Plaintiffs complain of.

Plaintiffs offer four arguments to the contrary. First, they argue that the Plan Assets Regulation merely provides for when a company asset is *per se* a plan asset, not for when a company asset is not a plan asset. That is true but cuts against Plaintiffs. The Plan Assets Regulation only provides a *per se* rule because that is the purpose of 29 U.S.C. § 1106(a). As the Sixth Circuit has explained,

> Congress (in ERISA § 406 [29 U.S.C. § 1106]) intended to create an easily applied *per se* prohibition ... of certain transactions, no matter how fair, unless the statutory exemption procedures (of ERISA § 408(a)) are followed." *Cutaiar v. Marshall*, 590 F.2d 523, 529–30 (3d Cir. 1979); *see also Eaves v. Penn*, 587 F.2d 453, 457–59 (10th Cir. 1978). Lack of harm to the plan or the good faith or lack of the same on the part of the borrower are not relevant, and certainly not controlling, under ERISA § 406. Rather, "Congress was concerned in ERISA (§ 406) to prevent

> transactions which offered a high potential for loss of plan assets or for insider abuse . . . ." (*Marshall v. Kelly*, 465 F. Supp. 341, 354 (W.D. Okla.1978)).

*Chao v. Hall Holding Co.*, 285 F.3d 415, 439 (6th Cir. 2002) (quoting *Reich v. Valley Nat. Bank of Arizona*, 837 F. Supp. 1259, 1281 (S.D.N.Y. 1993)). Defendants' purported "lack of good faith" is "not relevant" under 29 U.S.C. § 1106(a) because that section *only* creates a *per se* prohibition on transactions involving certain parties or certain assets.

Second, Plaintiffs argue the operating company exception should not apply because the Company had adopted a plan to wind down operations. An operating company is "is an entity that is primarily engaged, directly or through a majority owned subsidiary or subsidiaries, in the production or sale of a product or service other than the investment of capital." 29 C.F.R. § 2510.3-101. Some courts have held, however, that the operating company exception to the look-through rule may not apply to the implementation of a plan to liquidate an operating company owned by an ESOP. *See, e.g.*, *Johnson v. Couturier*, 572 F.3d 1067, 1080 (9th Cir. 2009). In *Johnson*, the ESOP was going to be liquidated and all remaining equity paid out to the ESOP participants. The Ninth Circuit rejected the argument that an advancement of defense costs to executives of the company did not implicate ERISA's ban on indemnification of a fiduciary of an ERISA plan by the plan because corporate assets rather than plan assets were used, because the "plan of liquidation provides for payment of all remaining equity to ESOP participants as shareholders" and so "any proceeds taken from [the company's] remaining funds . . . will, dollar for dollar, reduce the funds available for distribution to ESOP participants." *Id.* This Court finds that reasoning persuasive. Without the operating company exception, ERISA fiduciary standards would attach to the management of company assets like inventory or office supplies—"clearly an absurd result." *Id.* at 1077. But when a company is being liquidated, it is reasonable to view company assets as assets of the ESOP owning the company. The Court therefore concludes that transactions that were part

of the sale of the substantially all Company assets to C&S, and later transactions, may be prohibited transactions under 29 U.S.C. § 1106 because Company assets may then be considered Plan assets.

Third, Plaintiffs rely on *Johnson v. Couturier* for the broader proposition that "courts have found an ERISA prohibition on an ESOP taking a specific action also prohibits a similar action by the corporation whose stock is owned by the ESOP when the ESOP would effectively bear the financial cost and burden of the corporation's action." (Dkt. No. 62 at 31–32.) Plaintiffs appear to mean that the Plan Assets Regulation should not prevent look-through to an operating company's assets with regard to ERISA prohibitions against self-dealing from which fiduciaries could directly profit: "Where, as here, an ESOP fiduciary also serves as a corporate director or officer, imposing ERISA duties on business decisions from which that individual could directly profit does not to us seem an unworkable rule" because "[t]o hold otherwise would protect from ERISA liability obvious self-dealing, as Plaintiffs allege occurred here, to the detriment of the plan beneficiaries." *Johnson*, 572 F.3d at 1077.[5] This Court reads *Johnson* as holding that ERISA fiduciary duties may apply to self-dealing business decisions taken by a plan fiduciary who is also a corporate officer or director. This Court does not read *Johnson* as an abrogation of the Plan Assets Regulation. Courts in the Ninth Circuit likewise have declined to read *Johnson* as abrogating the Plan Assets Regulation. *See, e.g.*, *Wool v. Sitrick*, No. 210CV02741JHNPJWX, 2010 WL 11448099, at *7–8 (C.D. Cal. Aug. 10, 2010).

Fourth, Plaintiffs cite several cases in support of the proposition that a transaction is an "indirect prohibited transaction" under 29 U.S.C. § 1106(a) if the economic substance of the transaction is to dissipate plan assets to the benefit of parties-in-interest. (Dkt. No. 63 at 10–12.)

---

[5] Plaintiffs argument also relies on *Donovan v. Cunningham*, 541 F. Supp. 276 (S.D. Tex. 1982), but that case has limited relevance because it predates the Plan Assets Regulation.

Some of those cases antedate the Plan Assets Regulation. *E.g.*, *M & R Inv. Co. v. Fitzsimmons*, 685 F.2d 283, 287 (9th Cir. 1982); *Donovan v. Bryans,* 566 F. Supp. 1258 (E.D. Pa. 1983). Those that do not are inapposite. *Fish v. Greatbanc Trust Co.* does not concern, as Plaintiffs assert, an argument that a transaction did not involve plan assets under the Plan Assets Regulation. *See generally* 749 F.3d 671 (7th Cir. 2014). *FirsTier Bank, N.A. v. Zeller* concerned improper plan participant loans. 16 F.3d 907 (8th Cir. 1994). *Chesemore v. Alliance Holdings, Inc.* concerned a transaction in which a fiduciary received $2.9 million from the ESOP. 886 F. Supp. 2d 1007, 1055 (W.D. Wis. 2012). The fiduciary argued that he was not engaging in a prohibited transaction because he was not acting as a fiduciary with respect to the transaction, not that the transaction did not involve plan assets. *Id.* As discussed above, *Neil v. Zell* concerned (in part) whether voting the shares held by an ESOP constitutes the management or use of plan assets. 677 F. Supp. 2d at 1029. It did not address whether cash or other assets of an operating company are plan assets.

b. *Alleged Prohibited Transactions*

As noted above, Plaintiffs allege the Fiduciary Defendants caused the Plan to engage with parties-in-interest in four transactions (or groups of transactions) prohibited under 29 U.S.C. § 1106(a):

> a. The settlement of the Notes Payable with the Defendant Note Holders;
>
> b. The entry into and/or the continuance of leases with ACDC [the A-C Development Club, LLC] and entities controlled by ACDC and the Dallas Cotton Club;
>
> c. Excessive compensation and benefits paid to the Defendant Plan Fiduciaries; and
>
> d. Payment of certain of the Defendant Plan Fiduciaries for a covenant not to compete in connection with the 2014 Asset Sales as hereinabove alleged.

(Dkt. No. 50 ¶ 277.)

The "settlement of the Notes Payable with the Defendant Note Holders" is the March 2014 purchase by the Company of notes from the Noteholder Defendants for approximately $8.3 million in cash. (Dkt. No. 50 § IV.C.) Loans guaranteed by a party-in-interest (*i.e.*, the Company) must be without recourse to Plan assets other than unallocated Company shares pledged as security (*i.e.*, the shares purchased with the loans). 29 C.F.R. § 2550.408b-3(e). Plaintiffs allege that in March 2014 those shares were worth approximately $4.2 million. (Dkt. No. 50 § IV.C.) They allege the difference between the amount paid to the Noteholder Defendants and the value of the security available to them—approximately $4 million—was a transaction prohibited under ERISA. They allege that the Fiduciary Defendants are liable for their participation in that prohibited transaction and that Noteholder Defendants are liable under ERISA for "knowingly participating in transactions that violated ERISA and/or knowingly participated as parties in interest in prohibited transactions." (*Id.* ¶ 285.)

The Dallas Cotton Club, Inc. allegedly was a member in the A-C Development Club, LLC ("ACDC"), which allegedly owned many properties that it leased to the Company at above market rates. (*Id.* ¶¶ 150–67.) Plaintiffs allege the Fiduciary Defendants (or, in the case of Defendant Joseph Newton, his son Tradd), along with Jerry Durham, a Company executive who is not a named Defendant, created and controlled the Dallas Cotton Club and ACDC, that they in their capacities as corporate officers and directors directed the Company to enter into above-market leases with ACDC, and that those funds were ultimately distributed to the Fiduciary Defendants. (*Id.*)

Plaintiffs allege the Fiduciary Defendants and other Company executives received "grossly exorbitant compensation" and "excessive benefits" including luxury automobiles. (*Id.* ¶¶ 132–135.) They also allege the Company accelerated deferred compensation retirement benefits for

-21-

Company executives, which provided 15 years of full salary following retirement and vested at age 65, because Company executive realized the Company would not exist by the time they reached age 65. (*Id.* ¶¶ 138–142.) Plaintiffs also complain of allegedly excessive severance payments. (*Id.* ¶¶ 143–45.)

Allegedly, one of the terms of the sale agreement with C&S was a four-year covenant not to compete that would apply to senior Company management who did not become employees of C&S. (*Id.* ¶ 230.) Plaintiffs allege senior management, including Defendants David Schools, Edenfield, and Masche received $700,000 in consideration of their agreement not to compete with C&S. (*Id.*)

Under the analysis the Court provides above, the entry into leases with ACDC and entities controlled by ACDC and the Dallas Cotton Club were not prohibited transactions under 29 U.S.C. § 1106(a) because the Plan was not a party to those transactions and because no Plan assets were involved. Allegedly excessive compensation and benefits paid to the Fiduciary Defendants (before the September 5, 2014 decision to sell substantially all Company assets to C&S) were not prohibited transactions under 29 U.S.C. § 1106(a) for the same reason. These transactions might support claims for breach of fiduciary duties, but they do not fall within the *per se* prohibitions of 29 U.S.C. § 1106(a). Plaintiffs, however, have stated a claim under 29 U.S.C. § 1106(a) regarding the covenant not to compete that was allegedly included in the sale agreement with C&S, because that transaction diverted funds from the Plan participants to the Fiduciary Defendants.

The analysis of the 2014 settlement of the notes payable is more complex. The use of Company cash in the March 2014 purchase of notes payable with the Noteholder Defendants was not a prohibited transaction under 29 U.S.C. § 1106(a) merely because Company cash was used, because Company cash was not then a Plan asset. Plaintiffs, however, raise three additional

arguments specific to the notes payable settlement. First, Plaintiffs argue the Company was liquidating in 2013, *i.e.*, before the March 2014 settlement. The Court finds that argument unpersuasive. Plaintiffs allege the decision to sell substantially all assets and to wind down the Company occurred on September 5, 2014. (Dkt. No. ¶ 225.) Their allegations regarding 2013 are that the "2013 Asset Sales were a clear first step toward a sale of substantially the assets of the Company" and that "the Company had effectively decided in 2013 to embark on a sale of substantially all assets and pursue a winding down." (*E.g.*, *id.* ¶¶ 204, 219.) In the Court's view, the Company ceased to be an operating company (for purposes of the Plan Assets Regulation) when Company management and directors actually decided to sell substantially all the assets of the Company to C&S and to seek approval for a winding down of the Company, not when they "effectively decided" to sell the Company, not when they formed a subjective belief that the Company should be sold, and not when they took an action that might be characterized as a "first step" toward a sale.

Second, Plaintiffs argue the settlement had the effect of violating the prohibition against recourse to plan assets for repayment of loans to ESOPs guaranteed by a party-in-interest beyond the collateral provided for the loans. *See* 29 C.F.R § 2550.408b-3(e). The Court finds that argument unpersuasive because the settlement of the notes payable was, allegedly, without recourse against Plan assets (other than the pledged unallocated shares). The Noteholder Defendants received cash from the company, and the collateral shares were ultimately cancelled. (Dkt. No. 50 ¶ 211–12.). Plaintiffs' argument relies upon the premise that the Company cash tendered to the Noteholder Defendants was a Plan asset, which is a premise the Court rejects, for the reasons given above.

-23-

Third, Plaintiffs argue the transaction involved the redemption and cancellation of the unallocated shares held by the Plan and held as collateral to the notes. (Dkt. No. 63 at 13; Dkt. No. 50 ¶¶ 208–12.) The Court finds that argument persuasive but only as to the Piggly Wiggly Defendants. Plaintiffs allege the Company purchased the notes from the Noteholder Defendants in March 2014. (Dkt. No. 50 ¶ 211.) They allege the Company and the Plan later entered into a redemption agreement, in which the unallocated shares of Company stock held by the Plan and pledged as collateral for the notes were redeemed and cancelled, and the notes owed by the Plan were forgiven. (*Id.* ¶ 212.) What the Company and Plan did with the notes' collateral months after the Company purchased the notes is not relevant to the Noteholder Defendants' liability. But the cancellation of shares held by the Plan and forgiveness of notes collateralized by those shares was a transaction involving Plan assets. Plaintiffs alleged the cancellation was delayed from March to December to dilute Plan participants' voting percentage in the vote on the sale of the Company's assets to C&S. (*Id.*) That allegation is sufficient to state a claim under 29 U.S.C. § 1106(a)(1)(D) (prohibiting transactions between a plan and a party-in-interest (*e.g.*, the Company) that constitutes a direct or indirect transfer to, or use by or for the benefit of a party-in-interest).

Further, the Court observes that when the Company purchased the notes payable from the Noteholder Defendants, the Company was purchasing an interest in the collateral for those notes, which was a Plan asset. For that reason, the March 2014 purchase of the notes constituted an indirect transfer of Plan assets to a party-in-interest (the Company). The purchase may or may not have been for adequate consideration or commercially reasonable. Plaintiffs allege it was not, so that issue is a disputed question of fact, not a pleading deficiency to be adjudicated on a motion to dismiss.

## 2.    *Claims Under 29 U.S.C. § 1106(b)*

Title 29 U.S.C. § 1106(b) prohibits fiduciaries from dealing in plan assets on the

fiduciaries' own account or on behalf of a party with interests adverse to the plan beneficiaries.

> [29 U.S.C. § 1106(b)] is broader in scope [than 29 U.S.C. § 1106(a)], proscribing
> self-dealing and certain transactions by fiduciaries. Whereas [29 U.S.C. § 1106(a)]
> is limited to transactions with parties in interest, [29 U.S.C. § 1106(b)] is more
> expansive, proscribing self-dealing or transactions involving parties with interests
> that are adverse to those of the Plan. *See Reich v. Compton*, 57 F.3d 270, 289 (3rd
> Cir. 1995). [29 U.S.C. § 1106(b)] imposes a duty of undivided loyalty upon
> fiduciaries, making clear that in the exercise of their authority, fiduciaries may not
> involve parties with adverse interests.    *See* 29 C.F.R. § 2550.408b-2(e)(1);
> *Compton*, 57 F.3d at 287. [29 U.S.C. § 1106(b)] is broadly construed, *Lowen v.*
> *Tower Asset [Mgmt.]*, 829 F.2d 1209, 1213 (2[]d Cir. 1987); *Leigh*, 727 F.2d at 126,
> as is the term "adverse interest." *See Sandoval v. Simmons*, 622 F.Supp. 1174,
> 1213–14 (C.D. Ill. 1985). To be adverse within the meaning of the ERISA, the
> interests need not directly conflict but must be sufficiently different. *See id.* at
> 1213. *12

*Int'l Bhd. of Painters and Allied Trades Union and Indus. Pension Fund v. Duval*, 925 F. Supp.

815, 825 (D.D.C. 1996). Further, where 29 U.S.C. § 1106(a) applies to transactions in which the

Plan is a party or Plan assets are used or transferred, 29 U.S.C. § 1106(b) more broadly "prohibits

fiduciaries of an ERISA plan from receiving 'any consideration' coming 'from any party dealing

with' the plan in connection with a transaction 'involving' plan assets." *Chesemore*, 886 F. Supp.

2d at 1056–57. Indeed, 29 U.S.C. § 1106(b)(2)  does not even mention "plan assets." It only

requires that the transaction "involve the plan."

The broader scope of § 1106(b), however does not change the Court's prohibited

transaction analysis. The alleged excessive compensation for Company executives and alleged

above-market leases did not "involve" Plan assets. The settlement of the notes payable and non-

compete agreement did "involve" Plan assets.

*    *    *

For the above reasons, the Court grants the Piggly Wiggly Defendants' motion to dismiss as to claims under count four regarding entry into above-market leases and excessive compensation, and denies the motion to dismiss as to claims under count four regarding the 2014 settlement of the notes payable and the 2014 non-compete agreement. The Court denies the Noteholder Defendants motion to dismiss claims under count four. Although Noteholder Defendant Joanne Newton Ayers was not a party-in-interest, that is not relevant because the settlement of the notes payable was, allegedly, a transfer to or use by the Company of Plan assets, which is prohibited by 29 U.S.C. § 1106(a) unless an exemption under 29 U.S.C. § 1108 applies.

## G.    Equitable Claims

Title 29 U.S.C. § 1132(a)(3) is a "catchall" provision that provides "a safety net, offering appropriate equitable relief for injuries caused by violations that [29 U.S.C. § 1132] does not elsewhere adequately remedy." *Varity Corp. v. Howe*, 516 U.S. 489, 512 (1996). Under 29 U.S.C. § 1132(a)(3), "[a] civil action may be brought . . . by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan." In *Harris Trust and Savings Bank v. Salomon Smith Barney*, the Supreme Court provided that non-fiduciaries can be liable as knowing participants in fiduciary breaches under 29 U.S.C. § 1132(a)(3). 530 U.S. 238, 246 (2000) (noting that 29 U.S.C. § 1132(a)(3) "admits of no limit . . . on the universe of possible defendants"); *see also Daniels v. Bursey*, 313 F.Supp.2d 790, 808 (N.D. Ill. 2004) (concluding that to state a claim under 29 U.S.C. § 1132(a)(3), "the plaintiff must allege only that a fiduciary violated a substantive provision of ERISA and the nonfiduciary knowingly participated in the conduct that constituted the violation").

Relief under 29 U.S.C. § 1132(a)(3), however, is limited to "other appropriate equitable relief." "[O]ther appropriate equitable relief" incorporates limits from the common law of trusts. *Harris Tr.*, 530 U.S. at 250. Under the law of trusts, a non-fiduciary must "have had actual or constructive knowledge of the circumstances that rendered the transaction unlawful." *Id.* at 251; *see also* Rest. 2d Trusts § 297, cmt. a ("A third person has notice of a breach of trust not only when he knows of the breach, but also when he should know of it; that is when he knows facts which under the circumstances would lead a reasonably intelligent and diligent person to inquire whether the trustee . . . is committing a breach of trust, and if such inquiry when pursued with reasonable intelligence and diligence would give him knowledge or reason to know that the trustee is committing a breach of trust."). Typical equitable relief against a party that knowingly participates in a fiduciary breach would be an order requiring the party to return whatever plan assets it obtained in the transaction. *See, e.g.*, *Landwehr v. DuPree*, 72 F.3d 726, 735 (9th Cir. 1995).

To the extent the Fiduciary Defendants breached their fiduciary duties and other ERISA provisions do not provide adequate remedies, they may be liable for equitable relief under 29 U.S.C. § 1132(a)(3). To the extent the Company or the Noteholder Defendants participated in transactions prohibited under ERISA, they also may be liable for equitable relief if they had actual or constructive knowledge that the transactions involved a breach of fiduciary duties. Plaintiffs allege the Fiduciary Defendants engaged in or caused the Company to engage in violative transactions and that the Noteholder Defendants participated in those transactions knowledge that they violated ERISA. (Dkt. No. 50 ¶¶ 284–85.) Plaintiffs therefore state a claim under 29 U.S.C. § 1132(a)(3) for equitable relief, and the Piggly Wiggly Defendants' and Noteholder Defendants' motions to dismiss are denied as to count five of the complaint.

## H.     Co-Fiduciary Liability

The Piggly Wiggly Defendants' motion to dismiss count three (co-fiduciary liability) is premised on the purported failure to state a claim for an antecedent breach of fiduciary duty. Because the Court holds Plaintiffs have stated a claim for an antecedent breach of fiduciary duty, the Court denies the motion to dismiss as to count three.

## IV.     Conclusion

For the foregoing reasons, the Court **GRANTS IN PART AND DENIES IN PART** the Piggly Wiggly Defendants' motion to dismiss (Dkt. No. 59). The Court **DISMISSES** the claims asserted in paragraphs 254(c), 254(d), and 254(e) of count one and the claims regarding above-market leases and excessive executive compensation asserted in count four of the complaint. The Piggly Wiggly Defendants' motion to dismiss is otherwise **DENIED**. The Court **DENIES** the Noteholder Defendants' motion to dismiss (Dkt. No. 58).

**AND IT IS SO ORDERED.**

Richard Mark Gergel
United States District Court Judge

September **19**, 2017
Charleston, South Carolina

-28-