## UNITED STATES DISTRICT COURT
## DISTRICT OF SOUTH CAROLINA
## CHARLESTON DIVISION

| | |
|---|---|
| DANA SPIRES, *et al.*, <br><br>         Plaintiffs, <br><br> v. <br><br> DAVID R. SCHOOLS, *et al.*, <br><br>         Defendants. | No. 2:16-cv-616-RMG |

## PIGGLY WIGGLY DEFENDANTS' ANSWER TO
## PLAINTIFFS' FIRST AMENDED COMPLAINT

Defendants William A. Edenfield, Robert G. Masche, Joseph T. Newton, III, Burton R. Schools, David R. Schools, and the Piggly Wiggly Carolina Company & Greenbax Enterprises, Inc. Employee Stock Ownership Plan and Trust Committee (the "Piggly Wiggly Defendants"), by and through their undersigned counsel and pursuant to Rules 7 and 8 of the Federal Rules of Civil Procedure and the Local Rules of this Court, hereby submit this answer and affirmative defenses (the "Answer") to the allegations in Plaintiffs' First Amended Complaint, Dkt. 50 ("FAC").

### GENERAL DENIAL

The Piggly Wiggly Defendants deny all of the FAC's allegations not specifically admitted in this Answer.

## ANSWERS TO PLAINTIFFS' SPECIFIC ALLEGATIONS

### INTRODUCTION[1]

1.      This is a class action brought pursuant to Sections 404, 405, 406, 409 and 502 of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. §§ 1104, 1105, 1106, 1109 and 1132, against the Plan's fiduciaries and certain other defendants.

**ANSWER:**  Paragraph 1 alleges legal conclusions to which no response is required.  To the extent a response is required, the Piggly Wiggly Defendants deny the allegations in paragraph 1.

2.      The Plan is a non-contributory defined contribution plan covering substantially all employees and former employees of Piggly Wiggly Carolina Company, Inc. ("PWCC") and Greenbax Enterprises, Inc. ("Greenbax") (collectively, the "Plan Sponsors").  The Plan Sponsors together with their affiliates and subsidiary companies are heretofore referred to as the "Piggly Wiggly Group" or the "Company."[2] The Plan is administered by the Plan Committee (as hereinafter defined) which is appointed by the Board of Directors of the Piggly Wiggly Group.

[FN2]: Plaintiffs lack complete knowledge of the organizational structure of Piggly Wiggly Group but understand Greenbax to be the parent company of the Piggly Wiggly Group, with subsidiaries including Piggly Wiggly Holdings, LLC, and PWCC. Plaintiffs further understand upon information and belief that the Board of Directors of Greenbax also functions as the Board of Directors of PWCC, and effectively functions as the Board of Directors of the entity referred to herein as the Piggly Wiggly Group.

**ANSWER:**  Sentence 1 alleges legal conclusions to which no response is required. To the extent a response is required, the Piggly Wiggly Defendants admit that the Piggly Wiggly Carolina Company, Inc. Employee Stock Ownership Plan (the "Piggly Wiggly ESOP") is a defined contribution plan pursuant to ERISA section 3(34), 29 U.S.C. § 1002(34), but deny the remaining allegations in sentence 1.  Sentence 2 contains no allegations to which a response is required.  The Piggly Wiggly Defendants admit that the Board has the authority to appoint the

---

[1] The Piggly Wiggly Defendants do not consider Plaintiffs' section headings used throughout the FAC to contain allegations to which a response is required.  To the extent a response is required, the Piggly Wiggly Defendants deny all allegations contained in the section headers.  The Piggly Wiggly Defendants include these section headers in this Answer for ease of reference only.

Piggly Wiggly ESOP Administrative Committee ("Plan Committee") but lack knowledge or

information sufficient to form a belief as to the truth of the remaining allegations in sentence 3.

Footnote 2 does not contain any allegations to which a response is required. To the extent a

response is required to footnote 2, the Piggly Wiggly Defendants deny the allegations in footnote

2.

3.    Plaintiffs' claims arise from the failures of the Plan fiduciaries to act solely in the interest of the Participants of the Plan and their beneficiaries ("Beneficiaries"), and to exercise the required skill, care, prudence and diligence in administering the Plan and the Plan's assets during the Class Period of February 26, 2008, to the present (the "Class Period").

**ANSWER:** The Piggly Wiggly Defendants deny the allegations in paragraph 3.

4.    Defendants David Schools, William Edenfield, Robert Masche, Joseph Newton, and Burton Schools, together with other members of the Plan Committee and other Plan fiduciaries whose identities are currently not known but will be ascertained through discovery, (collectively, the "Defendant Plan Fiduciaries") at all pertinent times owed to the Plan and its Participants and Beneficiaries fiduciary obligations as set forth in ERISA § 404. These obligations are "the highest known to the law." *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982). As Justice Cardozo famously put it,

> **Many forms of conduct permissible in a workaday world for those acting at arm's length, are forbidden to those bound by fiduciary ties. A trustee is held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior.**

*Meinhard v. Salmon,* 164 N.E. 545, 546 (N.Y. 1928).

**ANSWER:** Sentences 1 and 2 of paragraph 4 allege legal conclusions to which no

response is required. To the extent a response is required, the Piggly Wiggly Defendants deny

the allegations in sentences 1 and 2. Plaintiffs' characterization of the Piggly Wiggly Defendants

as the "Defendant Plan Fiduciaries" implies a legal conclusion, which the Piggly Wiggly

Defendants deny. The Piggly Wiggly Defendants admit that sentences 3, 4, and 5 purport to

paraphrase, quote, and/or cite to a court opinion but rely on the court opinion to speak for itself.

3

5.     Among the duties required of fiduciaries is the duty of loyalty to plan participants and beneficiaries.  This duty requires that the fiduciary's decisions "**must be made with an eye single to the interest of the participants and beneficiaries**."  *Donovan*, 680 F.2d at 271 (citing, among other authorities, Restatement (Second) of Trusts § 170 (1959)).

**ANSWER:**  Sentence 1 alleges legal conclusions to which no response is required.  To the extent a response is required, the Piggly Wiggly Defendants deny the allegations in sentence 1.  The Piggly Wiggly Defendants admit that sentence 2 purports to paraphrase, quote, and/or cite to a court opinion but rely on the court opinion to speak for itself.

6.     Upon information and belief, Defendants David Schools, William Edenfield, Robert Masche, Joseph Newton, and Burton Schools, together with other members of the Plan Committee, acknowledged their fiduciary obligations in a document entitled "Fiduciary Acknowledgment" upon their appointment as fiduciaries.  This document addressed certain of their duties and specific responsibilities and provided guidance, including the following: "Avoid conflicts of interests and prohibited transactions.  If any transaction/investment decision is not made solely for the benefit of the plan participants and their beneficiaries, a breach is likely to have occurred and the fiduciary may be personally liable."

**ANSWER:**  The Piggly Wiggly Defendants deny the allegations in paragraph 6.

7.     Rather than acting consistently with their acknowledged duties and this "highest" of obligations, the Defendant Plan Fiduciaries, all of whom were also Company executives and/or directors, constantly prioritized protecting and enhancing their own personal interests and financial positions, including their interest in retaining their positions with the Company, instead of the interests of Plan Participants and Beneficiaries.

**ANSWER:**  The Piggly Wiggly Defendants deny the allegations in paragraph 7. Plaintiffs' characterization of the Piggly Wiggly Defendants as the "Defendant Plan Fiduciaries" implies a legal conclusion, which the Piggly Wiggly Defendants deny.

8.     Specifically, Plaintiffs allege in Count One that Defendant Plan Fiduciaries breached their fiduciary duties by imprudently and in pursuit of their own self-interest standing by and doing nothing as the value of the Plan's chief asset—Piggly Wiggly Group stock— plummeted by nearly 90% over a sustained period of time, devastating the retirement accounts of thousands of Company employees.  Despite clear evidence that the Company's financial results were significantly worse than the financial results enjoyed by comparable companies, that the value of the Company was in decline and that the Company's stock was being mismanaged, the Defendant Plan Fiduciaries, among other breaches, failed to act as prudent and loyal fiduciaries to (a) timely replace members of the Board of Directors of the Piggly Wiggly Group with competent and independent individuals who would have fulfilled their corporate fiduciary duties

4

and replaced Company management with competent and independent individuals, and (b) appropriately monitor and evaluate the Plan's investment in Company stock and adopt a prudent strategy to sell or liquidate that investment or otherwise appropriately limit the risk to the Plan associated with that investment.

**ANSWER:** The Piggly Wiggly Defendants admit that paragraph 8 purports to

paraphrase, quote, and/or cite to the FAC but relies on the FAC to speak for itself. To the extent

a response is required, the Piggly Wiggly Defendants deny the allegations in paragraph 8.

Plaintiffs' characterization of the Piggly Wiggly Defendants as the "Defendant Plan Fiduciaries"

implies a legal conclusion, which the Piggly Wiggly Defendants deny.

9.    In Count Two, Plaintiffs allege that the Defendant Plan Fiduciaries had full knowledge of, among other matters, mismanagement, conflicts of interest, overcompensation to management and directors, and rife insider deals orchestrated by the management and directors of Piggly Wiggly Group, all of which caused severe harm to the Company and contributed to a severe loss in the Company's value, yet the Defendant Plan Fiduciaries failed to bring one or more derivative actions seeking to enjoin and remedy such behavior, in breach of their fiduciary duties under ERISA.

**ANSWER:** The Piggly Wiggly Defendants admit that paragraph 9 purports to

paraphrase, quote, and/or cite to the FAC but rely on the FAC to speak for itself. To the extent a

response is required, the Piggly Wiggly Defendants deny the allegations in paragraph 9.

Plaintiffs' characterization of the Piggly Wiggly Defendants as the "Defendant Plan Fiduciaries"

implies a legal conclusion, which the Piggly Wiggly Defendants deny.

10.    In Count Three, Plaintiffs allege that the Defendant Plan Fiduciaries are also liable as co-fiduciaries with respect to the violations cited in the other counts, in that the Defendant Plan Fiduciaries participated knowingly in their co-fiduciaries' breaches, knowingly undertook to conceal those breaches, enabled their co-fiduciaries to commit the breaches, and failed to make any reasonable efforts to remedy the breaches.

**ANSWER:** The Piggly Wiggly Defendants admit that paragraph 10 purports to

paraphrase, quote, and/or cite to the FAC but rely on the FAC to speak for itself. To the extent a

response is required, the Piggly Wiggly Defendants deny the allegations in paragraph 10.

Plaintiffs' characterization of the Piggly Wiggly Defendants as the "Defendant Plan Fiduciaries" implies a legal conclusion, which the Piggly Wiggly Defendants deny.

11.    In Count Four, Plaintiffs allege that the Defendant Plan Fiduciaries engaged or caused the Company and/or the Plan to engage in numerous transactions that are categorically prohibited under ERISA as especially likely to harm retirement plans and their participants. The ERISA "prohibited transactions" complained of here involved, among other transactions, direct and indirect transactions between the Plan and the Defendant Plan Fiduciaries themselves as well as individuals related to the Defendant Plan Fiduciaries and entities controlled by or affiliated with the Defendant Plan Fiduciaries.

**ANSWER:** The Piggly Wiggly Defendants admit that paragraph 11 purports to paraphrase, quote, and/or cite to the FAC but rely on the FAC to speak for itself. To the extent a response is required, the Piggly Wiggly Defendants deny the allegations in paragraph 11. Plaintiffs' characterization of the Piggly Wiggly Defendants as the "Defendant Plan Fiduciaries" implies a legal conclusion, which the Piggly Wiggly Defendants deny.

12.    In Count Five, Plaintiffs seek equitable relief for the foregoing allegations of ERISA as well as for a specific transaction in which the Defendant Plan Fiduciaries and Defendants Joanne Newton Ayers and Marion Newton Schools colluded to orchestrate a huge payout of Company and Plan assets in settlement of certain Notes Payable (as hereinafter defined) held by Defendants Joseph Newton, Burton Schools, Joanne Newton Ayers, and Marion Newton Schools. This payout was far in excess of the actual value of the Notes Payable and in breach of ERISA. Further, this payout occurred as the Company was hemorrhaging money and the value of Participants' retirement accounts was plummeting. Defendants Joseph Newton, Burton Schools, Joanne Newton Ayers, and Marion Newton Schools knew or should have known that the payout breached ERISA.

**ANSWER:** The Piggly Wiggly Defendants admit that paragraph 12 purports to paraphrase, quote, and/or cite to the FAC but rely on the FAC to speak for itself. To the extent a response is required, the Piggly Wiggly Defendants deny the allegations in paragraph 12. Plaintiffs' characterization of the Piggly Wiggly Defendants as the "Defendant Plan Fiduciaries" implies a legal conclusion, which the Piggly Wiggly Defendants deny.

13.    This action is brought on behalf of the Plan and seeks losses to the Plan for which Defendant Plan Fiduciaries are personally liable pursuant to ERISA §§ 409 and 502(a)(2), 29 U.S.C. § 1109 and 1132(a)(2). In addition, under § 502(a)(3) of ERISA, 29 U.S.C. §

1132(a)(3), Plaintiffs seek other equitable relief from all Defendants, including without limitation, as available under applicable law, constructive trust, disgorgement, restitution, and other appropriate relief.

**ANSWER:** Paragraph 13 alleges legal conclusions to which no response is required. To the extent a response is required, the Piggly Wiggly Defendants admit that the FAC purports to allege claims under the Employee Retirement Income Security Act of 1974, as amended ("ERISA") but deny the remaining allegations in paragraph 13. Plaintiffs' characterization of the Piggly Wiggly Defendants as the "Defendant Plan Fiduciaries" implies a legal conclusion, which the Piggly Wiggly Defendants deny.

14.     As a result of Defendant Plan Fiduciaries' breaches of fiduciary duty, as hereinafter enumerated and described, the Plan has suffered substantial losses, resulting in the depletion of millions of dollars of the retirement savings and anticipated retirement income of the Plan's Participants. Under ERISA, the breaching fiduciaries are obligated to restore to the Plan the losses resulting from their fiduciary breaches.

**ANSWER:** The Piggly Wiggly Defendants deny the allegations in sentence 1. Sentence 2 contains legal conclusions to which no response is required. To the extent a response is required, the Piggly Wiggly Defendants deny the allegations in sentence 2. Plaintiffs' characterization of the Piggly Wiggly Defendants as the "Defendant Plan Fiduciaries" implies a legal conclusion, which the Piggly Wiggly Defendants deny.

15.     Because Plaintiffs' claims apply to Participants and Beneficiaries as a whole, and because ERISA authorizes participants such as Plaintiffs to sue for plan-wide relief for breach of fiduciary duty and related wrongful conduct, Plaintiffs bring this as a class action on behalf of all Participants and Beneficiaries of the Plan during the Class Period. Plaintiffs also bring this action as Participants seeking Plan-wide relief for breach of fiduciary duty and other breaches of ERISA on behalf of the Plan.

**ANSWER:** Paragraph 15 contains legal conclusions to which no response is required. To the extent a response is required, the Piggly Wiggly Defendants admit that Plaintiffs purport to bring their claims on behalf of a class of individuals but deny the remaining allegations in paragraph 15.

## JURISDICTION AND VENUE

16.      **Subject Matter Jurisdiction**.  This is a civil enforcement action for breach of fiduciary duty brought pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a).  This Court has original, exclusive subject matter jurisdiction over this action pursuant to the specific jurisdictional statute for claims of this type, ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).  In addition, this Court has subject matter jurisdiction pursuant to the general jurisdictional statute for "civil actions arising under the . . . laws . . . of the United States."   28 U.S.C. § 1331.

**ANSWER:**  Paragraph 16 contains legal conclusions to which no response is required.

To the extent a response is required, the Piggly Wiggly Defendants deny the allegations in

paragraph 16.

17.      **Personal Jurisdiction**.  ERISA provides for nationwide service of process, ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2).  All of the Defendants are residents of the United States, and this Court has personal jurisdiction over them.  This Court also has personal jurisdiction over them pursuant to Fed. Civ. P. 4(k)(1)(A), because they all would be subject to the jurisdiction of a court of general jurisdiction in the District of South Carolina.

**ANSWER:**  Paragraph 17 contains legal conclusions to which no response is required.

To the extent a response is required, the Piggly Wiggly Defendants admit the allegations in

paragraph 17.

18.      **Venue**.  Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because the Plan was administered in this District, some or all of the fiduciary breaches for which relief is sought occurred in this District, and/or some or all of the Defendants reside or maintain their primary place of business in this District.

**ANSWER:**  Paragraph 18 contains legal conclusions to which no response is required.

To the extent a response is required, the Piggly Wiggly Defendants admit that venue is proper

but deny the remaining allegations in paragraph 18.

## PARTIES

### Plaintiffs

19.      **Plaintiff Dana Spires** is a resident of Berkeley County, South Carolina.  At all relevant times Plaintiff Dana Spires was a PWCC employee and Participant in the Plan.

8

**ANSWER:** The Piggly Wiggly Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in sentence 1. The Piggly Wiggly Defendants admit that Dana Spires was a PWCC employee and participant in the Piggly Wiggly ESOP but deny the remaining allegations in sentence 2.

20.     **Plaintiff Glenn Grant** is a resident of Charleston County, South Carolina. At all relevant times Plaintiff Glenn Grant was a PWCC employee and Participant in the Plan.

**ANSWER:** The Piggly Wiggly Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in sentence 1. The Piggly Wiggly Defendants admit that Glenn Grant was a PWCC employee and participant in the Piggly Wiggly ESOP but deny the remaining allegations in sentence 2.

21.     **Plaintiff Susan Mohle** is a resident of Charleston County, South Carolina. At all relevant times Plaintiff Susan Mohle was a PWCC employee and Participant in the Plan.

**ANSWER:** The Piggly Wiggly Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in sentence 1. The Piggly Wiggly Defendants admit that Susan Mohle was a PWCC employee and participant in the Piggly Wiggly ESOP but deny the remaining allegations in sentence 2.

22.     **Plaintiff Tom Miranda** is a resident of Lexington County, South Carolina. At all relevant times Plaintiff Tom Miranda was a PWCC employee and Participant in the Plan.

**ANSWER:** The Piggly Wiggly Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in sentence 1. The Piggly Wiggly Defendants admit that Tom Miranda was a PWCC employee and participant in the Piggly Wiggly ESOP but deny the remaining allegations in sentence 2.

**Defendants**

23.     **Defendant David R. Schools ("David Schools")** was, at relevant times, a Trustee of the Plan and a member of the Plan Committee, as well an officer and/or director of the Piggly Wiggly Group. During the Class Period, Defendant David Schools was a fiduciary within

9

the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised discretionary authority or discretionary control respecting management of the Plan and/or exercised authority or control respecting management of the Plan's assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plan.

**ANSWER:** The Piggly Wiggly Defendants admit that David R. Schools has, at various times, been a trustee of the Piggly Wiggly ESOP, a member of the Plan Committee, and an officer and/or director of the Piggly Wiggly Carolina Company ("PWCC") and/or Greenbax Enterprises, Inc. ("Greenbax" and, together with PWCC, the "Company") but deny the remaining allegations in sentence 1. Sentence 2 alleges legal conclusions to which no response is required. To the extent a response is required, the Piggly Wiggly Defendants deny the allegations in sentence 2.

24.     **Defendant William A. Edenfield Jr. ("Edenfield")** was, at relevant times, a Trustee of the Plan and a member of the Plan Committee, as well an officer and/or director of the Piggly Wiggly Group. During the Class Period, Defendant Edenfield was a fiduciary within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised discretionary authority or discretionary control respecting management of the Plan and/or exercised authority or control respecting management of the Plan's assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plan.

**ANSWER:** The Piggly Wiggly Defendants admit that William A. Edenfield has, at various times, been a trustee of the Piggly Wiggly ESOP, a member of the Plan Committee, and an officer and/or director of the Company but deny the remaining allegations in sentence 1. Sentence 2 alleges legal conclusions to which no response is required. To the extent a response is required, the Piggly Wiggly Defendants deny the allegations in sentence 2.

25.     **Defendant Robert G. Masche ("Masche")** was, at relevant times, a Trustee of the Plan and a member of the Plan Committee, as well an officer and/or director of the Piggly Wiggly Group. During the Class Period, Defendant Masche was a fiduciary within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised discretionary authority or discretionary control respecting management of the Plan and/or exercised authority or control respecting management of the Plan's assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plan.

10

**ANSWER:** The Piggly Wiggly Defendants admit that Robert G. Masche has, at various times, been a trustee of the Piggly Wiggly ESOP, a member of the Plan Committee, and an officer and/or director of the Company but deny the remaining allegations in sentence 1. Sentence 2 alleges legal conclusions to which no response is required. To the extent a response is required, the Piggly Wiggly Defendants deny the allegations in sentence 2.

26.    **Defendant Joseph T. Newton III ("Newton")** was, at relevant times, a Trustee of the Plan and a member of the Plan Committee, as well an officer and/or director of the Piggly Wiggly Group. During the Class Period, Defendant Newton was a fiduciary within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised discretionary authority or discretionary control respecting management of the Plan and/or exercised authority or control respecting management of the Plan's assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plan.

**ANSWER:** The Piggly Wiggly Defendants admit that Joseph T. Newton, III has, at various times, been a trustee of the Piggly Wiggly ESOP, a member of the Plan Committee, and an officer and/or director of the Company but deny the remaining allegations in sentence 1. Sentence 2 alleges legal conclusions to which no response is required. To the extent a response is required, the Piggly Wiggly Defendants deny the allegations in sentence 2.

27.    **Defendant Burton R. Schools ("Burton Schools")** was, at relevant times, a Trustee of the Plan and a member of the Plan Committee, as well an officer and/or director of the Piggly Wiggly Group. During the Class Period, Defendant Burton Schools was a fiduciary within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised discretionary authority or discretionary control respecting management of the Plan and/or exercised authority or control respecting management of the Plan's assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plan.

**ANSWER:** The Piggly Wiggly Defendants admit that Burton R. Schools has, at various times, been a trustee of the Piggly Wiggly ESOP, a member of the Plan Committee, and an officer and/or director of the Company but deny the remaining allegations in sentence 1. Sentence 2 alleges legal conclusions to which no response is required. To the extent a response is required, the Piggly Wiggly Defendants deny the allegations in sentence 2.

28.    **Defendant Piggly Wiggly Carolina Company, Inc. and Greenbax Enterprises, Inc. Employee Stock Ownership Plan and Trust Plan Committee (the "Plan Committee")** was at all relevant times the administrator of the Plan, within the meaning of ERISA § 3(16)(A), 29 U.S.C. § 1002(16)(A), and therefore also a fiduciary of the Plan, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), because it exercised discretionary authority or discretionary control respecting management of the Plan and/or exercised authority or control respecting management of the Plan's assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plan.   Sandra S. Rabon, to the extent if any she served as a member of the Plan Committee, is excluded as a Defendant.

**ANSWER:**  Sentence 1 alleges legal conclusions to which no response is required.  To the extent a response is required, the Piggly Wiggly Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in sentence 1.  Sentence 2 does not contain any allegations to which a response is required.

29.    **Defendants John Does 1-10** include members of the Plan Committee, directors and officers of the Piggly Wiggly Group, and other persons and/or entities that serve or served as Plan fiduciaries during the Class Period, with the exception of Sandra S. Rabon, whose identities are currently unknown to Plaintiffs.  Plaintiffs reserve the right to seek leave to join these defendants under their true names once their identities have been ascertained through discovery.

**ANSWER:**  The Piggly Wiggly Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 29.

30.    **Defendant Joanne Newton Ayers** was a former holder of Company stock and participated and knew or should have known that she participated in a transaction that violated ERISA, as hereinafter alleged.  Defendant Joanne Newton Ayers is the sister of Defendant Joseph T. Newton III, the sister-in-law of Defendant Burton Schools, and the aunt of Defendant David Schools.

**ANSWER:**  Sentence 1 alleges legal conclusions to which no response is required.  To the extent a response is required, the Piggly Wiggly Defendants admit that Joanne Newton Ayers formerly held Company stock but deny the remaining allegations in sentence 1.  The Piggly Wiggly Defendants admit the allegations in sentence 2.

31.    **Defendant Marion Newton Schools** was a former holder of Company stock and participated and knew or should have known that she participated in a transaction that violated ERISA, as hereinafter alleged.  Defendant Marion Newton Schools is the wife of Defendant

Burton Schools, the sister of Defendant Joseph T. Newton III, and the mother of Defendant David Schools.

**ANSWER:** Sentence 1 alleges legal conclusions to which no response is required. To the extent a response is required, the Piggly Wiggly Defendants admit that Marion Newton Schools formerly held Company stock but deny the remaining allegations in sentence 1. The Piggly Wiggly Defendants admit the allegations in sentence 2.

## CLASS ACTION ALLEGATIONS

32.     Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and the following class of persons similarly situated (the "Class"):

> All persons, other than Defendants and Sandra S. Rabon, who were participants in or beneficiaries of the Plan at any time between February 26, 2008, and the present (the "Class Period").

**ANSWER:** The Piggly Wiggly Defendants admit that Plaintiffs purport to bring this action under Rule 23 of the Federal Rules of Civil Procedure but deny that class certification is appropriate and further deny the remaining allegations in paragraph 32.

33.     The members of the class are so numerous that joinder of all members is impracticable. While the exact number of class participants is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, the class is estimated to number well over 5,000 persons.

**ANSWER:** Paragraph 33 alleges a legal conclusion to which no response is required. To the extent a response is required, the Piggly Wiggly Defendants deny the allegations in paragraph 33.

34.     Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

> a.  Whether Defendant Plan Fiduciaries breached their fiduciary duties to Plaintiffs and members of the Class by failing to act prudently and solely in the interests of the Plan's participants and beneficiaries; and

b.   Whether all Defendants violated ERISA.

**ANSWER:**  Paragraph 34 alleges legal conclusions to which no response is required.  To the extent a response is required, the Piggly Wiggly Defendants deny the allegations in paragraph 34.  Plaintiffs' characterization of the Piggly Wiggly Defendants as the "Defendant Plan Fiduciaries" implies a legal conclusion, which the Piggly Wiggly Defendants deny.

35.     Plaintiffs' claims are typical of the claims of members of the Class because Plaintiffs and the other members of the Class each sustained a diminution of vested benefits arising out of the Defendants' wrongful conduct in violation of federal law as complained herein, and because Plaintiffs and the other members of the Class all have the right to bring action to recover on behalf of the Plan.

**ANSWER:**  Paragraph 35 alleges legal conclusions to which no response is required.  To the extent a response is required, the Piggly Wiggly Defendants deny the allegations in paragraph 34.

36.     Plaintiffs will fairly and adequately protect the interests of the Class and have retained counsel competent and experienced in class actions, ERISA, and complex civil and commercial litigation.  Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

**ANSWER:**  Sentence 1 alleges legal conclusions to which no response is required.  To the extent a response is required, the Piggly Wiggly Defendants deny the allegations in sentence 1.  The Piggly Wiggly Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in sentence 2.

37.     Class action status in this ERISA action is warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the actions, or substantially impair or impede their ability to protect their interests.

**ANSWER:**  Paragraph 37 alleges legal conclusions to which no response is required.  To the extent a response is required, the Piggly Wiggly Defendants deny the allegations in paragraph 37.

38.     Class action status is also warranted under other subsections of Rule 23(b) because (i) prosecuting separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants; (ii) Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole; and (iii) questions of law or fact common to members of the Class predominate over any questions affecting only individual members and a class action is superior to the other available methods for the fair and efficient adjudication of this controversy.

**ANSWER:** Paragraph 85 alleges legal conclusions to which no response is required.  To the extent a response is required, the Piggly Wiggly Defendants deny the allegations in paragraph 38.

## FACTUAL ALLEGATIONS

I.     **BACKGROUND**

  A.     **The Plan**

39.     The Plan is a non-contributory, "defined contribution" or "individual account" plan within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34), in that the Plan provides for individual accounts for each Participant and for benefits based solely upon the amount contributed to those accounts and any income, expenses, gains and losses which may be allocated to a Participant's account.

**ANSWER:** Paragraph 39 alleges legal conclusions to which no response is required. To the extent a response is required, the Piggly Wiggly Defendants admit that the Piggly Wiggly ESOP is a defined contribution or individual account plan pursuant to ERISA section 3(34), 29 U.S.C. § 1002(34), but deny the remaining allegations in paragraph 39.

40.     The Plan is administered by the Plan Committee, which is appointed by the Board of Directors of the Piggly Wiggly Group.  The Piggly Wiggly Group Board of Directors, as the governing body of Greenbax and PWWC, also appoints the Plan's Trustees.

**ANSWER:** The Piggly Wiggly Defendants lack knowledge or information sufficient to form a belief as to the allegations in sentence 1.  The Piggly Wiggly Defendants admit that the Board has appointed the Piggly Wiggly ESOP's Trustees but deny the remaining allegations in paragraph 40.

41.    Substantially all of the Plan's assets are and have been invested in the common stock of Greenbax, one of the Plan Sponsors, and Greenbax in turn owns 100% of PWCC, the other Plan Sponsor.

**ANSWER:**  The Piggly Wiggly Defendants admit the allegations in paragraph 41.

42.    Prior to April 1, 2014, each Participant's individual account was credited as of the last day of each plan year with an allocation of shares of the Plan Sponsors' common stock, based on a Participant's eligible compensation, relative to total eligible compensation.

**ANSWER:**  The Piggly Wiggly Defendants admit the allegations in paragraph 42.

43.    The Plan was frozen to new employees as of April 1, 2014, and all Participants as of that date became fully vested in their account balances as of April 1, 2014.

**ANSWER:**  The Piggly Wiggly Defendants admit the allegations in paragraph 43.

44.    The right of a Participant to diversify his or her account is limited. A Participant has no right whatsoever to diversify his or her account until reaching the age of 55. At that point, and provided the employee has at least 10 years of participation in the Plan, he or she may diversify up to a cumulative 25% of certain allocated shares for the following five years, and in the sixth year this percentage increases to 50%.  Given these parameters, the net effect has been that for the vast majority of Participants, their retirement futures have been tied either exclusively or nearly exclusively to the financial strength of Piggly Wiggly Group stock.

**ANSWER:**  The Piggly Wiggly Defendants admit that, in accordance with ERISA's

requirements for ESOPs, an ESOP's assets must be primarily invested in company stock but

deny the remaining allegations in sentence 1.  The Piggly Wiggly Defendants admit that

sentences 2 and 3 purport to paraphrase, quote, and/or cite to the plan document but rely on the

plan document to speak for itself.  To the extent a response is required, the Piggly Wiggly

Defendants admit the allegations in sentences 2 and 3.  The Piggly Wiggly Defendants lack

knowledge or information sufficient to form a belief as to the truth of the allegations in sentence

4.  To the extent a response is required, the Piggly Wiggly Defendants deny the allegations in

sentence 4.

45.    The voting rights of Participants with respect to their Greenbax stock are similarly limited.  For most practical purposes relating to the governance of Piggly Wiggly Group, and as provided in the Plan's governing documents, the shares of Company stock held by

the Plan are voted by the Plan's Trustees or Trustee, in accordance with the direction of the Plan Committee. Participants are allowed to vote their allocated shares of stock only on questions related to approval or disapproval of a corporate merger or consolidation, recapitalization, reclassification, liquidation, dissolution, sale of substantially all assets, or similar transaction.

**ANSWER:** The Piggly Wiggly Defendants admit that the Piggly Wiggly ESOP's governing documents permit participants to vote on certain matters, including on issues related to approval or disapproval of a corporate merger or consolidation, recapitalization, reclassification, liquidation, dissolution, or sale of substantially all assets, and admit that on certain matters shares held by the Plan are voted by the Trustee, but deny the remaining allegations in paragraph 45.

46.    The Plan's chief asset—Piggly Wiggly Group stock—is not publicly traded, and the stock's fair value is required to be determined each year based on an independent appraisal. This fair value is then required to be reported on the Plan's financial statements, which are filed each year with the United States Department of Labor.

**ANSWER:** The Piggly Wiggly Defendants admit that the Company's stock is not publicly traded, but the remainder of Paragraph 46 alleges legal conclusions to which no response is required. To the extent a response is required, the Piggly Wiggly Defendants admit the remaining allegations in paragraph 46.

47.    The Plan Committee, under the supervision of the Piggly Wiggly Group's Board of Directors, determines the fair value measurement policies and procedures in consultation with the Company's officers. The Plan's Trustee or Trustees select(s) the independent appraiser that will determine the value of the Company's stock and is(are) responsible for accepting or rejecting the appraiser's value.

**ANSWER:** The Piggly Wiggly Defendants deny the allegations in sentence 1. The Piggly Wiggly Defendants admit that the Plan's Trustee or Trustees are responsible for determining the value of the Piggly Wiggly ESOP's assets and have at certain times hired independent appraisers in connection with that responsibility but deny the remaining allegations in sentence 2.

48.    In accordance with the directions of the Plan Committee, the Plan's Trustee or Trustees may commence and maintain litigation for the Plan.

17

**ANSWER:**  Paragraph 48 alleges legal conclusions to which no response is required.  To the extent a response is required, the Piggly Wiggly Defendants deny the allegations in paragraph 48.

### B.    History of the Company and the Plan's Acquisition of Company Stock

49.    Since its founding, the Piggly Wiggly Group has been under the domination and control of members of the Newton family, including Defendants David Schools, Burton Schools, Newton, and Edenfield.

**ANSWER:**  The Piggly Wiggly Defendants admit that certain descendants and relatives, either by blood or marriage, of Joseph T. Newton, Jr., including David Schools, Burton Schools, Joseph Newton, and William Edenfield, have owned shares of the Company and/or held positions as directors, officers, or employees at the Company, but deny the remaining allegations in paragraph 49.

50.    The Piggly Wiggly Group traces its origins to 1947, when Joseph T. Newton, Jr. founded Piggly Wiggly Wholesale as a family-owned and managed company specializing in the operation of a chain of grocery stores.  These stores were primarily located in South Carolina and later in coastal Georgia.  Since that time, the Company has grown and organized itself into various affiliated and subsidiary companies referred to herein collectively as the "Piggly Wiggly Group."  The Piggly Wiggly Group includes Plan Sponsors PWCC and Greenbax.

**ANSWER:**  The Piggly Wiggly Defendants admit that Joseph T. Newton, Jr. founded Piggly Wiggly Wholesale in 1947 but deny the remaining allegations in sentence 1.  The Piggly Wiggly Defendants admit the remaining allegations in paragraph 50.

51.    Many of the individual Defendant Plan Fiduciaries are related either by blood or marriage to founder Joseph T. Newton, Jr.:  Defendant Newton is his son, Defendant Burton Schools his son-in-law, Defendant David Schools his grandson, and Defendant Edenfield his nephew.

**ANSWER:**  Plaintiffs' characterization of the Piggly Wiggly Defendants as the "Defendant Plan Fiduciaries" implies a legal conclusion, which the Piggly Wiggly Defendants deny. The Piggly Wiggly Defendants admit the remaining allegations in paragraph 51.

52.     The Piggly Wiggly Group remained exclusively or nearly-exclusively family-owned until approximately 1985, when Newton family members including Defendants Newton and Burton Schools, among others, began selling or otherwise transferring their common stock to the Plan.

**ANSWER:**  The Piggly Wiggly Defendants lack knowledge or information sufficient to

form a belief as to the allegations in paragraph 52.

53.     Further sales of family-owned stock to the Plan occurred in 2002, when the Plan purchased the then-remaining outstanding shares of PWCC, aside from those PWCC shares held by Greenbax.  The Plan financed this purchase through a $16 million loan from PWCC.

**ANSWER:**  The Piggly Wiggly Defendants deny the allegations in paragraph 53.

54.     In 2003, PWCC, Greenbax, and the Plan undertook a reorganization, which resulted in the ownership by Greenbax of 100% of PWCC and the Plan's ownership of 69.5% of Greenbax.

**ANSWER:**  The Piggly Wiggly Defendants admit the allegations in paragraph 54.

55.     Finally, in September 2005, the Plan purchased 32,032.44 shares of Greenbax common stock, resulting in the Plan's ownership of over 99% of outstanding Greenbax common stock, or 129,658.52275 total shares.  The Plan acquired these shares in conjunction with the issuance of notes payable totaling approximately $23,382,000 in original principal amount to approximately 9 individuals who sold their Greenbax shares to the Plan (the "Notes Payable").

**ANSWER:**  The Piggly Wiggly Defendants admit that the Piggly Wiggly ESOP

purchased Greenbax shares from certain individuals in September 2005 resulting in its ownership

of over 99% of outstanding Greenbax common stock, or 129,658.52275 total shares, but deny the

remaining allegations in sentence 1.  The Piggly Wiggly Defendants admit the allegations in

sentence 2.

56.     Nearly all of the shareholders who sold their shares to the Plan in 2005 in exchange for the Notes Payable were descendants of founder Joseph T. Newton, Jr. or related to the Newton family by marriage.

**ANSWER:**  The Piggly Wiggly Defendants admit the allegations in paragraph 56.

57.     Defendant Newton received a Note Payable in the principal amount of $7,704,847.11, Defendant Burton Schools a Note Payable in the principal amount of $2,521,868.38, Defendant Joanne Newton Ayers a Note Payable in the principal amount of

$6,806,358.62, and Defendant Marion Newton Schools a Note Payable in the principal amount of $4,137,168.70. Collectively, the Defendants who held the Notes Payable are referred to herein as the "Defendant Note Holders"[2].

[FN]:  Defendants Burton Schools and Newton are included among both the Defendant Plan Fiduciaries and the Defendant Note Holders.

**ANSWER:**  The Piggly Wiggly Defendants admit the allegations in sentence 1.

Sentence 2 and the footnote do not contain any allegations to which a response is required.

Plaintiffs' characterization of the Piggly Wiggly Defendants as the "Defendant Plan Fiduciaries"

implies a legal conclusion, which the Piggly Wiggly Defendants deny.

58.    The Notes Payable were issued on September 19, 2005, had a 25-year term, and required monthly payments including principal and accrued interest. The interest rate was recalculated annually and was based on the preceding five-year average of the Company's return on equity.

**ANSWER:**  The Piggly Wiggly Defendants admit the allegations in paragraph 58.

59.    As initially structured, the amounts payable by the Plan under the Notes Payable were guaranteed by Greenbax and collateralized by the unallocated portion of the shares of Greenbax stock sold in September 2005 to the Plan, which unallocated shares were held in trust by the Plan. As the Plan made payments on the principal of the Notes Payable, an amount of the unallocated stock was then allocated to the employee Participants' individual accounts.

**ANSWER:**  The Piggly Wiggly Defendants admit the allegations in sentence 1. The

Piggly Wiggly Defendants deny the allegations in sentence 2.

60.    By their express terms the Notes Payable were non-recourse. The only remedy that a Defendant Note Holder had against the Plan in the event that the Plan defaulted on its payment obligations was to sell the remaining unallocated shares of Company stock pledged as collateral for the Notes Payable.

**ANSWER:**  The Piggly Wiggly Defendants admit that paragraph 60 purports to

paraphrase, quote, and/or cite to the terms of the Notes Payable but rely on those documents to

speak for themselves. To the extent a response is required, the Piggly Wiggly Defendants admit

that the Notes Payable were non-recourse as to the Piggly Wiggly ESOP but deny the remaining

allegations in paragraph 60.

C.    **Continuing Control of the Company and Plan by Newton Family and Related Parties**

61.    Despite ownership of the Piggly Wiggly Group being gradually transferred to the Plan through the Plan's acquisition of PWCC and Greenbax stock from the mid-1980s through the mid-2000s, actual day-to-day control of the Plan and the Piggly Wiggly Group remained largely with members of the Newton family, including Defendants Newton, Burton Schools, David Schools, and Edenfield, and certain additional individuals related to the Newton family or longtime friends of the Newton family, including Defendant Masche.

**ANSWER:** The Piggly Wiggly Defendants admit that certain descendants and relatives, either by blood or marriage, of Joseph T. Newton, Jr., including David Schools, Burton Schools, Joseph Newton, and William Edenfield, as well as Robert Masche, have owned shares of the Company and/or held positions as directors, officers, or employees at the Company, but deny the remaining allegations in paragraph 61.

62.    During the Class Period, the members of the Piggly Wiggly Group Board of Directors were Defendants Newton, Burton Schools, David Schools, Edenfield and Masche, as well as from August 2011 to May 2014 Sandra S. Rabon.

**ANSWER:** The Piggly Wiggly Defendants admit that Joseph Newton, Burton Schools, David Schools, William Edenfield, and Robert Masche were members of the Board of Directors between 2008 and February 26, 2016, and that Sandra Rabon was a member of the Board until May 2014, but deny the remaining allegations in paragraph 62.

63.    When founder Joseph T. Newton Jr. retired as President of PWCC in 1979, he became Chairman of the Board of the Piggly Wiggly Group, a position he held until his death in 1997.

**ANSWER:** The Piggly Wiggly Defendants admit the allegations in paragraph 63.

64.    Defendant Burton Schools served as an officer of Piggly Wiggly Group until retiring in 1998, when he became chairman of the Board of the Piggly Wiggly Group, taking over this position following the death of his father-in-law Joseph T. Newton Jr.

**ANSWER:** The Piggly Wiggly Defendants admit the allegations in paragraph 64.

65.    Defendant Newton became the President of PWCC following his father Joseph T. Newton Jr.'s retirement in 1979, and later, in 1998, Defendant Newton also became the

President of Greenbax. Defendant Newton held both these positions until 2007, when he retired from the Company and became its Chairman of the Board, taking over that position from his brother-in- law, Burton Schools.

**ANSWER:** The Piggly Wiggly Defendants admit the allegations in paragraph 65.

66.    Defendant David Schools took over the Presidency of Piggly Wiggly Group from his uncle Defendant Newton in 2007 and continues to hold this position today.

**ANSWER:** The Piggly Wiggly Defendants admit the allegations in paragraph 66.

67.    Defendant Edenfield, the cousin of Defendants David Schools, Burton Schools, and Newton, has at relevant times served as an Executive Vice-President of the Piggly Wiggly Group.

**ANSWER:** The Piggly Wiggly Defendants admit that William Edenfield is a first cousin to Joseph Newton and is related to David Schools and Burton Schools but deny the remaining allegations in paragraph 67.

68.    Upon information and belief, Defendant Masche, a member of the Board of Directors of the Piggly Wiggly Group, is a longtime friend of the Newton family.

**ANSWER:** The Piggly Wiggly Defendants admit that Defendant Masche is a member of the Board of Directors of the Piggly Wiggly Group, has known certain members of the Newton family for years, and has been and is a friend of certain members of the Newton family. The Piggly Wiggly Defendants deny the remaining allegations in paragraph 68.

69.    With respect to governance of the Plan, Defendants Newton and Burton Schools served as Trustees of the Plan beginning on or before 2000 and continued serving in that role through May 31, 2012.

**ANSWER:** The Piggly Wiggly Defendants admit that Joseph Newton and Burton Schools were Trustees of the Piggly Wiggly ESOP prior to 2000 and until May 31, 2012 but deny the remaining allegations in paragraph 69.

70.    Defendant Edenfield served as a Plan Trustee from approximately 2005 through May 31, 2012. He was re-appointed as a Trustee on December 12, 2014 and continues to serve as a Plan Trustee to the present.

**ANSWER:** The Piggly Wiggly Defendants admit that William Edenfield resigned as Trustee on May 31, 2012, was re-appointed on December 12, 2014, and continued to serve as Trustee as of February 26, 2016 but deny the remaining allegations in paragraph 70.

71.     Defendants David Schools and Masche served as Plan Trustees from 2006 to May 31, 2012, and both were re-appointed as Plan Trustees on December 12, 2014, and continue to serve as Plan Trustees to the present.

**ANSWER:** The Piggly Wiggly Defendants admit that David Schools and Robert Masche resigned as Trustees on May 31, 2012, were re-appointed on December 12, 2014, and continued to serve as Trustees as of February 26, 2016 but deny the remaining allegations in paragraph 71.

72.     From August 2011 to May 31, 2012, Sandra S. Rabon served as a Plan Trustee.

**ANSWER:** The Piggly Wiggly Defendants admit the allegations in paragraph 72.

73.     Upon information and belief, during the Class Period, the members of the Plan Committee were Defendants Newton, Burton Schools, David Schools, Edenfield and Masche, as well as from August 2011 to May 2014 Sandra S. Rabon.

**ANSWER:** The Piggly Wiggly Defendants admit that, at certain times during the Class Period, Joseph Newton, Burton Schools, David Schools, William Edenfield, Robert Masche, and Sandra Rabon were members of the Plan Committee but otherwise lack knowledge or information sufficient to form a belief as to the remaining allegations in paragraph 73.

**D.     Plan Participants Were Kept Ignorant of Financial Conditions and Operations of Piggly Wiggly Group**

74.     Prior to and during the Class Period, the communications made by the Plan or the Piggly Wiggly Group to Plan Participants included extremely limited information concerning the Plan and the Piggly Wiggly Group.  Annually, following the end of a Plan fiscal year, each Plan Participant was sent an ESOP certificate that listed the number of shares allocated to his or her account, as well as the account's value and a vested account balance.   In addition, each Participant received annually a short—typically one-page—individual account statement that provided an "account summary" including figures for contributions to and transfers and withdrawals from the individual's account, as well as an "asset summary" listing the total

23

number of allocated shares in the account, a value per share, and a total account value of the shares.

**ANSWER:** The Piggly Wiggly Defendants admit that, prior to and during the Class

Period, the communications made by the Plan or the Company to Plan Participants included

information concerning the Plan and the Company but deny the remaining allegations in

sentence 1. The Piggly Wiggly Defendants admit the allegations in sentences 2 and 3.

75.     The annual ESOP certificate was accompanied by a one-page letter from the Piggly Wiggly Group president, and during the Class Period from 2008 to the present, this letter has been signed by Defendant David Schools. As further detailed below, Defendant David Schools's letters typically included an exhortation to the employee about the importance of hard work, as well as an explanation for the mostly poor performance of the company that shifted blame away from the company and its management and onto external causes, like market and economic conditions. The letters never provided any specific financial information respecting the Piggly Wiggly Group or the Plan.

**ANSWER:** The Piggly Wiggly Defendants admit the allegations in sentence 1. The

Piggly Defendants deny the remaining allegations in paragraph 75.

76.     Prior to and during the Class Period, no other information respecting the Plan or the Piggly Wiggly Group was provided to the Participants by the Company or the Plan. Moreover, the Participants had no ability to obtain financial information respecting the Piggly Wiggly Group, such as financial statements, management's discussion and analysis of financial condition and results of operations, related party transaction information, compensation paid to management or the annual appraisal reports prepared by the independent appraiser selected by the Plan Trustees to determine the value of the Company's stock. All such information was concealed by the Piggly Wiggly Group, the Plan and the Defendant Plan Fiduciaries from the Participants and the Beneficiaries, including the Plaintiffs.

**ANSWER:** The Piggly Wiggly Defendants deny the allegations in paragraph 76.

Plaintiffs' characterization of the Piggly Wiggly Defendants as the "Defendant Plan Fiduciaries"

implies a legal conclusion, which the Piggly Wiggly Defendants deny.

77.     Had any Participant requested such information from the Company, the Plan or the Defendant Plan Fiduciaries, his or her request would have been rebuffed, as evidenced by Defendant David Schools' responses to information requests made by George ("Joe") Pinto, a Participant. By email of February 26, 2015 to Defendant David Schools, Mr. Pinto requested, among other items, a financial statement for Greenbax. Defendant David Schools responded the same day by email, stating: "[T]here is no provision for an ESOP participant, former employee

or current employee to receive confidential corporate financial statements or information.  You are entitled to ESOP information only, the entirety of which you have received.  Therefore, there really is no need to communicate regarding further document requests."

**ANSWER:**  The Piggly Wiggly Defendants deny the allegations in sentence 1.  The

Piggly Wiggly Defendants admit that sentences 2 through 5 purport to paraphrase, quote, and/or

cite to an email exchange between Joe Pinto and David Schools but rely on the document to

speak for itself.  To the extent a response is required, the Piggly Wiggly Defendants admit the

allegations in sentences 2 through 5.  Plaintiffs' characterization of the Piggly Wiggly

Defendants as the "Defendant Plan Fiduciaries" implies a legal conclusion, which the Piggly

Wiggly Defendants deny.

78.    In September 2015, Mr. Pinto requested Defendant David Schools or the Plan Administrator to provide information respecting the Plan, including "[a]ll company stock valuation reports since 2000."  In response, Mr. Schools sent Mr. Pinto, under cover of a letter dated October 16, 2015, a copy of the Plan's governing Plan document and the Plan's fiscal 2014 financial statements.  No annual appraisal report was then or subsequently provided by Defendant David Schools, the Company or the Plan to Mr. Pinto.

**ANSWER:**  The Piggly Wiggly Defendants admit that sentence 1 purports to paraphrase,

quote, and/or cite to an email from Joe Pinto to David Schools but rely on the document to speak

for itself.  To the extent a response is required, the Piggly Wiggly Defendants admit the

allegations in sentence 1.  The Piggly Wiggly Defendants admit the allegations in sentences 2

and 3.

79.    Despite effectively being the owners of the Piggly Wiggly Group, Plan Participants were not provided any information about the financial condition, results of operations, or future plans of or other material information respecting the Company.  Nor were the Plan Participants given any opportunity to be involved in electing the Board of Directors of the Company.

**ANSWER:**  The Piggly Wiggly Defendants deny the allegations in sentence 1.  The

Piggly Wiggly Defendants admit that, per the terms of the plan document, participants did not

25

vote to instruct the Piggly Wiggly ESOP's trustee(s) regarding Board of Directors elections, but

deny the remaining allegations in sentence 2.

## II.     COLLAPSE IN COMPANY FINANCIAL RESULTS, CONDITION AND VALUE DUE TO MISMANAGEMENT, AND FAILURE OF FIDUCIARIES TO RESPOND

80.     Prior to and during the Class Period, the Company experienced a steady and sustained deterioration in its financial performance, which caused a huge decline in its reported appraised value, leading to a correspondingly large drop in the overall reported value of the Plan's net assets. The Plan's Form 5500 Annual Reports (the "Annual Reports"), which were filed with the Department of Labor and correspond to Plan fiscal years ending on or near March 31, document this downturn in the value of the Company and the Plan.

**ANSWER:** The Piggly Wiggly admit that the value of the Company's stock and the

Plan's net assets is impacted by the Company's financial performance and that those values

declined over the Class Period but deny all remaining allegations in sentence 1.  The Piggly

Wiggly Defendants admit that sentence 2 purports to paraphrase, quote, and/or cite to the Piggly

Wiggly ESOP's form 5500 filings but rely on those documents to speak for themselves.

81.     In the face of this year-after-year decline, Defendant Plan Fiduciaries did not replace the Company's Board of Directors with a competent and independent Board that would have investigated and analyzed the reasons for the Company's disastrous performance and replaced management with competent and independent management.  Instead, the Defendant Plan Fiduciaries kept in place the existing Company board and management despite the long and sustained period of demonstrated managerial and directorial incompetence.

**ANSWER:** The Piggly Wiggly Defendants admit that the Company's Board included

Joseph Newton, Burton Schools, David Schools, Bill Edenfield, and Robert Masche between

February 26, 2008 and February 26, 2016, and also included Sandra Rabon between 2009 and

2014, but deny the remaining allegations in paragraph 81.  Plaintiffs' characterization of the

Piggly Wiggly Defendants as the "Defendant Plan Fiduciaries" implies a legal conclusion, which

the Piggly Wiggly Defendants deny.

82.     During the same period, comparable grocery store chains were enjoying increasing revenues and profitable operations.  For much of the same time, and particularly from

2010 to 2015, the values of these comparable grocery store chains were either increasing or maintaining their value, in direct contrast with the Company's experience.

**ANSWER:**  The Piggly Wiggly Defendants deny knowledge or information sufficient to

form a belief regarding the allegations in paragraph 82.

> A.    **Commencing Before the Class Period, and Continuing Throughout the Class Period, the Piggly Wiggly Group was Grossly Mismanaged, Leading to Terrible Financial Results, Unlike the Results Enjoyed by Comparable Companies**

83.    Every year commencing with the fiscal year ended 2007, the Company has suffered a large loss.  Over the same period, the Company's other financial metrics, such as total revenues and gross profits, significantly worsened.  These financial results were the result of gross mismanagement.

**ANSWER:**  The Piggly Wiggly Defendants admit that the value of Greenbax stock and

certain financial metrics declined between 2007 and February 26, 2016 but deny the remaining

allegations in paragraph 83.

84.    During the Company's fiscal year ended April 1, 2007, the Company incurred a substantial loss.  The magnitude of this loss is suggested by the approximate $12.1 million drop in the Company's net book value (as adjusted by the Company's appraiser selected by the Defendant Plan Fiduciaries) from fiscal year end 2006 to fiscal year end 2007.

**ANSWER:**  The Piggly Wiggly Defendants lack knowledge or information sufficient to

form a belief as to the meaning of the term "substantial loss" as used by Plaintiffs.  The Piggly

Wiggly Defendants admit that the Company's net book value declined by approximately $12.1

million from fiscal year end 2006 to fiscal year end 2007.  The Piggly Wiggly Defendants deny

all remaining allegations of paragraph 84.  Plaintiffs' characterization of the Piggly Wiggly

Defendants as the "Defendant Plan Fiduciaries" implies a legal conclusion, which the Piggly

Wiggly Defendants deny.

85.    During the fiscal year ended March 30, 2008, the Company's gross profit and earnings before interest, taxes, depreciation and amortization ("EBITDA") declined materially and the Company incurred a massive loss.  The magnitude of this loss is suggested by the approximate $32.5 million drop in the Company's net book value (as adjusted by the appraiser

selected by the Defendant Plan Fiduciaries) from fiscal year end 2007 to fiscal year end 2008.  In its fiscal year end 2008 appraisal of the Company's stock, the appraiser characterized these results as "poor performance in 2008," stated that "the Company has underperformed in recent years" and noted "the material decrease in net worth during the past two years…"  Faced with a history of two years of poor managerial competence, a board of directors fulfilling its corporate fiduciary duties would have taken drastic corrective action, as described below.  This need for major board action continued to be the case during the entire period commencing March 2008.

**ANSWER:**  The Piggly Wiggly Defendants admit that the Company's EBITDA declined

in the Plan year ending March 31, 2008 but deny the remaining allegations in sentence 1.   The

Piggly Wiggly Defendants admit that sentences 2 and 3 purport to paraphrase, quote, and/or cite

to the appraisal report as of March 30, 2008 but rely on that document to speak for itself.  To the

extent a response is required, the Piggly Wiggly Defendants deny the allegations in sentences 2

and 3.  The Piggly Wiggly Defendants deny the allegations in sentences 4 and 5.  Plaintiffs'

characterization of the Piggly Wiggly Defendants as the "Defendant Plan Fiduciaries" implies a

legal conclusion, which the Piggly Wiggly Defendants deny.

86.     This history of mismanagement and poor financial performance continued in the fiscal year ended March 29, 2009, during which the Company's total sales and gross profit declined, and, once again, the Company operated at a very large loss.  The magnitude of the loss is suggested by the approximate $23.1 million drop in that fiscal year in the Company's net book value (as adjusted by the Company's appraiser).  Again, in its fiscal year end 2009 appraisal of the Company's stock, the appraiser selected by the Defendant Plan Fiduciaries stated that "the Company has underperformed in recent years" and noted "the material decrease in net worth during the past three years" and "[a]s a result of the recent losses, the Company now carries a stockholders' deficit on its balance sheet."

**ANSWER:**  The Piggly Wiggly Defendants admit that the Company's total sales and

gross profits declined in the fiscal year ended March 31, 2009 but deny the remaining allegations

in sentence 1.  The Piggly Wiggly Defendants admit that sentences 2 and 3 purport to

paraphrase, quote, and/or cite to the appraisal report as of March 29, 2009 but rely on that

document to speak for itself.  Plaintiffs' characterization of the Piggly Wiggly Defendants as the

"Defendant Plan Fiduciaries" implies a legal conclusion, which the Piggly Wiggly Defendants

deny.

87.     The Company's fiscal year ended March 28, 2010 continued the same dismal
performance.  In that fiscal year, the Company's sales and gross profit declined again and the
Company incurred another significant loss.  The magnitude of this loss is suggested by the
approximate $10.9 million drop over that fiscal year in the Company's net book value (as
adjusted by the Company's appraiser).  Fiscal year ended 2010 represented the fourth
consecutive year of significant negative results.  Over those four years, the Company's total
sales, gross profit and gross margins had declining trends, and other financial metrics of the
Company (such as liquidity ratios) worsened.  In its fiscal year end 2010 appraisal of the
Company's stock, the appraiser selected by the Defendant Plan Fiduciaries noted "the material
decrease in net worth during the past four years" and, once again, stated that "the Company has
underperformed in recent years."  The appraiser also stated that "[a]s a result of the poor
performance, [the Company's] financial position has weakened substantially."  Faced with these
four years of terrible managerial performance, a reasonably prudent and loyal fiduciary would
have voted the Plan's Company stock to elect a new board of directors of the Company.  The
Defendant Plan Fiduciaries instead voted the stock to retain the existing board, including
themselves.

**ANSWER:**  The Piggly Wiggly Defendants admit that the Company's sales and gross

profits declined in the fiscal year ended March 31, 2010 and that the Company's net book value

declined by approximately $10.9 million over the fiscal year ended March 28, 2010 but deny the

remaining allegations in sentences 1 through 4.  The Piggly Wiggly Defendants admit that

certain financial metrics declined between the 2006 and 2010 Plan years but deny the remaining

allegations in sentence 5.  The Piggly Wiggly Defendants admit that sentences 6 and 7 purport to

paraphrase, quote, and/or cite to the appraisal report as of March 28, 2010 but rely on that

document to speak for itself.  To the extent a response is required, the Piggly Wiggly Defendants

admit the allegations in sentences 6 and 7.  The Piggly Wiggly Defendants deny the allegations

in sentences 8 and 9.  Plaintiffs' characterization of the Piggly Wiggly Defendants as the

"Defendant Plan Fiduciaries" implies a legal conclusion, which the Piggly Wiggly Defendants

deny.

88.     In the fiscal year ended April 3, 2011, the Company's revenue increased as compared to fiscal year 2010, but the Company suffered another severe loss, the fifth consecutive year of losses.  Plaintiffs are unaware of the magnitude of this loss, but it exceeded $7 million.  In that fiscal year, the Company's gross profit continued to decline, having decreased by a compound rate of 2.9% annually from fiscal 2007 to fiscal 2011.  Moreover, since fiscal year 2008, the Piggly Wiggly Group had carried a negative working capital position, and, as had been the case in each of the prior two fiscal years, the Company ended its fiscal year 2011 with a negative net worth.  In its fiscal year end 2011 appraisal of the Company's stock, the appraiser selected by the Defendant Plan Fiduciaries noted "the poor performance of [the Company],", "[t]he Company's balance sheet continued to weaken as operating losses were incurred" and "the material decline in equity" and once again stated that "the Company has underperformed in recent years."  Faced now with five years of terrible managerial performance, a reasonably prudent and loyal fiduciary would have voted the Plan's Company stock to elect a new board of directors of the Company.  The Defendant Plan Fiduciaries instead voted the stock to retain the existing board, including themselves.

**ANSWER:**  The Piggly Wiggly Defendants admit that revenue rose in the fiscal year ended March 31, 2011.  The Piggly Wiggly Defendants lack knowledge or information sufficient to form a belief as to the meaning of the term "loss" as used by Plaintiffs and so deny the remaining allegations in sentence 1.  The Piggly Wiggle Defendants deny knowledge or information sufficient to form a belief as to the allegations in sentence 2.  The Piggly Wiggly Defendants admit the allegations in sentence 3.  Plaintiffs' characterization of the Piggly Wiggly Defendants as the "Defendant Plan Fiduciaries" implies a legal conclusion, which the Piggly Wiggly Defendants deny.  The Piggly Wiggly Defendants admit the remaining allegations in sentence 4.  The Piggly Wiggly Defendants admit that sentence 5 purports to paraphrase, quote, and/or cite to the appraisal report as of April 3, 2011 but rely on that document to speak for itself.  To the extent a response is required, the Piggly Wiggly Defendants admit that the quoted portions are accurate but deny the remaining allegations in sentence 5.  The Piggly Wiggly Defendants deny the allegations in sentences 6 and 7.

89.     The Company's revenues continued to drop in the fiscal year ended April 1, 2012. From fiscal year 2008 to fiscal year 2012, the Company's net sales had decreased at a compound annual rate of 3.6%.  In fiscal year 2012, the Company's EBITDA, as adjusted by the

appraiser of the Company stock selected by Reliance Trust Company, the directed Trustee of the Plan, declined from the prior year level and the Company's EBITDA margin (at 2.0%) was significantly below the 5.6% median for the comparable companies used by the appraiser. The Company incurred a loss in fiscal year 2012 (in an amount unknown to Plaintiffs), its sixth consecutive fiscal year of losses. In its fiscal year end 2012 appraisal of the Company's stock, the appraiser noted that "PW's [Piggly Wiggly Holdings, LLC's] profitability levels are significantly below industry averages." Faced now with six years of terrible managerial performance, a reasonably prudent and loyal fiduciary would have voted the Plan's Company stock to elect a new board of directors of the Company. The Defendant Plan Fiduciaries instead voted the stock to retain the existing board, including themselves.

      **ANSWER:** The Piggly Wiggly Defendants admit the allegations in sentence 1. The

Piggly Wiggly Defendants admit that, in fiscal year 2012, the Company's EBITDA, as adjusted

by the appraiser of the Company stock selected by Reliance, declined from the prior year level,

and the Company's EBITDA margin (at 2.0%) was below the 5.6% median for the comparable

companies used by the appraiser, but deny all remaining allegations in sentence 2. The Piggly

Wiggly Defendants lack knowledge or information sufficient to form a belief as to the meaning

of the term "loss" as used by Plaintiffs and so deny the allegations in sentence 3. The Piggly

Wiggly Defendants admit that sentence 5 purports to paraphrase, quote, and/or cite to the

appraisal report as of April 1, 2012 but rely on that document to speak for itself. The Piggly

Wiggly Defendants deny the allegations in sentence 6 and 7.    Plaintiffs' characterization of the

Piggly Wiggly Defendants as the "Defendant Plan Fiduciaries" implies a legal conclusion, which

the Piggly Wiggly Defendants deny.

      90.     Continuing the history of negative financial results, in the fiscal year ended March 31, 2013, the Company's revenues declined, the Company's EBITDA declined more than 43% from the prior year level, the Company's EBITDA margin (at 1.3%) was significantly below the 5.1% median for the comparable companies used by the appraiser selected by Reliance Trust Company, and the Company incurred another large loss. In its fiscal year end 2013 appraisal of the Company's stock, the appraiser selected by Reliance Trust Company, the directed Trustee of the Plan, noted again that "PW's [Piggly Wiggly Holdings, LLC's] profitability levels are significantly below industry averages" and stated that "[a]s of the Valuation Date, PW was experiencing significant liquidity challenges, which may hinder PW's ability to execute its strategy and could possibly result in bankruptcy." Faced now with seven

years of terrible managerial performance, a reasonably prudent and loyal fiduciary would have voted the Plan's Company stock to elect a new board of directors of the Company. The Defendant Plan Fiduciaries instead voted the stock to retain the existing board, including themselves.

**ANSWER:** The Piggly Wiggly Defendants admit that sentences 1 and 2 purport to paraphrase, quote, and/or cite to the appraisal report as of March 31, 2013 but rely on that document to speak for itself and deny all remaining allegations in sentences 1 and 2. The Piggly Wiggly Defendants deny the allegations in sentence 3. The Piggly Wiggly Defendants deny the allegations in sentence 4. Plaintiffs' characterization of the Piggly Wiggly Defendants as the "Defendant Plan Fiduciaries" implies a legal conclusion, which the Piggly Wiggly Defendants deny.

91.     These disastrous financial results caused the Company to default on various financial covenants contained in its debt instruments. Due to or related to these defaults, the Company's distressed financial condition and prospects forced the Company, beginning in 2010 or 2011, to refinance its indebtedness with loans bearing interest at exorbitant rates. At April 1, 2012, the Company's term loan debt bore interest at the annual rate of LIBOR plus 12.0%. At March 31, 2013, its term debt bore interest at the annual rate of LIBOR plus 13.75%. Upon information and belief, because of the Company's extremely poor financial performance, the Company's lender informed the Company in 2012 or 2013 that its credit facilities would become due in full in September 2013. Because the Company was unable to refinance its debt, the Company was forced in 2013 to sell 29 of its stores in order to pay off its debt and avoid filing for bankruptcy.

**ANSWER:** The Piggly Wiggly Defendants admit that the Company defaulted on certain financial covenants and subsequently obtained debt from new lenders but deny the remaining allegations in sentences 1 and 2. The Piggly Wiggly Defendants admit the allegations in sentences 3 and 4. The Piggly Wiggly Defendants admit that the Company's lender informed the Company in 2012 or 2013 that its credit facilities would become due in full in September 2013 but deny the remaining allegations in sentences 5 and 6.

92.     These severely negative financial results for the Piggly Wiggly Group were the result of grossly incompetent and self-interested management. As outlined below, the Piggly Wiggly Group's management made poor store location, pricing, facility updating and other

business decisions and entered into and continued business relationships that favored the Defendant Plan Fiduciaries at the expense of the Company and the Plan.

**ANSWER:**  The Piggly Wiggly Defendants deny the allegations in paragraph 92.

93.     Upon information and belief, all of the above-described financial information was known to the Plan Committee and the Plan Trustees.  The annual appraisal reports of the value of the Company's stock were performed at the request of the Plan Trustees and were addressed to a Plan Trustee.

**ANSWER:**  The Piggly Wiggly Defendants lack knowledge or information sufficient to

form a belief as to the allegations in sentence 1..  The Piggly Wiggly Defendants admit that the

annual appraisal reports were addressed to a Trustee but lack knowledge or information

sufficient to form a belief as to the remaining allegations in sentence 2.  Plaintiffs'

characterization of the Piggly Wiggly Defendants as the "Defendant Plan Fiduciaries" implies a

legal conclusion, which the Piggly Wiggly Defendants deny.

94.     By contrast with the Piggly Wiggly Group's terrible financial performance, comparable companies in the grocery business enjoyed increased sales and were consistently profitable during the relevant period.  During the entire seven-year period ended near March 2013, each of Ingles Markets, Inc., The Kroger Co., Weiss Markets, Inc. and Publix Super Markets, Inc. had increasing sales and was profitable.  Of these, (a) Ingles Markets, Inc., The Kroger Co., and Publix Super Markets, Inc. were included in the group of six publicly-traded companies that the Company stock appraiser (selected by the Defendant Plan Fiduciaries) considered reasonably comparable to the Piggly Wiggly Group, and (b) Ingles Market, Inc., The Kroger Co. and Weiss Markets, Inc. were included in the nine publicly-traded companies that the Company stock appraiser (selected by the directed Plan Trustee, Reliance Trust Company) considered reasonably comparable to the Piggly Wiggly Group.

**ANSWER:**  The Piggly Wiggly Defendants lack knowledge or information sufficient to

form a belief as to the allegations in sentences 1 and 2 regarding other companies and otherwise

deny the remaining allegations in sentences 1 and 2.  The Piggly Wiggly Defendants admit that

sentence 3 purports to paraphrase, quote, and/or cite to the annual appraisals of Company stock

but rely on those documents to speak for themselves and deny all remaining allegations in

sentence 3. Plaintiffs' characterization of the Piggly Wiggly Defendants as the "Defendant Plan

Fiduciaries" implies a legal conclusion, which the Piggly Wiggly Defendants deny.

### B.    Corresponding Collapse in Company Value

95.    As set out in the Annual Reports, the 7-year period from March 30, 2008, to
March 31, 2015, the total reported value of the Piggly Wiggly Group stock held by the Plan—
essentially the Plan's only asset—fell from $88,773,300 at fiscal year end 2008 to $9,026,267 at
fiscal year end 2015. This represents a drop in stock value over seven years of $79,747,033, or
over 89% of the reported 2008 stock value. Over the same period, the net assets of the Plan
declined from $59,153,834 in 2008 to $13,623,177 in 2015—a decline of $45,530,657, or nearly
77% of the reported net assets at fiscal year end 2008.

**ANSWER:** The Piggly Wiggly Defendants admit that paragraph 95 purports to

paraphrase, quote, and/or cite to the annual appraisals of Company stock but rely on those

documents to speak for themselves. To the extent a response is required, the Piggly Wiggly

Defendants admit the allegations in paragraph 95.

96.    This catastrophic decline decimated the retirement savings of thousands of
Piggly Wiggly employees, including the Plaintiffs, a large percentage of which employees, upon
information and belief, earned compensation of less than $40,000 per year.

**ANSWER:** The Piggly Wiggly Defendants lack knowledge or information sufficient to

form a belief as to the allegations in paragraph 96.

97.    As of March 30, 2008, the reported value of Company stock held by the Plan
was $88,773,300, and the net Plan assets stood at $59,153,834. A continuous decline from these
numbers followed.

**ANSWER:** The Piggly Wiggly Defendants admit the allegations in paragraph 97.

98.    In the fiscal year ended March 29, 2009, the reported value of the Plan-held
Company stock dropped to $72,005,861, a loss of $16,767,439—or almost 19%— in a single
year. The reported value of net Plan assets likewise declined over $15,000,000 to $43,582,020.

**ANSWER:** The Piggly Wiggly Defendants admit the allegations in paragraph 98.

99.    In September or October 2009, Defendant David Schools communicated the
following to Plan Participants:

The fiscal year that ended in March of 2009 was particularly challenging for <u>our</u>

company and the economy as a whole. . . . Some parts of the economy are showing improvement, but, one of the most important economic indicators, unemployment, is still too high.   This has a direct negative impact on the supermarket industry in general and our company in particular.   However, we strongly believe in our future. . . . Like stock in every company, the price of ours will rise and fall from time to time.  Our goal is to see our company turn around this negative stock-value trend with improved performance and growth.   To contribute to that outcome, we must think like owners.  Business success is never guaranteed, but our team has never been stronger as we work together to improve our company's performance. Only by doing that – working together – will we achieve the true potential of our company and our ESOP. (Underlined Emphasis in Original)

**ANSWER:**  The Piggly Wiggly Defendants admit that paragraph 99 purports to paraphrase, quote, and/or cite to a letter from David Schools to Piggly Wiggly ESOP participants but rely on that document to speak for itself.  To the extent a response is required, the Piggly Wiggly Defendants admit the allegations in paragraph 99.

100.    The following fiscal year saw another decline, with reported total share value falling to $68,222,425, a drop of $3,783,436—or over 5%—by March 28, 2010.  The reported value of net plan assets similarly declined to $41,906,983.

**ANSWER:**  The Piggly Wiggly Defendants admit the allegations in paragraph 100.

101.    Despite these numbers, Defendant David Schools wrote to Plan Participants in October 2010, explaining:

There is no avoiding the fact that the last two fiscal years have been challenging for our company and the economy as a whole. . . . However through aggressive cost management and well thought out operational changes, including the introduction of the Pig Way, ***we have greatly improved our financial performance during the most recent fiscal year. . . . Our stock price performance is not where we would like to see it, but the trend is improving.*** . . . I could not be more proud of the progress we, as owners, have made in continuing to improve the financial performance of our company.   Our work is not done and many rewards are yet to come.  But, remember these things:   your work and ownership of Piggly Wiggly/Greenbax has enabled you to continue to help support your families, educate your children, and give you some level of financial security in a time in our nation's history during which those could not be taken for granted. (Emphasis Added in Boldface; Underlined Emphasis in Original)

**ANSWER:**  The Piggly Wiggly Defendants admit that paragraph 101 purports to paraphrase, quote, and/or cite to a letter from David Schools to Piggly Wiggly ESOP participants

but rely on that document to speak for itself.  To the extent a response is required, the Piggly

Wiggly Defendants admit that paragraph 101 accurately quotes the October 2010 letter but deny

the remaining allegations in paragraph 101.

102.    Despite the manner in which the Plan Participants were being misled by such
statements, a similar decline followed in the 2010-2011 fiscal year, with the reported total stock
value dropping $3,419,095 to $64,803,330, again a decline of approximately 5%.  The reported
net plan assets also dropped again, falling to $40,523,681.

**ANSWER:**  The Piggly Wiggly Defendants admit that the reported Company stock value

for the fiscal year ended March 31, 2011 was $64,803,330 and the Piggly Wiggly ESOP's net

assets $40,523,681 but deny the remaining allegations in paragraph 102.

103.    Notwithstanding this continued decline, Defendant David Schools wrote to Plan
Participants in September 2011, proclaiming

> Our stock price performance is still not where we would like to see it, ***but the trend
> continues to improve***. . . We must continue to think like owners.  Only by working
> together will we achieve the true potential of our company and our ESOP. . . . ***Our
> current fiscal year through July is showing improvement over our last fiscal year.
> Let's keep up this momentum and continue to focus on immediate improvements
> that translate into long-term success for Our company and Our ESOP.***"
> **(Emphasis added)**

**ANSWER:**  The Piggly Wiggly Defendants admit that paragraph 103 purports to

paraphrase, quote, and/or cite to a letter from David Schools to Piggly Wiggly ESOP participants

but rely on that document to speak for itself.  To the extent a response is required, the Piggly

Wiggly Defendants admit that paragraph 103 accurately quotes the September 2011 letter but

deny the remaining allegations in paragraph 103.

104.    But worse was yet to come, with the next two fiscal years seeing declines
unmatched since the period of 2008 to 2009. In the fiscal year ended April 1, 2012, the total
reported value dropped $11,610,921—or nearly 18%—to $53,192,409.  The reported net plan
assets fell also to $32,532,521.

**ANSWER:**  The Piggly Wiggly Defendants admit that the reported Company stock value

for the fiscal year ended March 31, 2012 was $53,192,409 and the reported net plan assets

$32,532,521 but deny the remaining allegations in paragraph 104.

105.    In the fiscal year ended March 31, 2013, the total reported value dropped a
shocking $21,873,393—or 41%—to $31,319,016. The reported net Plan assets experienced a
similar decline to $12,341,592, a drop of some $20 million.  As had always been the case, the
only indication Plan Participants received about this drop came approximately 7 months later,
when they received an annual communication from the Plan noting the decline in the value per
share of Company stock.

**ANSWER:**  The Piggly Wiggly Defendants admit that the reported Company stock value

for the fiscal year ended March 31, 2013 was $31,319,016 and the net plan assets $12,341,592

but deny the remaining allegations in sentences 1 and 2.  The Piggly Wiggly Defendants lack

knowledge or information sufficient to form a belief as to the truth of the allegations in sentence

3.

106.    In the fiscal year ended March 30, 2014, the reported total stock value dropped
again to $27,837,685, a decline in overall value of $3,481,331, or 11%.  The reported net Plan
assets experienced a similar decline to $8,936,174.

**ANSWER:**  The Piggly Wiggly Defendants admit the allegations in paragraph 106.

107.    Finally, in the fiscal year ended March 29, 2015—the last year for which data is
available, the reported total stock value dropped yet again to $9,026,267, a decline in overall
value of $18,811,418, or nearly 68%. The reported value of Plan assets over the same period rose
to $13,623,177, primarily due to the reduction in the Plan's liabilities with the payoff of the
Notes Payable, as described below.

**ANSWER:**  The Piggly Wiggly Defendants admit that, as of March 31, 2015 the

reported value of Company stock was $9,026,267 but deny the remaining allegations in sentence

1.  The Piggly Wiggly Defendants admit that, as of March 31, 2015 the Piggly Wiggly ESOP's

net assets increased to $13,623,177 and that cancelling the Notes Payable reduced the Piggly

Wiggly ESOP's liabilities but deny the remaining allegations in sentence 2.

108.    The charts that follow document this sustained decline in the reported value of

Company stock and the net assets of the Plan. From fiscal year end 2008 to 2015, the reported value of Company stock in the Plan's Form 5500s trended as follows, declining from a per share value of $684.67 per share at fiscal year end 2008 to $98.12 per share at fiscal year end 2015:



| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 |
|---|---|---|---|---|---|---|---|---|
| Total Value | $88,773,300 | $72,005,861 | $68,222,425 | $64,803,330 | $53,192,409 | $31,319,016 | $27,837,685 | $9,026,267 |
| Per Share | $684.67 | $555.35 | $526.17 | $499.80 | $410.25 | $241.55 | $214.70 | $98.12 |

**ANSWER:** The Piggly Wiggly Defendants admit that paragraph 108 purports to paraphrase, quote, and/or cite to the Piggly Wiggly ESOP's 2007-2015 forms 5500 filings but rely on those documents to speak for themselves.

109.    Reflecting a like trend, the net Plan assets as reported on the Plan's Form 5500s declined as follows:



| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 |
|---|---|---|---|---|---|---|---|---|
| Net Plan Assets | $59,153,834 | $43,582,020 | $41,906,983 | $40,523,681 | $32,532,521 | $12,341,592 | $8,936,174 | $13,623,177 |

**ANSWER:** The Piggly Wiggly Defendants deny the allegations in sentence 1.  The

Piggly Wiggly Defendants admit that paragraph 109 purports to paraphrase, quote, and/or cite to

the Piggly Wiggly ESOP's 2007-2015 forms 5500 filings but rely on those documents to speak

for themselves.

110.     Some of the declines in net plan assets were due, of course, to distributions to
Plan Participants and Beneficiaries.  But even adding back these annual distributions to the
reported net Plan assets, there was nevertheless a major decline in the value of the Plan, as
reflected on the chart and table below:



| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 |
|---|---|---|---|---|---|---|---|---|
| Net Plan Assets Plus Distributions | $59,153,834 | $48,393,474 | $47,904,658 | $48,205,071 | $40,233,128 | $21,369,971 | $21,285,932 | $30,552,196 |

**ANSWER:**  The Piggly Wiggly Defendants admit the allegations of sentence 1.  The

Piggly Wiggly Defendants admit that paragraph 110 purports to paraphrase, quote, and/or cite to

the Piggly Wiggly ESOP's 2007-2015 forms 5500 filings but rely on those documents to speak

for themselves.

### C.    By Contrast, Comparable Grocery Store Chains Experience Growth in Value

111.    From 2010 to 2015, at the same time as the value of the Piggly Wiggly Group
was in decline, the value of other comparable grocery store chains was actually ***increasing***.  The
growth in the value of these comparable companies demonstrates how other grocery store chains
fared during the same time as the Piggly Wiggly Group was sliding into financial ruin.

**ANSWER:**  The Piggly Wiggly Defendants lack knowledge or information sufficient to

form a belief as to the truth of the allegations in sentence 1.  The Piggly Wiggly Defendants deny

the allegations in sentence 2.

40

112.    For example, the value of Ingles stock, as reported on Ingles' 2015 Form 10-K filed with the United States Securities and Exchange Commission ("SEC") increased over the period of 2010 to 2015 from $14.42 per share in 2010 to $56.39 in 2015.  (A company's Form 10-K commonly will report the stock performance of the company over a 5-year period as compared with both a peer group of comparable companies and the S&P 500, showing how an investment of $100 would fare in each case.)  An investment of $100 with Ingles in 2010 would have fared well:



**COMPARISON OF 5 YEAR CUMULATIVE TOTAL RETURN***
Among Ingles Markets, Inc., the S&P 500 Index,
2014 Peer Group and 2015 Peer Group

*$100 invested on 9/25/10 in stock or 9/30/10 in index, including reinvestment of dividends.
Index calculated on month-end basis.

Copyright© 2015 S&P, a division of McGraw Hill Financial. All rights reserved.

Source: Ingles Markets, Inc., Annual Report (Form 10-K) p. 16 (Dec. 10, 2015).

**ANSWER:**  The Piggly Wiggly Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 112.

113.    Similarly, the per share value of Kroger increased some 400% between 2010 and 2015, from $10.68 in 2010 to over $40.00 today.  The five-year trend for $100 invested in

Kroger stock shows a similar positive trajectory:



Source:  The Kroger Co., Annual Report (Form 10-K) p. 8 (March 31, 2015).

**ANSWER:**  The Piggly Wiggly Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 113.

114.    Similarly, the per-share value of Weiss Markets, a regional grocery store chain in the Mid-Atlantic states, while increasing somewhat more modestly, nevertheless increased, as reflected on Weiss's 2015 Form 10-K:



Source: Weiss Markets, Inc., Annual Report (Form 10-K) p. 8 (Dec. 12, 2015).

**ANSWER:** The Piggly Wiggly Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 114.

115.    The same trend holds for Publix, where $100 invested in 2009 would have grown to $237.04 by the same time in 2014.



Source: Publix Super Markets, Inc., Annual Report (Form 10-K) p. 8 (March 2, 2015).

**ANSWER:** The Piggly Wiggly Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 115.

### D.    Plan Fiduciaries Make No Changes in Company Managers or Officers Despite the Mismanagement and Continuous Decline in Financial Performance and Value of Plan Assets

116.    By March 2008, it would have been obvious to a competent and independent member of the Company's Board of Directors that the Company was being mismanaged.  As described above, the Company's gross profit had declined in the most recent fiscal year, and the Company had incurred significant losses during each of the two fiscal years ended in 2007 and 2008, while comparable companies were enjoying revenue increases and profitable operations.  Moreover, a competent and independent member of the Company's Board of Directors with knowledge of all the relevant facts and circumstances, would have been aware of the further indicia of mismanagement described below.

**ANSWER:** The Piggly Wiggly Defendants admit that revenue and gross profit declined during the two fiscal years ended in 2007 and 2008 but deny the remaining allegations in paragraph 116.

44

117.     The conclusion that the Piggly Wiggly Group was being mismanaged was reinforced by the Company's results of operations during the fiscal year ended March 2009. As described above, during that year, the Company's total sales and gross profit declined, and, once again, for the third year in a row, the Company operated at a significant loss, by contrast to the results of comparable companies.

**ANSWER:** The Piggly Wiggly Defendants deny the allegations in sentence 1. The

Piggly Wiggly Defendants admit that the Company's total sales and gross profits decreased

during the fiscal year ended March 31, 2009 but lack knowledge or information sufficient to

form a belief as to the allegations related to "comparable companies."

118.     As of March 2010, the Piggly Wiggly Group had suffered four consecutive years of significant negative results, confirming the conclusion that the Company was being grossly mismanaged. As described above, the Company's total sales, gross profit and gross margins had declining trends during the four years then ended. During that period, other financial metrics (such as liquidity ratios and cash-to-sales ratios) had also worsened. As a result, the Company had incurred losses during each of the four fiscal years ended in 2007, 2008, 2009 and 2010. During the same four-year period, companies comparable to the Piggly Wiggly Group had increasing revenues and earned profits.

**ANSWER:** The Piggly Wiggly Defendants deny the allegations in sentence 1. The

Piggly Wiggly Defendants admit that certain financial metrics declined between April 1, 2007

and the fiscal year ended March 31, 2010 but deny the remaining allegations in sentences 2

through 4. The Piggly Wiggly Defendants lack knowledge or information sufficient to form a

belief as to the truth of the allegations in sentence 5.

119.     By April 2008 and at all times subsequent to then, a Board of Directors of the Piggly Wiggly Group that was fulfilling its duties of loyalty, due care and good faith to the Company would have engaged independent counsel and a competent independent financial consultant, would have undertaken a comprehensive, thorough and scrupulous investigation of the Company's historical results, would have undertaken an analysis of the causes of those results, the Company's prospects and the alternatives available to the Company, would have identified individuals with a proven track record and experience in the grocery retail business or similar businesses, and would have replaced the Company's existing management with those identified individuals, in order to more competently direct the affairs of the Piggly Wiggly Group. Upon information and belief, the Company's Board of Directors undertook none of these actions during the period April 2008 through at least August 2012. Instead, the Piggly Wiggly Company Board of Directors made no material changes to management during the entire Class Period, and, upon information and belief, from April 2008 through at least August 2012 the

Piggly Wiggly Company Board of Directors did not investigate, review and analyze the Company's options in light of the information known to the Board and the Company's significantly adverse results of operations or engage independent counsel or financial consultants to advise them on the options they should and could consider.

**ANSWER:** The Piggly Wiggly Defendants deny the allegations in paragraph 119.

120.    In light of this inaction by the Company's Board of Directors, by April 2010 an independent prudent member of the Plan Committee or Trustee of the Plan, loyal to the interests of the Plan and its Participants and Beneficiaries as required by ERISA, with knowledge of the relevant facts and circumstances would have voted the Plan's Company stock to change the Company's Board of Directors to include at least a majority of competent Board members independent of management, so that the Board of Directors could engage in the conduct required of a competent and independent Board of Directors, namely to engage independent counsel and an independent financial adviser, to undertake a comprehensive, thorough and scrupulous investigation of the Company's historical results, to undertake an analysis of the causes of those results, the Company's prospects and the alternatives available to the Company, to identify individuals with a proven track record and experience in the grocery retail business or similar businesses, and to replace the Company's existing management with those identified individuals, in order to more competently direct the affairs of the Piggly Wiggly Group.  Such a change in the composition of the Company's Board of Directors and such actions of the Board would not have been viewed by a prudent and loyal member of the Plan Committee and Plan Trustee in like circumstances as likely to harm the Company or the Plan.

**ANSWER:** The Piggly Wiggly Defendants deny the allegations in paragraph 120.

121.    Instead of using their authority to vote the Company's stock in this manner, the Plan Committee and the Plan Trustees throughout the Class Period continued their practice of reelecting the same individuals to the Company's Board of Directors, each of whom was a member of management or related to a member of management, and the Company's Board of Directors made no material changes to the Company's top management.

**ANSWER:** The Piggly Wiggly Defendants admit that, between February 26, 2008 and February 26, 2016, the Company's officers included at various times David Schools, Bill Edenfield, and Robert Masche; the Company's trustees included at various times Reliance, Argent, David Schools, Bill Edenfield, and Robert Masche; and the Company's Board included at various times Joseph Newton, Burton Schools, David Schools, Bill Edenfield, and Robert Masche, but deny the remaining allegations in paragraph 121.

122.    In sum, rather than replace the Board of the Company with competent and independent individuals who would bring on competent management, Defendant Plan

46

Fiduciaries, including Defendants David Schools, Burton Schools, Newton, Edenfield, and Masche, essentially did nothing meaningful during the Class Period to prevent or arrest the Company's steady financial decline, ignoring their duties under ERISA, as the retirement savings of the Participants, including the Plaintiffs, and the Beneficiaries were decimated.

**ANSWER:**  The Piggly Wiggly Defendants deny the allegations in paragraph 122.

Plaintiffs' characterization of the Piggly Wiggly Defendants as the "Defendant Plan Fiduciaries"

implies a legal conclusion, which the Piggly Wiggly Defendants deny.

123.     The financial results of comparable companies show that with competent management, it is reasonable to believe the Company would have increased in value, similar to the positive growth and increase in value that was experienced by grocery chains like Ingles, Kroger, Weiss, and Publix, as set forth above.  At the very least, the value of the Piggly Wiggly Group would have remained constant and not fallen so significantly.

**ANSWER:**  The Piggly Wiggly Defendants lack knowledge or information sufficient to

form a belief as to the truth of the allegations regarding other grocery store chains.  The Piggly

Wiggly Defendants deny the remaining allegations in paragraph 123.

124.     The Defendant Plan Fiduciaries, including Defendants David Schools, Burton Schools, Newton, Edenfield, and Masche, further permitted the Plan to continue to hold Company stock year after year, notwithstanding its steady decline in value.  By contrast, a prudent and loyal member of the Plan Committee and Plan Trustee in similar circumstances would, prior to the steady decline in the value of the Company's stock, and at least by March 2010, have actively explored the possibility of selling, and seeking bids to purchase, the Company stock held by the Plan and would not have concluded that such activity was likely to harm the Company or the Plan.

**ANSWER:**  The Piggly Wiggly Defendants admit that the Piggly Wiggly ESOP held

Company stock between April 1, 2007 and February 26, 2016 but deny the remaining allegations

in paragraph 124.  Plaintiffs' characterization of the Piggly Wiggly Defendants as the

"Defendant Plan Fiduciaries" implies a legal conclusion, which the Piggly Wiggly Defendants

deny.

125.     Moreover, the Defendant Plan Fiduciaries, in their capacities as members of the Plan Committee, failed to seek any remedy through one or more derivative actions for this inactivity during the Class Period by the Company's Board of Directors and management.  By contrast, a prudent and loyal member of the Plan Committee in similar circumstances would have

brought one or more derivative actions against the Company's Board of Directors and management to remedy the Board's and management's failures as outlined above and would not have concluded that such derivative actions were likely to harm the Company or the Plan. Such derivative actions would have been successful, as demonstrated by the allegations herein.

**ANSWER:** The Piggly Wiggly Defendants admit that they did not initiate a derivative action on behalf of the Company but deny all remaining allegations in paragraph 125. Plaintiffs' characterization of the Piggly Wiggly Defendants as the "Defendant Plan Fiduciaries" implies a legal conclusion, which the Piggly Wiggly Defendants deny.

126.    The Defendant Plan Fiduciaries, in their capacities as members of the Company's Board of Directors, failed in their duty to monitor the Plan Committee and the Plan Trustees with respect to these failures and to replace the members of the Plan Committee and the Plan Trustees with individuals willing to satisfy their duties under ERISA. By contrast, a prudent and loyal member of the Company's Board of Directors in similar circumstances would have monitored the Plan Committee and the Plan Trustees with respect to these failures, would have replaced the members of the Plan Committee and the Plan Trustees with individuals willing to satisfy their duties under ERISA, and would not have concluded that such actions were likely to harm the Company or the Plan.

**ANSWER:** The Piggly Wiggly Defendants deny the allegations in paragraph 126. Plaintiffs' characterization of the Piggly Wiggly Defendants as the "Defendant Plan Fiduciaries" implies a legal conclusion, which the Piggly Wiggly Defendants deny.

127.    This inactivity of the Defendant Plan Fiduciaries in the face of the Company's financially disastrous results is not surprising given that the continued ability of the Defendant Plan Fiduciaries to enrich themselves at the expense of the Plan and its Participants and Beneficiaries would have been jeopardized had the Company's Board of Directors and management been replaced or had the Company's stock been sold to a third-party investor.

**ANSWER:** The Piggly Wiggly Defendants deny the allegations in paragraph 127. Plaintiffs' characterization of the Piggly Wiggly Defendants as the "Defendant Plan Fiduciaries" implies a legal conclusion, which the Piggly Wiggly Defendants deny.

128.    Defendant Plan Fiduciaries were constantly looking out for themselves, prioritizing their personal self-interest in keeping Company cash flowing into their own pockets over the interests of the Plan and its Participants and Beneficiaries, contrary to the requirements of ERISA.

**ANSWER:** The Piggly Wiggly Defendants deny the allegations in paragraph 128.

Plaintiffs' characterization of the Piggly Wiggly Defendants as the "Defendant Plan Fiduciaries"

implies a legal conclusion, which the Piggly Wiggly Defendants deny.

### III.    CORRUPT PRACTICES, MISMANAGEMENT, AND INSIDER DEALS CONTRIBUTE TO COMPANY'S DECLINE AND REDUCE THE VALUE OF PLAN ASSETS

129.    Defendants Newton, Burton Schools, David Schools, Edenfield, Masche were also involved in Company-wide corruption, including over-compensation, insider deals, and mismanagement prior to and during the Class Period as further detailed below, all of which contributed to the financial downturn of the Company and reduced the value of Plan assets, to the financial detriment of the Participants and Beneficiaries, including the Plaintiffs.

**ANSWER:** The Piggly Wiggly Defendants deny the allegations in paragraph 129.

130.    Despite having knowledge of these practices, Defendant Plan Fiduciaries, including Defendants Newton, Burton Schools, David Schools, Edenfield, and Masche, (a) in their capacities as members of the Company's Board of Directors with the authority to select, retain or remove the members of the Plan Committee and the Plan Trustees, failed to monitor and to replace the Plan Committee or the Plan Trustees (until, in the case of the Plan Trustees, May 31, 2012 when the Plan Trustees were replaced with Reliance Trust Company) and, (b) in their capacities as members of the Plan Committee and/or as Plan Trustees with the authority to elect and remove the members of the Company's Board of Directors, failed to replace the Board of Directors with a competent and independent Board of Directors and failed to pressure the Board of Directors to replace existing management with competent and independent management. A prudent and loyal fiduciary would have undertaken the actions that the Defendant Plan Fiduciaries failed to do and would not have concluded that such actions were likely to harm the Company or the Plan.

**ANSWER:** The Piggly Wiggly Defendants deny the allegations in paragraph 130.

Plaintiffs' characterization of the Piggly Wiggly Defendants as the "Defendant Plan Fiduciaries"

implies a legal conclusion, which the Piggly Wiggly Defendants deny.

131.    Further, despite having knowledge of these practices, Defendant Plan Fiduciaries, including Defendants Newton, David Schools, Burton Schools, Edenfield, and Masche, in their capacities as members of the Plan Committee and/or as Plan Trustees with the authority to bring litigation on behalf of the Plan, failed to cause the Plan, as shareholder of the Company, to bring one or more derivative actions on behalf of the Company against themselves as directors and managers in order to recover the substantial losses to the Company caused by these practices, which practices breached the directors' or managers' duties of loyalty, due care and good faith to the Company. The Defendant Plan Fiduciaries, in their capacities as members

of the Company's Board of Directors, failed in their duty to monitor the Plan Committee and the Plan Trustees with respect to these failures and to replace the members of the Plan Committee and the Plan Trustees with individuals willing to bring such derivative actions. A prudent and loyal fiduciary would have undertaken the actions that the Defendant Plan Fiduciaries failed to do and would not have concluded that such actions were likely to harm the Company or the Plan. Such derivative actions would have been successful, as demonstrated by the allegations herein.

**ANSWER:** The Piggly Wiggly Defendants admit that they did not bring a derivative suit on behalf of the Company but deny the remaining allegations in paragraph 131. Plaintiffs' characterization of the Piggly Wiggly Defendants as the "Defendant Plan Fiduciaries" implies a legal conclusion, which the Piggly Wiggly Defendants deny.

### A.    Overcompensation and Excessive Benefits Paid to Company Management and Directors

132.    Prior to and during the Class Period—and at the same time as the Company was hemorrhaging money—Defendants Newton, Burton Schools, David Schools, Edenfield, and Masche, and other top Company management and directors were paid grossly exorbitant compensation and received excessive benefits.

**ANSWER:** The Piggly Wiggly Defendants deny the allegations in paragraph 132.

133.    The excessive benefits provided prior to and during the Class Period to top Company management and directors, including Defendants Newton, Burton Schools, David Schools, Edenfield, and Masche, included perks such as luxury automobiles leased by the Company.

**ANSWER:** The Piggly Wiggly Defendants admit that, as part of his compensation, the Company leased an automobile for use by Defendant Newton but deny the remaining allegations in paragraph 133.

134.    Among the luxury vehicles that the Company leased for Defendant Newton is a new Mercedes in 2014; the Company has paid the property taxes on this car every year to the present. The Company provided Jerry Durham, who served as a Company executive, with a Jaguar convertible during the Class Period and, upon information and belief, provided other luxury cars to other Defendants prior to and during the Class Period.

**ANSWER:** The Piggly Wiggly Defendants admit that, as part of his compensation, the Company leased an automobile for use by Defendant Newton and has paid the accompanying

property taxes but deny the remaining allegations in sentence 1.  The Piggly Wiggly Defendants

deny the allegations in sentence 2.

135.    Top Company management and directors, including Defendants Newton, Burton Schools, David Schools, Edenfield, and Masche, continued to receive their exorbitant compensation and benefits during the Class Period even as the Piggly Wiggly Group lost tens of millions of dollars and some 90% of its value between 2007 and 2015.

**ANSWER:**  The Piggly Wiggly Defendants deny the allegations in paragraph 135.

136.    Prior to and during the Class Period, members of the Company's Board of Directors were paid excessive compensation for minimal services, with Defendants Newton and Burton Schools receiving compensation of $100,000 per year solely for their service as directors.

**ANSWER:**  The Piggly Wiggly Defendants deny the allegations in paragraph 136.

137.    During the Class Period, the Company restructured the retirement benefits it offered to top Company management solely to benefit management.

**ANSWER:**  The Piggly Wiggly Defendants deny the allegations in paragraph 137.

138.    Historically the Company had offered top management "golden handcuff" deferred compensation agreements that included handsome benefits during retirement, including 15 years of full salary following retirement, provided the employee was actually still employed by the Company at the age of 65.

**ANSWER:**  The Piggly Wiggly Defendants admit that certain officers entered into

deferred compensation arrangements with the Company but deny the remaining allegations in

paragraph 138.

139.    During the Class Period, as the Company began to collapse financially, current top management who were parties to these deferred compensation agreements, including Defendants David Schools, Masche, and Edenfield, realized their benefits would never vest because the Company would probably no longer exist when they reached age 65, and the Company agreed to renegotiate the golden handcuff agreements.

**ANSWER:**  The Piggly Wiggly Defendants admit that the Company renegotiated certain

of its deferred compensation obligations but deny the remaining allegations in paragraph 139.

140.    Defendants David Schools, Masche, and Edenfield were all parties to deferred compensation agreements that were renegotiated during the Class Period.

51

**ANSWER:** The Piggly Wiggly Defendants admit paragraph 140.

141.     Under these renegotiated deferred compensation agreements, the Company agreed to accelerate deferred compensation payments to top management notwithstanding the age 65 vesting requirement.

**ANSWER:** The Piggly Wiggly Defendants deny the allegations in paragraph 141.

142.     As of May 30, 2014, Defendants David Schools, Edenfield, and Masche alone received approximately $1,460,000 pursuant to renegotiated deferred compensation agreements.

**ANSWER:** The Piggly Wiggly Defendants admit the allegations in paragraph 142.

143.     During the Class Period, top Company management, including Defendants David Schools, Edenfield, and Masche, also received severance and incentive bonuses at various times pursuant to severance and incentive plans and arrangements that, upon information and belief, were adopted during the Class Period.

**ANSWER:** The Piggly Wiggly Defendants admit the allegations in paragraph 143.

144.     As of May 30, 2014, 12 persons in Company management who were members of a so-called "Executive Leadership Team", including Defendants David Schools, Masche, and Edenfield, had received severance totaling well over $500,000. Defendants David Schools, Edenfield and Masche alone received approximately $200,000 in such severance.

**ANSWER:** The Piggly Wiggly Defendants admit the allegations in paragraph 144.

145.     Up to May 30, 2014 the total amount of severance, accelerated deferred compensation payments, and incentive bonuses paid by the Company to Defendant David Schools was approximately $690,000, the total such amount paid to Defendant Edenfield was approximately $750,000, and the total such amount paid to Defendant Masche was approximately $675,000.

**ANSWER:** The Piggly Wiggly Defendants admit the allegations in paragraph 145.

146.     In total the Company had paid out as of that date over $3.7 million in severance, incentive bonuses, and accelerated deferred compensation to the members of the Executive Leadership Team, including Defendants David Schools, Edenfield, and Masche.

**ANSWER:** The Piggly Wiggly Defendants admit the allegations in paragraph 146.

147.     At the same time as the Company was providing its management and directors with grossly excessive compensation and benefits and renegotiating golden handcuff retirement agreements for top management, the Company was hemorrhaging money, laying off employees, freezing employee salaries, ceasing the prior practice of paying employee bonuses, failing to maintain and improve stores, and generally sliding into financial ruin as detailed heretofore and

below.

      **ANSWER:**  The Piggly Wiggly Defendants deny the allegations in paragraph 147.

      148.     Defendant Plan Fiduciaries, who (in their capacities as members of the Plan Committee and Plan Trustees) voted the stock in the Company owned by the Plan and who (in their capacities as members of the Company's Board of Directors) selected, and had a duty to monitor, the Plan Committee and the Plan Trustees, did nothing to attempt to replace the Plan Committee or (prior to May 31, 2014) the Plan Trustees or the Board with competent and independent individuals, who would replace the existing Board of Directors and management, with competent and independent individuals and rein in the excessive compensation, benefits, and accelerated retirement plans being provided to Company officers and directors as heretofore alleged.  Furthermore, Defendant Plan Fiduciaries, who (in their capacities as members of the Plan Committee and/or Plan Trustees) had the authority to bring derivative actions on behalf of the Company, did not pursue any derivative actions against the Company's directors and officers for breach of their duties to the Company of loyalty, care and good faith.  These failures constituted breaches by the Defendant Plan Fiduciaries of their duties of prudence and loyalty, which caused the Plan assets to have less value than would have been the case in the absence of such breaches, to the financial detriment of the Participants and of Beneficiaries, including the Plaintiffs.  The Defendant Plan Fiduciaries, in their capacities as members of the Company's Board of Directors, failed in their duty to monitor the Plan Committee and the Plan Trustees with respect to these failures and to replace the members of the Plan Committee and the Plan Trustees with individuals willing to bring such derivative actions.

      **ANSWER:**  The Piggly Wiggly Defendants admit that, between February 26, 2008 and February 26, 2016, the Company's officers included at various times David Schools, Bill Edenfield, and Robert Masche; the Company's trustees included at various times Reliance, Argent, David Schools, Bill Edenfield, and Robert Masche; and the Company's Board included at various times Joseph Newton, Burton Schools, David Schools, Bill Edenfield, and Robert Masche, but deny the remaining allegations in sentence 1.  The Piggly Wiggly Defendants admit that they did not initiate a derivative action on behalf of the Company but deny the remaining allegations in sentence 2.  The Piggly Wiggly Defendants deny the allegations in sentences 3 and 4.  Plaintiffs' characterization of the Piggly Wiggly Defendants as the "Defendant Plan Fiduciaries" implies a legal conclusion, which the Piggly Wiggly Defendants deny.

## B.    Entry into Above-Market Leases

149.    Corrupt practices among top management were not limited to the payment of excessive compensation and benefits.  Prior to and during the Class Period, Defendants David Schools, Edenfield, and Masche, with the cooperation and/or acquiescence of other Piggly Wiggly Group officers and directors, also participated in insider real estate deals that benefitted their own personal interests while harming the Piggly Wiggly Group.

**ANSWER:**  The Piggly Wiggly Defendants deny the allegations in paragraph 149.

150.    Pursuant to these insider deals, PWCC was the lessee on certain leases that included rental rates substantially in excess of market rates.  The resulting above-market rent payments were funneled through a network of entities that ultimately paid money into the pockets of Defendants David Schools, Edenfield, and Masche.

**ANSWER:**  The Piggly Wiggly Defendants deny the allegations in paragraph 150.

151.    At times, this scheme was effected in collaboration with the Columbia, SC, development firm Asbill-Christopher.

**ANSWER:**  The Piggly Wiggly Defendants deny the allegations in paragraph 151.

152.    Piggly Wiggly Group insiders, including Jerry Durham, who served as a Company executive, Tradd Newton, who is Defendant Newton's son, and Defendants David Schools, Edenfield, and Masche, were directors of and/or shareholders in an entity known as the Dallas Cotton Club, Inc. (the "Dallas Cotton Club"), a South Carolina corporation founded in 1993 and for which Defendants Burton Schools, David Schools, and Edenfield have at various times served as registered agents.

**ANSWER:**  The Piggly Wiggly Defendants deny Plaintiffs' application of the undefined term "insiders" to the specified individuals but admit the remaining allegations in paragraph 152.

153.    Upon information and belief, the Dallas Cotton Club was an owner or member, direct or indirect, in another entity, A-C Development Club, LLC ("ACDC"), a South Carolina limited liability company formed in 1996 and for which Defendants Burton Schools served as a registered agent and Defendant Edenfield is the current registered agent.

**ANSWER:**  The Piggly Wiggly Defendants admit the allegations in paragraph 153.

154.    Beginning in the 1990s, ACDC or LLCs controlled directly or indirectly by or affiliated with ACDC acquired numerous properties, particularly near the South Carolina Coast, and developed these properties to be leased to PWCC to serve as Piggly Wiggly stores.  ACDC or LLCs affiliated with ACDC owned the underlying property, and PWCC was a tenant on the properties pursuant to long-term leases.

**ANSWER:** The Piggly Wiggly Defendants deny Plaintiffs' characterization of the properties as "particularly near the South Carolina Coast" but admit the remaining allegations in paragraph 154.

155.    At the direction of Piggly Wiggly Group officers and directors, including Jerry Durham and Defendants Newton, Burton Schools, David Schools, and Edenfield, PWCC entered into these long-term leases, which were at substantially above-market rates.

**ANSWER:** The Piggly Wiggly Defendants admit that PWCC leased property from ACDC at the direction of PWCC's officers and directors but deny the remaining allegations in paragraph 155.

156.    Some of the properties developed by ACDC or its affiliates and rented to PWCC at above-market rates included Company stores in Georgetown, Hollywood, Moncks Corner, Folly Beach, Bluffton, and Pawley's Island, South Carolina.

**ANSWER:** The Piggly Wiggly Defendants admit that PWCC rented property from ACDC for stores in Georgetown, Hollywood, Moncks Corner, Folly Beach, Bluffton, and Pawley's Island, South Carolina but deny the remaining allegations in paragraph 156.

157.    Financially, these above-market rates harmed Piggly Wiggly Group but benefitted ACDC, the LLCs affiliated with ACDC, and ultimately the Dallas Cotton Club and its owners, including Jerry Durham, Tradd Newton, and Defendants David Schools, Edenfield, and Masche.

**ANSWER:** The Piggly Wiggly Defendants deny the allegations in paragraph 157.

158.    Prior to and during the Class Period, all or part of the difference between market-rates and the above-market rates paid pursuant to the leases was ultimately funneled each month into the Dallas Cotton Club.

**ANSWER:** The Piggly Wiggly Defendants deny the allegations in paragraph 158.

159.    Defendants David Schools, Edenfield, and Masche, as well as Jerry Durham, in turn received monthly payments from the Dallas Cotton Club. Upon information and belief, prior to and during the Class Period these monthly payments at times totaled $7,000 or more to each recipient.

**ANSWER:** The Piggly Wiggly Defendants admit that Dallas Cotton Club made distributions to its members in accordance with its articles and bylaws and that these distributions were at times greater than or equal to $7,000 per month but deny the remaining allegations in paragraph 159.

160.    Defendant Edenfield provided monthly instructions on what the payments to the owners of the Dallas Cotton Club should be, and signed the checks paid out to those owners, including himself.

**ANSWER:** The Piggly Wiggly Defendants admit that William Edenfield provided monthly instructions regarding the distributions to members of Dallas Cotton Club and signed the distribution checks, including to himself, but deny the remaining allegations in paragraph 160.

161.    On a date unknown during the Class Period, Greenbax bought out Tradd Newton's interest in the Dallas Cotton Club and began receiving his share of the payments.

**ANSWER:** The Piggly Wiggly Defendants deny the allegations in paragraph 161.

162.    In 2012 and 2013, when BiLo and Harris Teeter were negotiating with Piggly Wiggly Group to purchase some of the stores subject to the above-market leases, both BiLo and Harris Teeter refused to pay the existing lease rates, recognizing that the leases were substantially above market rates.

**ANSWER:** The Piggly Wiggly Defendants deny the allegations in paragraph 162.

163.    In order to finalize the deals with BiLo and Harris Teeter for the sale of the stores, PWCC, at the direction of Defendants David Schools, Edenfield, and Masche, agreed to remain a tenant or otherwise obligated under the leases and sublet (or otherwise allowed the lease of) the stores to BiLo and Harris Teeter at fair market rates. PWCC further agreed or otherwise remained obligated to pay the difference under the leases between the new market-rate rents and the required above-market rates rather than attempting to re-negotiate the leases with ACDC.

**ANSWER:** The Piggly Wiggly Defendants deny the allegations in paragraph 163.

164.    PWCC made this decision, rather than attempting to re-negotiate the leases, so as not to interfere with the money being funneled through the Dallas Cotton Club to Piggly Wiggly Group insiders including Defendants David Schools, Edenfield, and Masche.

**ANSWER:** The Piggly Wiggly Defendants deny the allegations in paragraph 164.

165.     For example, the Company's store at Folly Beach was paying $63,000 a month in rent to an entity controlled by ACDC prior to the store's sale to Harris Teeter. After that sale, Harris Teeter was paying only $45,000 per month in rent, and upon information and belief, the Company remained liable each month for the $18,000 difference.

**ANSWER:** The Piggly Wiggly Defendants deny the allegations in paragraph 165.

166.     Upon information and belief, PWCC remained (at least until approximately April 12, 2016 when ACDC or related entities sold the properties to a third party purchaser) a party to or otherwise obligated under the above-market leases, and payments continued to members of the Dallas Cotton Club, including Defendants David Schools, Edenfield, and Masche.

**ANSWER:** The Piggly Wiggly Defendants deny the allegations in paragraph 166.

167.     PWCC remained a party to these long-term leases at above market rates during the Class Period and, upon information and belief, did not attempt at any time during the Class Period to renegotiate them to fair market value, despite the continuing financial pressures on the Company, including the real risk of bankruptcy, and the effective control of the lessors by Piggly Wiggly Group insiders. During the Class Period, the Company's financial performance had become so poor as to put the Company at substantial risk of having to file for bankruptcy. Typically, when faced with a real risk of insolvency a company will seek amendments to its leases to reduce the financial burden to the company of the leases to lessen the bankruptcy risk. Lessors typically enter into such amendments - even where not contractually required to do so - in order to reduce the risk that the company might file for bankruptcy protection and be in a position to reject the undesired leases. Upon information and belief, at no time during the Class Period did the Company attempt to enter into any such lease amendments with ACDC or related lessors, to the financial detriment of the Participants and Beneficiaries, including the Plaintiffs.

**ANSWER:** The Piggly Wiggly Defendants deny the allegations in paragraph 167.

168.     In the face of this inaction by the Company, Defendant Plan Fiduciaries (in their capacities as members of the Company's Board of Directors) did nothing to replace the Plan Committee or (prior to May 31, 2014) the Plan Trustees or (in their capacities as members of the Plan Committee and/or as Plan Trustees) the Company's Board of Directors with competent and independent individuals, who would replace the existing management with competent and independent management who would renegotiate the above-market leases. Furthermore, Defendant Plan Fiduciaries, who had the authority as members of the Plan Committee and/or as Plan Trustees to bring derivative actions on behalf of the Company, did not pursue any derivative actions against the Company's directors and officers for breach of their duties to the Company of loyalty, care and good faith. This failure constituted a breach by Defendant Plan Fiduciaries of their duties of prudence and loyalty, which caused the Plan assets to have less value than would have been the case in the absence of such breach, to the financial detriment of the Participants and Beneficiaries, including the Plaintiffs. The Defendant Plan Fiduciaries, in their capacities as members of the Company's Board of Directors, failed in their duty to monitor the Plan Committee and the Plan Trustees with respect to these failures and to replace the members of the

Plan Committee and the Plan Trustees with individuals willing to bring such derivative actions.

**ANSWER:** The Piggly Wiggly Defendants admit that, between February 26, 2008 and February 26, 2016, the Company's officers included at various times David Schools, Bill Edenfield, and Robert Masche; the Company's trustees included at various times Reliance, Argent, David Schools, Bill Edenfield, and Robert Masche; and the Company's Board included at various times Joseph Newton, Burton Schools, David Schools, Bill Edenfield, and Robert Masche, but deny the remaining allegations in sentence 1. The Piggly Wiggly Defendants admit that they did not initiate a derivative action on behalf of the Company but deny the remaining allegations in sentence 2. The Piggly Wiggly Defendants deny the allegations in sentences 3 and 4. Plaintiffs' characterization of the Piggly Wiggly Defendants as the "Defendant Plan Fiduciaries" implies a legal conclusion, which the Piggly Wiggly Defendants deny.

### C.     Mismanagement of the Company During the Collapse

169.     The mismanagement of the Company by Defendants David Schools, Edenfield, and Masche—and the failure of the Plan Committee and the Plan Trustees, in not replacing the Company's Board of Directors, and of the Company's Board members, including Defendants Burton Schools, Newton, David Schools, Edenfield and Masche, to redress this mismanagement—bears responsibility for the Company's financial deterioration prior to and during the Class Period. This mismanagement involved significant financial losses to the Company due to, among other things, poor site-selection for new stores, counterproductive expense reductions and flawed company policies and initiatives that drove away customers. These financial losses reduced the value of the Plan's assets, to the financial detriment of the Participants and the Beneficiaries, including the Plaintiffs.

**ANSWER:** The Piggly Wiggly Defendants deny the allegations in paragraph 169.

170.     In addition, Company management's mismanagement led the Company to enter into disadvantageous arrangements with lenders. These detrimental lending arrangements resulted from the careless and imprudent manner in which the Company had been and was being run and its assets deployed, and they caused the Company to pay higher rates of interest than would otherwise have been the case, which reduced the value of the Plan's assets, to the financial detriment of the Participants and the Beneficiaries, including the Plaintiffs.

**ANSWER:** The Piggly Wiggly Defendants deny the allegations in paragraph 170.

58

171.     Upon information and belief, in the mid-2000s, the Company took out significant loans from Wachovia Bank, N.A. (now Wells Fargo) to meet its cash flow needs.

**ANSWER:**  The Piggly Wiggly Defendants admit to having a credit facility with

Wachovia Bank, N.A. / Wells Fargo ("Wells Fargo") for a period of time but deny the remaining

allegations in paragraph 171.

172.     Upon information and belief, in approximately 2007 or 2008, Wells Fargo sought to remove itself as the Company's lender, given the deterioration in the Company's financial results and decline in the Company's value.

**ANSWER:**  The Piggly Wiggly Defendants deny the allegations in paragraph 172.

173.     Upon information and belief, the Company obtained replacement financing, first from CIT Bank, N.A., and later from Crystal Financial, to refinance the Wells Fargo Loan, and these new debt arrangements provided high interest rate, asset-based loans to the Company, which provided the Company with a daily line of credit based in part on Company accounts receivable and inventory.  The accounts receivable were held by the lender as collateral, and the lender had a security interest in the Company's inventory.

**ANSWER:**  The Piggly Wiggly Defendants admit that the Company obtained asset-

based credit facilities from CIT Bank, N.A. ("CIT") and Crystal Financial ("Crystal"), which it

used to pay down the remaining balance on the Wells Fargo loan; that it later obtained an asset-

based loan from Crystal; and that in connection with these credit facilities the Company's

accounts receivable were used as collateral and CIT and Crystal held security interests in the

Company's and inventory, but deny the remaining allegations in paragraph 173.

174.     Upon information and belief, the interest rate for these replacement loans varied between 9.33% and 11% in 2010 alone, at the same time as the prime rate was at 3.25%.

**ANSWER:**  The Piggly Wiggly Defendants lack knowledge or information sufficient to

form a belief as to the truth of the allegations in paragraph 174.

175.     Upon information and belief, a financial consultant required by Crystal Financial, Carl Marks, reviewed the Company accounts receivable and other financial indicators each day and helped Crystal Financial determine what amounts to loan the Company at the high interest rates Crystal Financial offered.

**ANSWER:** The Piggly Wiggly defendants deny the allegations in paragraph 175.

176.    Upon information and belief, around 2010, the Company began dipping into the reserve accounts historically kept by each individual store, to pay annual real estate taxes and insurance premiums, in order to make the Company's loan payments to Crystal Financial.

**ANSWER:** The Piggly Wiggly Defendants deny the allegations in paragraph 176.

177.    The depletion of certain of these reserve accounts was accompanied by a significant reduction in the funds applied to regular maintenance and upgrades at Company stores, and the appearance to customers of the stores declined as a result.

**ANSWER:** The Piggly Wiggly Defendants deny the allegations in paragraph 177.

178.    Upon information and belief, the Company also made a decision in or around 2010 to raise its grocery prices. This, combined with the decline in store appearance, resulted in a significant loss of customers—including the Company's own employees—many of whom began buying groceries at other grocery stores that offered lower prices in nicer stores.

**ANSWER:** The Piggly Wiggly Defendants lack knowledge or information sufficient to

form a belief as to the truth of the allegations in paragraph 178.

179.    Upon information and belief, Company management also displayed repeated and marked incompetence in selecting sites for new Company stores in the late 2000s. Upon information and belief, Defendant Masche was the member of management most involved in this process, and his missteps were many and seemingly without any consequence to his salary or job status at the Company.

**ANSWER:** The Piggly Wiggly Defendants deny the allegations in paragraph 179.

180.    Upon information and belief, at the direction of Defendant Masche, the Company entered into development agreements or arrangements that put a disproportionate share of the costs for store site selection and development on the Company, rather than the developer.

**ANSWER:** The Piggly Wiggly Defendants deny the allegations in paragraph 180.

181.    Upon information and belief, Company management caused highly excessive amounts to be paid to design and build new stores, which led to over-market rental rates and operating costs. For example, to develop the Company's store at Market Common in Myrtle Beach, which opened in April 2008, over $11 million was spent—a figure far in excess of a reasonable amount to spend on developing a new store.

**ANSWER:** The Piggly Wiggly Defendants deny the allegations in paragraph 181.

182.    Upon information and belief, Defendant Masche similarly mismanaged the Company's efforts in selecting a site for and building a store in Sunset Beach, NC.  The Sunset Beach store was such a spectacular failure that it was closed in April 2008, less than a year after opening, and was then sold to Lowes Foods.  Upon information and belief, the sale to Lowes Foods resulted in a huge loss to the Company.

**ANSWER:**  The Piggly Wiggly Defendants admit that the Company sold a store in

Sunset Beach, NC in April 2008 to Lowes Foods but deny the remaining allegations in paragraph

182.

183.    The mismanaged efforts in developing the stores in Myrtle Beach, SC, and Sunset Beach, NC, were not isolated.  Upon information and belief, many of the other stores developed by the Company in the late 2000s were unable to break even due to massive overhead costs and poor site selection.

**ANSWER:**  The Piggly Wiggly Defendants deny the allegations in paragraph 183.

184.    Upon information and belief, during this time of mismanagement, certain members of management at corporate headquarters privately spoke of the Company being "on the verge of bankruptcy."

**ANSWER:**  The Piggy Wiggly Defendants lack knowledge or information sufficient to

form a belief as to the truth of the allegations regarding private conversations.  The Piggly

Wiggly Defendants deny that the Company was ever mismanaged and deny all remaining

allegations in paragraph 184.

185.    Despite the internal warnings of management that the Company was at risk of bankruptcy, and despite the repeated and demonstrated incompetence of management, Defendant Plan Fiduciaries, including Defendants David Schools, Newton, Burton Schools, Edenfield, and Masche, (in their capacities as members of the Company's Board of Directors) did nothing to replace the members of the Plan Committee or (prior to May 31, 2014) the Plan Trustees and (in their capacities as members of the Plan Committee and/or as Plan Trustees) did nothing to replace the Company's Board with a competent and independent Board, which would have replaced management with competent and independent management, violating their duties of prudence and loyalty, to the financial detriment of the Participants and the Beneficiaries, including the Plaintiffs.  The Defendant Plan Fiduciaries, in their capacities as members of the Company's Board of Directors, failed in their duty to monitor the Plan Committee and the Plan Trustees with respect to these failures.

**ANSWER:**  The Piggly Wiggly Defendants admit that, between February 26, 2008 and February 26, 2016, the Company's officers included at various times  David Schools, Bill Edenfield, and Robert Masche; the Company's trustees included at various times Reliance, Argent, David Schools, Bill Edenfield, and Robert Masche; and the Company's Board included at various times Joseph Newton, Burton Schools, David Schools, Bill Edenfield, and Robert Masche, but deny the remaining allegations in sentence 1.  The Piggly Wiggly Defendants deny the allegations in sentence 2.  Plaintiffs' characterization of the Piggly Wiggly Defendants as the "Defendant Plan Fiduciaries" implies a legal conclusion, which the Piggly Wiggly Defendants deny.

186.    Further, despite knowledge of all these practices giving rise to meritorious derivative claims, Defendant Plan Fiduciaries, including Defendants David Schools, Newton, Burton Schools, Edenfield, and Masche, took no steps, as members of the Plan Committee and/or as Plan Trustees, to bring such claims on behalf of the Company against themselves as Company managers and directors, violating their duties of prudence and loyalty, to the financial detriment of the Participants and the Beneficiaries, including the Plaintiffs. The Defendant Plan Fiduciaries, in their capacities as members of the Company's Board of Directors, failed in their duty to monitor the Plan Committee and the Plan Trustees with respect to these failures and to replace the members of the Plan Committee and the Plan Trustees with individuals willing to bring such derivative actions.

**ANSWER:**  The Piggly Wiggly Defendants admit that they did not initiate a derivatives action on behalf of the Company but deny the remaining allegations in sentence 1.  The Piggly Wiggly Defendants deny the allegations in sentence 2.  Plaintiffs' characterization of the Piggly Wiggly Defendants as the "Defendant Plan Fiduciaries" implies a legal conclusion, which the Piggly Wiggly Defendants deny.

187.    Upon information and belief, Sandra S. Rabon, in one or more of her capacities as a Company director or manager, member of the Plan Committee and Plan Trustee, from time to time recommended expenditure reductions and questioned and objected to the mismanagement of the Company as hereinabove alleged that contributed to its financial collapse, but her concerns were rebuffed by other Company managers and directors and Defendant Plan Fiduciaries, including Defendants David Schools, Newton, Burton Schools, Edenfield, and Masche.

62

**ANSWER:**  The Piggly Wiggly Defendants deny the allegations in paragraph 187.

Plaintiffs' characterization of the Piggly Wiggly Defendants as the "Defendant Plan Fiduciaries"

implies a legal conclusion, which the Piggly Wiggly Defendants deny.

## IV.    COMPANY RESPONDS TO DOWNTURN ONLY AFTER THE PERSONAL INTERESTS OF INSIDERS BECOME AT RISK

188.    The Company's response to its history of terrible financial results and continued decline in value during the Class Period came belatedly in late 2012 and was prompted only by the fact that Plan payments to the Defendant Note Holders who held the Notes Payable became in jeopardy.

**ANSWER:**  The Piggly Wiggly Defendants deny the allegations in paragraph 188.

189.    This risk to Defendant Note Holders then led to a series of actions, including an unauthorized significant sale of Company assets in 2013 and another sale of substantially all the then-remaining assets of the Company in late 2014.

**ANSWER:**  The Piggly Wiggly Defendants admit that the Company sold certain assets

in 2013 and 2014 but deny the remaining allegations in paragraph 189.

190.    With the cash the Company received from the 2013 sale, the Defendant Plan Fiduciaries improperly colluded with the Defendant Note Holders to perpetrate a substantial insider payoff of the Notes Payable.  In this collusion, the Company paid the Defendant Note Holders an amount far in excess of the actual value of the Notes Payable in return for a settlement of the Notes Payable.  This transaction improperly drained the Company of cash, which in turn reduced the value of the Plan assets to the financial detriment of the Participants and the Beneficiaries, including the Plaintiffs.  The Defendant Plan Fiduciaries violated their duties of prudence and loyalty by failing to bring a derivative action on behalf of the Company against the Defendant Plan Fiduciaries and the Defendant Note Holders to seek recovery of the amount paid in excess of the Notes Payable's actual value.  The Defendant Note Holders participated in this improper transaction having actual or constructive knowledge that the transaction violated ERISA.

**ANSWER:**  The Piggly Wiggly Defendants admit that the Company settled its

obligations to certain noteholders but deny the remaining allegations in sentences 1 through 3.

The Piggly Wiggly Defendants deny the allegations in sentences 4 and 5.  Plaintiffs'

characterization of the Piggly Wiggly Defendants as the "Defendant Plan Fiduciaries" implies a

legal conclusion, which the Piggly Wiggly Defendants deny.

191.    In addition to perpetrating this improper collusion, Company management and directors, with the cooperation and consent of the Defendant Plan Fiduciaries, ignored the rights of Plan Participants in both the 2013 and 2014 sales. The Company never sought the approval of the Plan Participants for the 2013 sale as is required under applicable law when a Company adopts a plan to sell substantially all its assets.  Further, in the 2014 sale, the financial information the Company provided to Participants when it did seek approval for a sale of assets was woefully inadequate, in violation of applicable law.  These failures deprived the Participants and the Beneficiaries, including the Plaintiffs, of their rights under applicable state law and ERISA to determine the best course of action for the Company to take with respect to its future.

**ANSWER:**  The Piggly Wiggly Defendants admit that the Piggly Wiggly ESOP did not hold a participant vote in connection with the sale of any assets prior to 2014 but deny the remaining allegations in sentences 1 and 2.  The Piggly Wiggly Defendants deny the allegations in sentences 3 and 4.  Plaintiffs' characterization of the Piggly Wiggly Defendants as the "Defendant Plan Fiduciaries" implies a legal conclusion, which the Piggly Wiggly Defendants deny.

### A.    Piggly Wiggly Management and Board are Prompted to Take Action Only When Payments on Notes Payable Stop

192.    Fiscal year 2013 saw one of the steepest declines in reported Company value during the Class Period as well certain actions by the Board of the Company and the Plan that were related to that decline, including the appointment of a directed Trustee and the engagement of what the Company described in official correspondence as an "investment banking advisor".

**ANSWER:**  The Piggly Wiggly Defendants admit that the Company's Board engaged Reliance on May 31, 2012, that the Company's value declined during the Class Period, and that paragraph 192 purports to paraphrase, quote, and/or cite to certain correspondence but rely on that correspondence to speak for itself.  The Piggy Wiggly Defendants deny all remaining allegations in paragraph 192.

193.    Defendants Newton, Burton Schools, David Schools, Edenfield, and Masche, as well as Sandra S. Rabon, all served as Plan Trustees until May 31, 2012, when they resigned upon the appointment by the Piggly Wiggly Group Board of Reliance Trust Company ("Reliance") to serve as a directed Trustee of Plan.

**ANSWER:** The Piggly Wiggly Defendants admit that Defendants Newton, Burton Schools, David Schools, Edenfield, and Masche, as well as Sandra S. Rabon, all served as Plan Trustees until May 31, 2012, when they resigned upon the appointment by the Board of Reliance to provide services to the Plan but deny the remaining allegations in paragraph 193.

194.    Despite the appointment of Reliance, the Defendant Plan Fiduciaries, including Defendants Newton, Burton Schools, David Schools, Edenfield and Masche, as members of the Plan Committee, retained power to direct most of the decisions of Reliance with respect to the Plan, including decisions regarding Plan investments, Plan administration, whether to bring legal claims, and the voting of shares of Company stock in Board elections.

**ANSWER:** The Piggly Wiggly Defendants admit that paragraph 194 purports to paraphrase, quote, and/or cite to the trust agreement with Reliance and/or Argent but rely on that document to speak for itself. To the extent a response is required, the Piggly Wiggly Defendants deny the allegations in paragraph 194. Plaintiffs' characterization of the Piggly Wiggly Defendants as the "Defendant Plan Fiduciaries" implies a legal conclusion, which the Piggly Wiggly Defendants deny.

195.    Sometime around September 2012, after six straight years of losses in which nearly half the value of the Company had been squandered and in the midst of a fiscal year in which the Company's value would later be reported as having declined another 41%, the Board of Piggly Wiggly Group engaged an outside consultant, Mark Gross, the principal of Surry Investment Advisors, LLC, to assist the Board in evaluating the Company and the strategic alternatives available to it.

**ANSWER:** The Piggly Wiggly Defendants admit that the Company engaged Mark Gross's firm, Surry Investment Advisors, LLC ("Surrey"), in September 2012 to advise it on strategic alternatives going forward and admit that the value of the Company declined in 2012 but deny the remaining allegations in paragraph 195.

196.    Also in September 2012, payments from the Plan on the Notes Payable were suspended. On information and belief, the payments were suspended when the Company's lender, Crystal Financial, insisted that the Company cease funding Plan payments on the Notes Payable. Promptly following the pay-off of the Crystal Financial loan, payments on the Notes Payable recommenced in June 2013.

**ANSWER:**  The Piggly Wiggly Defendants admit that payments on the Notes Payable were suspended for a time and resumed in June 2013 but deny the remaining allegations in paragraph 196.

197.     Plan documents termed Mr. Gross an "investment banking advisor," but in reality, upon information and belief, Mr. Gross was primarily a broker who had previously worked with the Company in a sale of some of its warehouse assets.

**ANSWER:**  The Piggly Wiggly Defendants admit that the Company engaged Mr. Gross's firm, Surrey, and that paragraph 197 purports to paraphrase, quote, and/or cite certain documents but rely on those document to speak for themselves.  The Piggly Wiggly Defendants deny the remaining allegations in paragraph 197.

198.     On information and belief, the Company's Board chose to seek out Mr. Gross's assistance in September 2012 only because continuing payments on the Notes Payable due to Defendants Newton, Burton Schools and the other Defendant Note Holders were seen as jeopardized.

**ANSWER:**  The Piggly Wiggly Defendants deny the allegations in paragraph 198.

199.     Upon information and belief, the Board made a strategic decision around or shortly following the time it engaged Mr. Gross in 2012 to begin the process of selling all or substantially all of the Company's assets, and it instructed Mr. Gross to begin shopping these assets in an effort to find a buyer or buyers.  As stated in the Company's October 2014 Information Statement sent to the Plan Participants:  "Based upon this analysis [i.e., the analysis undertaken by the Board and Company management following the September 2012 engagement of the investment banking advisor], the Board, in consultation with its advisors, concluded that [Greenbax] should pursue exiting the retail grocery market and the wholesale grocery business and liquidate all of its remaining assets."

**ANSWER:**  The Piggly Wiggly Defendants deny the allegations in sentence 1.  The Piggly Wiggly Defendants admit that sentence 2 purports to paraphrase, quote, and/or cite to a communication sent to participants in October 2014 but rely on the communication to speak for itself.

200.     Despite making this decision, the Board waited over two years, in contravention of state and federal law and the terms of the Plan, to seek approval for such a transaction from

66

the Plan Participants, who had a right to instruct how the Plan would vote its shares of Company stock on such a decision.

**ANSWER:**  The Piggly Wiggly Defendants deny the allegations in paragraph 200.

201.    Specifically, pursuant to Internal Revenue Code ("IRC") 401(a)(22), 26 U.S.C. § 401(a)(22),  in order to be a qualified retirement plan, an employee stock ownership plan like the Plan must meet the requirements of IRC 409(e). Section 409(e) provides that for an employer that does not have registered securities (such as the Piggly Wiggly Group), participants and beneficiaries must be entitled to vote with respect to "any corporate matter which involves the voting of such shares with respect to the approval or disapproval of any corporate merger or consolidation, recapitalization, reclassification, liquidation, dissolution, sale of substantially all assets of a trade or business or such similar transactions as the Secretary may prescribe in regulations."  The governing Plan document itself includes nearly mirror language to IRC § 409(e), establishing this right of Plan participants in Article 9.12(c).  Pursuant to South Carolina Code Section 33-12-102, shareholder approval is required for the sale of all or substantially all of a corporation's property otherwise than in the usual and regular course of business.

**ANSWER:**  Sentence 1 alleges legal conclusions to which no response is required.  To the extent a response is required, the Piggly Wiggly Defendants deny the allegations in sentence 1.  The Piggly Wiggly Defendants admit that sentence 2 purports to paraphrase, quote, and/or cite to IRC § 409(e) but rely on IRC § 409(e) to speak for itself.  To the extent a response is required, the Piggly Wiggly Defendants deny the allegations in sentence 2.  The Piggly Wiggly Defendants admit that sentence 3 purports to paraphrase, quote, and/or cite to the plan document but rely on the plan document to speak for itself.  To the extent a response is required, the Piggly Wiggly Defendants deny the allegations in sentence 3.  Sentence 4 alleges legal conclusions to which no response is required.  To the extent a response is required, the Piggly Wiggly Defendants deny the allegations in sentence 4.

### B.    2013 Sales of Company Assets Proceed Without Approval from Participants

202.    The sale of Company assets in liquidation of the Company began in earnest in 2013, when the Company sold 30 stores and an additional location under construction to 2 different grocery store chains, BiLo and Harris Teeter.  The Company also sold another 5 stores, 4 to an independent operator and 1 to another grocery chain.  Proceeds from these sales (collectively, the "2013 Asset Sales") were used in part to repay debts of the Company, including all amounts owed under the Company's loan from Crystal Financial.

**ANSWER:** The Piggly Wiggly Defendants admit that the Company sold twenty-eight existing Piggly Wiggly retail stores and one store under construction to BiLo and Harris Teeter in 2013 but deny the remaining allegations in sentences 1 and 2. The Piggly Wiggly Defendants admit the allegations in sentence 3.

203.    Commenting on the 2013 Asset Sales, Defendant David Schools later observed in a letter to the Plan's directed Trustee on September 29, 2014, that "the Company's most desirable retail stores were sold in 2013," and that the stores that remained after this sale "[were] largely either unprofitable or in rural locations and have not attracted interest by the larger grocery store market chains."

**ANSWER:** The Piggly Wiggly Defendants admit that paragraph 203 purports to paraphrase, quote, and/or cite to a letter to Reliance/Argent but rely on that letter to speak for itself. To the extent a response is required, the Piggly Wiggly Defendants admit that the quoted portion of the September 29, 2014 letter from David Schools to the trustee is accurate but deny the remaining allegations in paragraph 203.

204.    The 2013 Asset Sales were a clear first step towards a sale of substantially all the assets of the Company, but Company management did not bother to seek approval from the Plan Participants at this time for such a transaction, despite the Participants' right, as established in federal and state law and in the Plan itself, to vote on whether or not to approve such a sale. This unlawful exclusion from involvement of Plan Participants was consistent with the long-standing practice of the Defendant Plan Fiduciaries to keep Plan Participants locked out of any information about the true financial results and state of the Company.

**ANSWER:** The Piggly Wiggly Defendants deny the allegations in paragraph 204. Plaintiffs' characterization of the Piggly Wiggly Defendants as the "Defendant Plan Fiduciaries" implies a legal conclusion, which the Piggly Wiggly Defendants deny.

205.    The Company also began a massive round of layoffs in 2013, as it announced in November 2013 that it would close certain of its warehouse and distribution centers and outsource these services to other companies.

**ANSWER:**  The Piggly Wiggly Defendants admit that the Company announced in November 2013 that certain of its distribution work would be outsourced but deny the remaining allegations in paragraph 205.

206.    Even as the Company continued its steady decline, excessive compensation paid to management and insiders continued as set forth in hereinabove, as did payments on above-market leases as set forth hereinabove, and payments from the Plan to Newton family members on the Notes Payable resumed in June 2013.

**ANSWER:**  The Piggly Wiggly Defendants admit that payments to noteholders resumed in June 2013 but deny the remaining allegations in paragraph 206.

207.    Members of the Executive Leadership Team also received substantial incentive bonuses resulting from the 2013 Asset Sales as set forth in greater detail hereinabove.  Upon information and belief, these incentive bonus arrangements would not have been entered into if the Company had not already decided to commence its own liquidation.

**ANSWER:**  The Piggly Wiggly Defendants admit that certain Company officers received incentive distributions following the sale of certain assets in 2013 but deny the remaining allegations in paragraph 207.

**C.**    **Defendant Plan Fiduciaries and Defendant Note Holders Collude on a Large and Improper Settlement of the Notes Payable in Early 2014**

208.    With cash assets from the 2013 Asset Sales in hand—and while the Company was still in financial distress—Company insiders and Defendant Plan Fiduciaries, whose identities constantly overlapped, began orchestrating a scheme in or around early 2014 to drain assets from the Company, to the financial detriment of the Plan, into the hands of the Defendant Note Holders, all of whom were Company insiders, members of the Newton Family, or both.

**ANSWER:**  The Piggly Wiggly Defendants deny the allegations in paragraph 208. Plaintiffs' characterization of the Piggly Wiggly Defendants as the "Defendant Plan Fiduciaries" implies a legal conclusion, which the Piggly Wiggly Defendants deny.

209.    This scheme involved a purchase of the Notes Payable by the Company from the Defendant Note Holders (and five other note holders), and the ultimate cancellation of the Notes Payable.

**ANSWER:**  The Piggly Wiggly Defendants admit that Joanne Newton Ayers, Marion Newton Schools, Burton Schools, Joseph Newton, and certain other individuals holding notes issued by the Piggly Wiggly ESOP ("Notes") assigned the Notes to the Company in 2014, and admit that the Company subsequently forgave the remaining amounts owed under the Notes, but deny Plaintiffs characterization of the transaction as a scheme and deny the remaining allegations in paragraph 209.

210.    This scheme was effected in several steps.  First, in March 2014 the Defendant Note Holders (and five other note holders) entered into agreements to sell and assign the Notes Payable, together with the related security agreements and other loan documents, to the Company, and the Company replaced the Defendant Note Holders (and the five other note holders) as the holder of the Notes Payable as of March 31, 2014.

**ANSWER:**  The Piggly Wiggly Defendants deny the allegations in sentence 1.  The Piggly Wiggly Defendants admit the allegations in sentence 2.

211.    Subsequently, around the end of March 2014, the Company paid the Defendant Note Holders in cash the aggregate purchase price of $8,272,669 for their Notes Payable.

**ANSWER:**  The Piggly Wiggly Defendants admit that the Company purchased the notes in March 2014 but deny the remaining allegations in paragraph 211.

212.    Finally, on December 12, 2014, the Company and the Plan entered into a redemption agreement, pursuant to which the unallocated shares of Company stock held by the Plan and pledged as collateral for the Notes Payable were redeemed and cancelled by the Company and the related outstanding loans owed by the Plan were forgiven.  Upon information and belief, the Defendant Plan Fiduciaries postponed the closing of this stock redemption from approximately March 2014 (when the Notes Payable were acquired by the Company) until December 2014 (when this stock redemption occurred) in order to dilute the Plan Participants' voting percentage in the upcoming vote, as described below, on the sale of the Company's wholesale business and related matters.  The postponement allowed the unallocated shares held by the Plan (and to be voted by the Plan Trustee) to remain outstanding for voting purposes.

**ANSWER:**  The Piggly Wiggly Defendants admit the allegations in sentence 1.  The Piggly Wiggly Defendants deny the allegations in sentences 2 and 3.  Plaintiffs' characterization

of the Piggly Wiggly Defendants as the "Defendant Plan Fiduciaries" implies a legal conclusion, which the Piggly Wiggly Defendants deny.

213.    By early 2014, the actual value of the Notes Payable was far less than both the outstanding principal amount that remained on the Notes Payable and the $8,272,669 the Company paid to the Defendant Note Holders for their Notes Payable in settlement.  That lower actual value resulted from the ERISA legal requirement (reflected in the terms of all the Notes Payable) that the Notes Payable held or guaranteed by parties in interest be without recourse to any assets of the Plan other than the unallocated shares of Company stock pledged as security for the Notes Payable.

ANSWER:  The Piggly Wiggly Defendants deny the allegations in paragraph 213.

214.    ERISA regulations provide that any loan obligations of an ESOP to parties in interest (such as Defendants Newton, Burton Schools and Marion Newton Schools) or guaranteed by a party in interest (such as the Company) be without recourse against the ESOP and that the only assets of the ESOP that may be given as collateral for such loans are certain qualifying employer securities, such as Piggly Wiggly Group unallocated stock.  29 C.F.R. § 2550.408b-3(e).   These provisions were reflected in the terms of all the Notes Payable.

ANSWER:  The Piggly Wiggly Defendants admit that sentence 1 purports to paraphrase, quote, and/or cite to 29 C.F.R. § 2550.408b-3 but rely on that provision to speak for itself.  To the extent a response is required, the Piggly Wiggly Defendants deny the allegations in sentence 1.  The Piggly Wiggly Defendants admit that sentence 2 purports to paraphrase, quote, and/or cite to the Notes but rely on the Notes to speak for themselves.  To the extent a response is required, the Piggly Wiggly Defendants deny the allegations in sentence 2.

215.    Under these ERISA regulations and pursuant to the express terms of the Notes Payable, had the Plan defaulted on its payment obligations on the Notes Payable, the sole recourse that the holders of the Notes Payable would have had against the Plan would have been to sell the unallocated shares of Company stock that were pledged as collateral for the Notes Payable.  The holders of the Notes Payable could not, legally or under the terms of the Notes Payable, use any assets of the Plan – other than the unallocated Company stock pledged as security – to make payments to themselves under or with respect to the Notes Payable.

ANSWER:  Paragraph 215 alleges legal conclusions to which no response is required.  To the extent a response is required, the Piggly Wiggly Defendants admit that paragraph 215 purports to paraphrase, quote, and/or cite to ERISA and the Notes but rely on ERISA and the

Notes to speak for themselves, and admit that the Notes Payable were non-recourse as to the

Piggly Wiggly ESOP but deny the remaining allegations in paragraph 215.

216.    By early 2014, 19,463.52 shares were unallocated and held by the Plan as security for the Notes Payable.  The reported value of these shares as of March 31, 2014, based upon the reported value in the Plan's Fiscal 2014 Form 5500 of $214.70 per share, was $4,178,818.

**ANSWER:**  The Piggly Wiggly Defendants admit that a number of shares were

unallocated and held as security for the Notes Payable in early 2014 but deny the remaining

allegations in sentence 1.  The Piggly Wiggly Defendants admit that sentence 2 purports to

paraphrase, quote, and/or cite to the form 5500 for the fiscal year ending March 31, 2014 but rely

on the document to speak for itself.  To the extent a response is required, the Piggly Wiggly

Defendants admit that the per share value of Greenbax stock as of March 31, 2014 was $214.70

but deny the remaining allegations in sentence 2.

217.    Upon information and belief, Company management provided faulty financial information for the appraisals upon which this per share value was based, and even this valuation was likely inflated.

**ANSWER:**  The Piggly Wiggly Defendants deny the allegations in paragraph 217.

218.    But even assuming the accuracy of the reported value of $214.70 per share and a resulting value of $3,783,564 for the Notes Payable held by the Defendant Note Holders, the Company's approximate $8.3 million payout to the Defendant Note Holders was ***$4,489,105 more than the reported value*** of the unallocated Company stock pledged as collateral for the Notes Payable held by the Defendant Note Holders.

**ANSWER:**  The Piggly Wiggly Defendants deny the allegations in paragraph 218.

219.    The Plan owned nearly 100% of the Company.  Moreover, the Company had effectively decided in 2013 to embark on a sale of substantially all assets and pursue a winding down.  Thus, any Company assets that remained following a winding down would necessarily flow to the Plan, unless the Defendants found other ways to appropriate those assets for themselves.  In these circumstances, every dollar paid by the Company to the Defendant Note Holders in excess of the value of the unallocated Company stock pledged as collateral reduced by virtually the same amount the value of the Plan's other assets.  Nearly dollar-for-dollar, the non-collateral Plan assets bore the financial cost and burden of the $4,489,105 amount paid by the Company for the Notes Payable to the Defendant Note Holders in excess of the value of the

72

unallocated stock pledged as collateral for those Notes Payable.  The practical and economic substance of the transaction was the same as if the Plan had used its non-pledged assets to pay nearly $4,489,105 to the Defendant Note Holders.

**ANSWER:**  The Piggly Wiggly Defendants admit the allegations in sentence 1.  The Piggly Wiggly Defendants deny the allegations in sentence 2.  Sentences 3 through 6 allege legal conclusions to which no response is required.  To the extent a response is required, the Piggly Wiggly Defendants deny the allegations in sentences 3 through 6.

220.    The goal of the ERISA regulations cited above is to protect the non-collateral assets of ESOPs from the financial burdens imposed by loans incurred by ESOPs from or guaranteed by parties in interest.  Payment by the Company to the Defendant Note Holders of $4,489,105 in excess of the value of the pledged unallocated Company stock was tantamount to payment to the Defendant Note Holders by the Plan, using its non-collateral assets, of 99.5% of such $4,489,105.  Structuring the settlement of the Notes Payable as they did, the Company's Board of Directors (the majority of the members of which were Defendant Plan Fiduciaries) attempted to do an "end run" around ERISA's requirement that Plan borrowing be without recourse against the Plan beyond the unallocated employer securities held as collateral. The transaction was arranged, not primarily in the interest of the Participants and Beneficiaries, but in the interest of the Defendant Note Holders.  Nearly $4.5 million in Company assets was improperly drained away to the insiders at a time of acute financial stress for both the Company and the Plan, causing a corresponding decrease in the value of Plan assets, to the financial detriment of the Participants and the Beneficiaries, including the Plaintiffs.  Taking into account all the relevant circumstances, this payment violated ERISA's requirement and the terms of the Notes Payable that no Plan assets other than the unallocated stock serving as collateral for the Notes Payable be used to pay the Notes Payable.

**ANSWER:**  The Piggly Wiggly Defendants lack knowledge or information sufficient to form a belief as to the allegations in sentence 1.  The Piggly Wiggly Defendants deny the allegations in sentences 2 through 6.  Plaintiffs' characterization of the Piggly Wiggly Defendants as the "Defendant Plan Fiduciaries" implies a legal conclusion, which the Piggly Wiggly Defendants deny.

221.    Upon information and belief, the Defendant Plan Fiduciaries (in their individual capacities and in their capacities as members of the Company's Board of Directors), acting on behalf of (or representing) one or more of the Defendant Note Holders, whose interest were adverse to the interests of the Plan and its Participants and Beneficiaries, caused this transaction to occur.

**ANSWER:** The Piggly Wiggly Defendants deny the allegations in paragraph 221.

Plaintiffs' characterization of the Piggly Wiggly Defendants as the "Defendant Plan Fiduciaries"

implies a legal conclusion, which the Piggly Wiggly Defendants deny.

222.    The failure of the Plan Committee and/or the Plan Trustees to bring a derivative action on behalf of the Company against those members of the Company's Board of Directors who are Defendant Plan Fiduciaries to seek recovery from the Defendant Plan Fiduciaries, and to seek restitution or disgorgement from the Defendant Note Holders, for the excess amount paid by the Company for the Notes Payable constitutes a breach by the members of the Plan Committee/or and the Plan Trustees of their duties of prudence and loyalty, to the financial detriment of the Participants and the Beneficiaries, including the Plaintiffs. The Defendant Plan Fiduciaries, in their capacities as members of the Company's Board of Directors, failed in their duty to monitor the Plan Committee and the Plan Trustees with respect to this failure and to replace the members of the Plan Committee and the Plan Trustees with individuals willing to bring such a derivative action.

**ANSWER:** The Piggly Wiggly Defendants deny the allegations in paragraph 222.

Plaintiffs' characterization of the Piggly Wiggly Defendants as the "Defendant Plan Fiduciaries"

implies a legal conclusion, which the Piggly Wiggly Defendants deny.

223.    Defendant Note Holders were well aware of or should have known the essential facts of this improper transaction. They knew or should have known that the Plan owned virtually all of the stock of the Company. The express terms of the Notes Payable held by the Defendant Note Holders included non-recourse language required by ERISA. The Defendant Note Holders had to know the principal amounts owed on their respective Notes Payable. Each of the Defendant Note Holders signed in March 2014 an agreement entitled "Loan Sale and Assignment of Note, Security Agreement and Other Loan Documents," which set forth the purchase price for that holder's Note Payable, which was less than the Note Payable's outstanding principal amount. It is reasonable to infer that each holder of a Note Payable would have requested an explanation for why the purchase price for his or her Note Payable was less than the then outstanding principal amount of the Note Payable. It is reasonable to infer that the explanation given by the Defendant Plan Fiduciaries to each Defendant Note Holder was that the value of the unallocated stock serving as security for the Notes Payable was significantly less than the outstanding principal amount of the Notes Payable and that the Plan was not legally able to pay more for the Notes Payable than the value of such unallocated stock, but that because the contemplated transaction involved a purchase of the Notes Payable by the Company, rather than the Plan, the Defendant Note Holders would be paid more than the amount they would receive if the Plan purchased their Notes Payable. Furthermore, it is reasonable to infer that the Defendant Note Holders knew or should have known, or were told by the Defendant Plan Fiduciaries (who were relatives of the Defendant Note Holders), that the value of the Company had been in constant decline, that payments on the Notes Payable had been suspended for some 10 months

from September 2012 to June 2013 because the Plan could not meet its payment obligations on the Notes Payable, and that the Defendant Plan Fiduciaries had determined that the Company would sell substantially all its assets and wind down.

**ANSWER:** Joseph Newton and Burton Schools admit that they understood the terms of the Company's Note purchase and subsequent redemption transaction, lack knowledge or information sufficient to form a belief as to the other Defendant Note Holders' knowledge, and deny the remaining allegations in sentence 1. Joseph Newton and Burton Schools admit the allegations in sentence 2 except that they lack knowledge or information sufficient to form a belief as to the other Defendant Note Holders' knowledge. Joseph Newton and Burton Schools admit that they had sufficient information to determine the amount of the principal outstanding on their Notes Payable, lack knowledge or information sufficient to form a belief as to the other Defendant Note Holders' knowledge, and deny the remaining allegations in sentence 4.

David Schools, William Edenfield, and Robert Masche lack knowledge or information sufficient to form a belief as to the truth of the allegations in sentences 1, 2, and 4.

The Piggly Wiggly Defendants admit that sentence 3 purports to paraphrase, quote, and/or cite to the terms of the Notes but rely on the Notes to speak for themselves. To the extent a response is required, the Piggly Wiggly Defendants admit that the Notes were non-recourse as to the Piggly Wiggly ESOP but deny the remaining allegations in sentence 3. The Piggly Wiggly Defendants admit the allegations in sentence 5. The Piggly Wiggly Defendants deny the allegations in sentences 6 through 8. Plaintiffs' characterization of the Piggly Wiggly Defendants as the "Defendant Plan Fiduciaries" implies a legal conclusion, which the Piggly Wiggly Defendants deny.

224.    The Defendant Note Holders, therefore, participated in a transaction that they knew or should have known violated ERISA. Under the circumstances, the amount paid to the Defendant Note Holders over the value of the pledged unallocated stock belongs in good

conscience to the Plan and it is inequitable for the Defendant Note Holders to retain that excess.

**ANSWER:** The Piggly Wiggly Defendants deny the allegations in paragraph 224.

D.    **Company Seeks Approval in late 2014 for a Sale of Substantially All Assets and Winding Down of the Company**

225.    Having looted Company and Plan assets in settlement of the Notes Payable with themselves and their family members who made up the Defendant Note Holders, Company management and directors, including Defendants David Schools, Newton, Burton Schools, Masche, and Edenfield, agreed on September 5, 2014, for the Company to enter into an asset purchase agreement with C&S Wholesale Grocers, Inc. ("C&S") for a sale of substantially all of the then-remaining assets of the Company.

**ANSWER:** The Piggly Wiggly Defendants admit that the Company entered into an asset

purchase agreement with C&S Wholesale Grocers, Inc. ("C&S") as of September 5, 2014 for

certain of the Company's assets but deny the remaining allegations in paragraph 225.

226.    Until they were forced by the Company's deteriorated financial state to begin the process of selling all the Company assets, including coming to the deal table with C&S, Company insiders, including Defendants David Schools, Newton, Burton Schools, Masche, and Edenfield, had no interest in pursuing such a sale, as it would have brought to an end their lucrative sinecures that were draining the Company of precious resources.

**ANSWER:** The Piggly Wiggly Defendants deny the allegations in paragraph 226.

227.    Because they waited so long to shop the Company through years of financial losses, the sale to C&S was effectively a fire sale at a bargain basement price, far lower than the amount the Company could have received for its assets had a sale been conducted earlier in the Class Period.

**ANSWER:** The Piggly Wiggly Defendants deny the allegations in paragraph 227.

228.    On October 1, 2014, Argent Trust Company ("Argent"), which had by that time replaced Reliance as the directed Plan Trustee, distributed to participants a "Notice of Action" that requested approval from Plan participants for both the proposed sale to C&S and a winding down of the Company. The Notice further indicated that the Board of the Piggly Wiggly Group had voted unanimously in favor the proposed transaction and the winding down and was recommending that participants vote in favor also.

**ANSWER:** The Piggly Wiggly Defendants admit that, by October 1, 2014, Argent had

replaced Reliance and that Argent distributed a Notice of Action to Plan participants.  The Piggly

76

Wiggle Defendants rely on that Notice of Action to speak for itself and deny all remaining

allegations in paragraph 228.

229.    The Notice of Action was accompanied by a short Information Statement
concerning the proposed sale and dissolution (the "Information Statement"). The Information
Statement discussed in general terms the strategic factors that first led the Company Board to
consult with an "investment banking advisor" in September 2012, as well as the Board's decision
to exit the grocery store business and pursue a winding down of the Company.

**ANSWER:** The Piggly Wiggly Defendants admit that paragraph 229 purports to

paraphrase, quote, and/or cite to the Notice of Action and Information Statement but rely on

those documents to speak for themselves. To the extent a response is required, the Piggly

Wiggly Defendants admit the allegations in paragraph 229.

230.    The Information Statement also discussed some of the material terms of the
proposed sale agreement. One of these terms was a 4-year covenant not to compete that would be
required of senior Piggly Wiggly Management who did not become employees of C&S. The
consideration to be paid for the covenant not to compete was $700,000, and upon information
and belief, this consideration has been paid to senior Company management, including
Defendants David Schools, Edenfield, and Masche.

**ANSWER:** The Piggly Wiggly Defendants admit that the consideration for the covenant

not to compete has been paid, and that paragraph 230 purports to paraphrase, quote, and/or cite

to the Information Statement but rely on the Information Statement to speak for itself. To the

extent a response is required, the Piggly Wiggly Defendants admit the allegations in paragraph

230.

231.    The Information Statement was facially deficient in that it provided no or scanty
information concerning the value of the Company, its financial statements or financial
performance, management's discussion and analysis of the Company's financial results of
operation and financial condition, the results of any independent appraisals of or reports
concerning the Company, its business or financial prospects, the history leading up to the
transactions to be approved, the fairness opinion received by the Plan's trustee, the sales prices
and other material terms contemplated by the verbal commitments that the Company had
received to sell seventeen of its remaining 19 grocery stores, or the portion of the proceeds to be
received by Company directors and management for the A-C Development real estate portfolio
sales contemplated by the letter of intent referred to in the Information Statement. Participants
were therefore unable to evaluate for themselves whether the proposed terms of the sale

agreement with C&S and the other transactions that they were being asked to approve were fair or appropriate. This mistreatment of the Participants and the Beneficiaries by the Defendant Plan Fiduciaries continued the Defendant Plan Fiduciaries' pattern and practice of consistently favoring their own interests over those of the Participants and the Beneficiaries and of violating and circumventing applicable legal requirements.

**ANSWER:** The Piggly Wiggly Defendants deny the allegations in paragraph 231.

Plaintiffs' characterization of the Piggly Wiggly Defendants as the "Defendant Plan Fiduciaries"

implies a legal conclusion, which the Piggly Wiggly Defendants deny.

232.    Upon information and belief, the sale agreement with C&S and the winding down of the Company were approved by vote of the Company's shareholders, with Argent voting the allocated shares of those Participants who did not respond to the Notice of Action and all shares held by the Plan that were unallocated.

**ANSWER:** The Piggly Wiggly Defendants admit that the sale agreement with C&S and

the winding down of the Company were approved by vote of the Company's shareholders, with

Argent voting allocated shares, but deny the remaining allegations in paragraph 232.

233.    Following approval of the sale and winding down of the Company, on December 12, 2014, the Company's Board met and removed Defendant Argent as the Plan's independent directed Trustee. Defendants David Schools, Edenfield and Masche were appointed successor Trustees, and continued to serve as the Plan Committee.

**ANSWER:** The Piggly Wiggly Defendants admit that the Company's Board removed

Argent as Trustee on December 12, 2014 but deny the remaining allegations in sentence 1. The

Piggly Wiggly Defendants admit that David Schools, William Edenfield, and Robert Masche

were appointed as Trustees following Argent's removal and lack knowledge or information

sufficient to form a belief as to the remaining allegations in sentence 2.

234.    The Company is currently being wound-down under the continued management of Defendants David Schools, Edenfield, and Masche.

**ANSWER:** The Piggly Wiggly Defendants admit that, as of February 26, 2016, the

David Schools, William Edenfield, and Robert Masche were managing the continue winding-

down of the Company but deny the remaining allegations in paragraph 234.

235.    Upon information and belief, as of the date of filing of this Amended Complaint, Company insiders, including Defendants David Schools, Newton, and Edenfield, have received or will soon receive a substantial payout in connection with the sale by ACDC or entities affiliated with ACDC and the Dallas Cotton Club of some 13 different properties on which Piggly Wiggly stores are or were located.  The buyer in this sale was Wheeler Real Estate Investment Trust, a real estate investment firm based in Virginia, and the reported sale value was approximately $71 million.  Upon information and belief, the sale closed on or about April 12, 2016.

**ANSWER:**  The Piggly Wiggly Defendants admit that David Schools and William Edenfield received certain distributions in connection with the sale by ACDC or entities affiliated with ACDC of certain properties but deny the remaining allegations in sentence 1.  The Piggly Wiggly Defendants admit the allegations in sentences 2 and 3.

### THE LAW UNDER ERISA

236.    At all relevant times, Defendant Plan Fiduciaries were and served as fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

**ANSWER:**  Paragraph 236 alleges legal conclusions to which no response is required. To the extent a response is required, the Piggly Wiggly Defendants deny the allegations in paragraph 236.  Plaintiffs' characterization of the Piggly Wiggly Defendants as the "Defendant Plan Fiduciaries" implies a legal conclusion, which the Piggly Wiggly Defendants deny.

## I.    DEFENDANT PLAN FIDUCIARIES BREACHED THEIR FIDUCIARY DUTIES TO THE PLAN

237.    ERISA § 404(a)(1)(A) and (B), 29 U.S.C. § 1104(a)(1)(A) and (B), provides, in pertinent part, that a fiduciary shall discharge his or its duties with respect to a plan solely in the interest of the participants and beneficiaries, for the exclusive purpose of providing benefits to participants and their beneficiaries, and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

**ANSWER:**  Paragraph 237 alleges legal conclusions to which no response is required. To the extent a response is required, the Piggly Wiggly Defendants admit that paragraph 237

purports to paraphrase, quote, and/or cite to ERISA § 404 but rely on ERISA § 404 to speak for

itself.  The Piggly Wiggly Defendants deny the remaining allegations in paragraph 237.

238.     These fiduciary duties under ERISA § 404(a)(1)(A) and (B) are referred to as the duties of loyalty, exclusive purpose, and prudence and are the "highest known to the law." *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982).  They entail, among other things:

(a)  A duty to conduct an independent, intensive and thorough investigation into, and continually monitor, matters as to which the fiduciaries have decision-making authority;

(b)  A duty to make good faith, reasoned and objectively reasonable analyses and decisions concerning matters as to which the fiduciaries have decision-making authority;

(c)  A duty to administer and manage a plan with an "eye single" to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor;

(d)  These duties are applicable, among other instances, where fiduciaries exercise stock voting rights;

(e)  These duties also apply, among other instances, where fiduciaries decide whether or not to bring one or more derivative actions to remedy corporate action or inaction giving rise to such a claim;

(f)  A duty to disclose and inform, which encompasses: (1) a negative duty not to misinform; (2) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and (3) a duty to convey complete and accurate information material to the circumstances of participants and beneficiaries.

**ANSWER:**  Paragraph 238 alleges legal conclusions to which no response is required.

To the extent a response is required, the Piggly Wiggly Defendants admit that paragraph 238

purports to paraphrase, quote, and/or cite to certain statutes and court opinions but rely on those

statutes and court opinions to speak for themselves.  The Piggly Wiggly Defendants deny the

remaining allegations in paragraph 238.

239.     ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), provides, in pertinent part, that a civil action may be brought by a participant for relief under ERISA § 409, 29 U.S.C. § 1109.

80

**ANSWER:** Paragraph 239 alleges legal conclusions to which no response is required. To the extent a response is required, the Piggly Wiggly Defendants admit that paragraph 239 purports to paraphrase, quote, and/or cite to ERISA § 502 but rely on ERISA § 502 to speak for itself. The Piggly Wiggly Defendants deny the remaining allegations in paragraph 239.

240.    ERISA § 409(a), 29 U.S.C. § 1109(a), "Liability for Breach of Fiduciary Duty," provides, in pertinent part, that any person who is a fiduciary with respect to a plan and breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by ERISA shall be personally liable to restore to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

**ANSWER:** Paragraph 240 alleges legal conclusions to which no response is required. To the extent a response is required, the Piggly Wiggly Defendants admit that paragraph 240 purports to paraphrase, quote, and/or cite to ERISA § 409 but rely on ERISA § 409 to speak for itself. The Piggly Wiggly Defendants deny the remaining allegations in paragraph 240.

241.    ERISA § 405(a), 29 U.S.C. § 1105(a), "Liability for breach by co-fiduciary," provides, in pertinent part, that:

> [I]n addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances; (A) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; (B) if, by his failure to comply with section 404(a)(1), 29 U.S.C. § 1104(a)(1), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or (C) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

**ANSWER:** Paragraph 241 alleges legal conclusions to which no response is required. To the extent a response is required, the Piggly Wiggly Defendants admit that paragraph 241 purports to paraphrase, quote, and/or cite to ERISA § 405 but rely on ERISA § 405 to speak for itself. The Piggly Wiggly Defendants deny the remaining allegations in paragraph 241.

242.    Plaintiffs bring this action against the Defendant Plan Fiduciaries under the authority of ERISA § 502(a) for Plan-wide relief under ERISA § 409(a) to recover losses sustained by the Plan arising out of the breaches of fiduciary duties by Defendant Plan Fiduciaries for violations under ERISA § 404(a)(1) and ERISA § 405(a).

**ANSWER:**  The Piggly Wiggly Defendants admit that Plaintiffs purport to bring this suit under ERISA § 502 and § 409 but deny that Plaintiffs suffered losses or that the Piggly Wiggly Defendants breached any duties Plaintiffs allege they had.  Plaintiffs' characterization of the Piggly Wiggly Defendants as the "Defendant Plan Fiduciaries" implies a legal conclusion, which the Piggly Wiggly Defendants deny.

## II.    DEFENDANT PLAN FIDUCIARIES ENGAGED IN TRANSACTIONS THAT VIOLATED ERISA OR OTHERWISE WERE PROHIBITED BY ERISA

243.    In addition to the general fiduciary duties set forth in ERISA § 404, ERISA § 406 categorically prohibits certain types of transactions that are especially likely to harm plans or their participants—so called "prohibited transactions."  29 U.S.C. § 1106(a)-(b).

**ANSWER:**  Paragraph 243 alleges legal conclusions to which no response is required. To the extent a response is required, the Piggly Wiggly Defendants admit that paragraph 243 purports to paraphrase, quote, and/or cite to ERISA § 406 but rely on ERISA § 406 to speak for itself.  The Piggly Wiggly Defendants deny the remaining allegations in paragraph 243.

244.    ERISA § 406(a) prohibits "direct or indirect" transactions between plans and "parties in interest," such as the sale or exchange, or leasing, of property between a plan and a party in interest and a transfer to a party in interest of any assets of a plan.  Parties in interest include fiduciaries, trustees and plan sponsors, amongst others, as well as entities controlled by parties in interest and their families.  *See* ERISA § 3(14), 29 U.S.C. § 1002(14).

**ANSWER:**  Paragraph 244 alleges legal conclusions to which no response is required. To the extent a response is required, the Piggly Wiggly Defendants admit that paragraph 244 purports to paraphrase, quote, and/or cite to ERISA § 406 and § 3(14) but rely on those sections to speak for themselves.  The Piggly Wiggly Defendants deny the remaining allegations in paragraph 244.

245.     ERISA § 406(b) prohibits certain self-dealing transactions where a fiduciary: (a) deals with assets of the plan in his own interest or for his own account; (b) in his individual or in any other capacity acts in any transaction involving the plan on behalf of a party (or represents a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries; or (c) receives any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.

**ANSWER:**  Paragraph 245 alleges legal conclusions to which no response is required. To the extent a response is required, the Piggly Wiggly Defendants admit that paragraph 245 purports to paraphrase, quote, and/or cite to ERISA § 406 but rely on ERISA § 406 to speak for itself.  The Piggly Wiggly Defendants deny the remaining allegations in paragraph 245.

246.     ERISA further provides in § 502(a)(3), 29 U.S.C. § 1132(a)(3), that a participant may bring a civil action "(A) to enjoin any act or practice which violates [ERISA Subchapter 1] or the terms of the plan or (B) to obtain other appropriate equitable relief (i) to redress such violations or  (ii) to enforce  any provision of [ERISA Subchapter 1] or the terms of the plan."

**ANSWER:**  Paragraph 246 alleges legal conclusions to which no response is required. To the extent a response is required, the Piggly Wiggly Defendants admit that paragraph 246 purports to paraphrase, quote, and/or cite to ERISA § 502 but rely on ERISA § 502 to speak for itself.  The Piggly Wiggly Defendants deny the remaining allegations in paragraph 246.

247.     Plaintiffs bring this action against the Defendant Plan Fiduciaries under the authority of ERISA § 502(a) to obtain appropriate equitable relief against Defendant Plan Fiduciaries for their violations under ERISA § 406(a).

**ANSWER:**  The Piggly Wiggly Defendants admit that Plaintiffs purport to bring this suit under ERISA § 502 and § 406 but deny that Plaintiffs suffered losses or that the Piggly Wiggly Defendants violated ERISA.  Plaintiffs' characterization of the Piggly Wiggly Defendants as the "Defendant Plan Fiduciaries" implies a legal conclusion, which the Piggly Wiggly Defendants deny.

## III.     DEFENDANT NOTE HOLDERS KNOWINGLY PARTICIPATED IN TRANSACTIONS THAT VIOLATED ERISA AND/OR AS PARTIES IN INTEREST IN PROHIBITED TRANSACTIONS

248.    Non-fiduciaries, acting with actual or constructive knowledge, may be held liable under ERISA in two ways:  (1) as parties in interest, for participating in a § 406 prohibited transaction, and (2) as non-fiduciaries, for participating in a transaction that violates ERISA. ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3);  *Harris Trust & Savings Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238 (2000).

**ANSWER:**  Paragraph 248 alleges legal conclusions to which no response is required.

To the extent a response is required, the Piggly Wiggly Defendants admit that paragraph 248

purports to paraphrase, quote, and/or cite to certain statutes and court opinions but rely on those

statutes and court opinions to speak for themselves.  The Piggly Wiggly Defendants deny the

remaining allegations in paragraph 248.

249.    All Defendant Note Holders, with actual or constructive knowledge, participated in transactions that violated ERISA.  Defendant Note Holders Newton, Burton Schools and Marion Newton Schools are also parties in interest who, with actual or constructive knowledge, participated in § 406 prohibited transactions.

**ANSWER:**  The Piggly Wiggly Defendants deny the allegations in paragraph 249.

250.    Plaintiffs therefore bring this action against the Defendant Note Holders under the authority of ERISA § 502(a) for Plan-wide equitable relief against the Defendant Note Holders to remedy the losses to the plan that resulted from their knowing participation in transactions that violated ERISA.

**ANSWER:**  The Piggly Wiggly Defendants admit that Plaintiffs purport to bring this suit

under ERISA § 502 but deny that Plaintiffs suffered losses or that any Defendant violated

ERISA.

## CAUSES OF ACTION
### Count One
### (Breach of Fiduciary Duty against the Defendant Plan Fiduciaries)

251.    The foregoing allegations are incorporated herein by reference.

**ANSWER:**  The Piggly Wiggly Defendants reassert their responses to paragraphs 1

through 250 and incorporate the same as if fully set forth herein.

252.    As set forth above, the Defendant Plan Fiduciaries owe to the Plan, its Participants and Beneficiaries, and the Class extensive fiduciary duties.

**ANSWER:** Paragraph 252 alleges legal conclusions to which no response is required. To the extent a response is required, the Piggly Wiggly Defendants deny the allegations in paragraph 252. Plaintiffs' characterization of the Piggly Wiggly Defendants as the "Defendant Plan Fiduciaries" implies a legal conclusion, which the Piggly Wiggly Defendants deny.

253.    As set forth above, there was substantial overlap between the identities of the Defendant Plan Fiduciaries and inside management and directors of the Piggly Wiggly Group, such that Defendant Plan Fiduciaries were aware of the corporate actions and inactions of the Piggly Wiggly Group Board of Directors and management, including the mismanagement, overcompensation to management, and insider deals hereinabove alleged, as well as such other misconduct to be proven at trial.

**ANSWER:** The Piggly Wiggly Defendants admit that certain individuals held multiple positions within the Company, including director, officer, Plan Committee member, and Trustee of the Piggly Wiggly ESOP, but deny the remaining allegations in paragraph 253. Plaintiffs' characterization of the Piggly Wiggly Defendants as the "Defendant Plan Fiduciaries" implies a legal conclusion, which the Piggly Wiggly Defendants deny.

254.    As set forth in detail above, the Defendant Plan Fiduciaries breached their fiduciary obligations to the Plan, the Plan Participants and Beneficiaries, and the Class by, among other conduct to be proven at trial:

a.    Failing, as members of the Plan Committee and Plan Trustees, to exercise their authority to vote the Company stock owned by the Plan to replace the Board of Directors of the Piggly Wiggly Group with competent and independent individuals (who would faithfully exercise their duties to the Company of loyalty, due care and good faith), despite the continued and demonstrated poor performance of the Company, the mismanagement of the Company by the Company's Board and management, and the self-dealing engaged in by the Company's management;

b.    Failing, as members of the Plan Committee and Plan Trustees, to exercise their authority to vote the Company stock owned by the Plan to replace the Board of Directors of the Piggly Wiggly Group with competent and independent individuals (who would faithfully exercise their duties to the Company of loyalty, due care and good faith), despite knowledge of those facts giving rise to derivative claims as set forth in Sub-Paragraph 262 (a) to (k) below and elsewhere hereinabove;

85

    c.   Failing, as members of the Plan Committee and Plan Trustees, to appropriately monitor and evaluate Plan investments and remove inappropriate ones, including Company stock;

    d.   Failing, as members of the Plan Committee and Plan Trustees, to sell Company stock either before or during its steady decline in value;

    e.   Continuing, as members of the Plan Committee and Plan Trustees, to allow the Plan to hold Company stock year after year despite the decline in stock value between 2007 and 2015;

    f.   Failing, as members of the Company's Board of Directors, to monitor the actions and inactions of the members of the Plan Committee and the Plan Trustees;

    g.   Failing, as members of the Company's Board of Directors, to take appropriate measures to correct the actions and inactions of the members of the Plan Committee and the Plan Trustees, including, but not limited to, providing all necessary and material information to the members of the Plan Committee and the Plan Trustees; and

    h.   Failing, as members of the Company's Board of Directors, to replace the members of the Plan Committee and the Plan Trustees with competent and independent individuals (who would faithfully exercise their duties to the Plan of prudence and loyalty), despite the failure of the Plan Committee and the Plan Trustees to satisfy their duties to the Plan of prudence and loyalty, as outlined above.

**ANSWER:** The Court dismissed the claims in sections (c), (d), and (e) of paragraph 254 in its September 19, 2017 order granting in part and denying in part Defendants' motions to dismiss the FAC, Dkt. 91, and therefore no response is required to the allegations in those sections. To the extent a response is required, the Piggly Wiggly Defendants deny the allegations in sections (c), (d), and (e) of paragraph 254. The Piggly Wiggly Defendants deny the remaining allegations in paragraph 254. Plaintiffs' characterization of the Piggly Wiggly Defendants as the "Defendant Plan Fiduciaries" implies a legal conclusion, which the Piggly Wiggly Defendants deny.

255.    The actions that the Defendant Plan Fiduciaries failed to take alleged herein were alternative courses of action that were available to the Defendant Plan Fiduciaries that would have benefitted, and not harmed, the Plan, and no prudent and loyal fiduciary in the same position as the Defendant Plan Fiduciaries could have concluded that taking these actions would have done the Plan more harm than good. Because the Company's stock was not publicly traded, and there was no readily established market for the Plan's shares, there was no risk that taking these actions could cause a negative market reaction to the value of the Plan's holdings of Company stock. However, in light of the Company's steady and increasing underperformance relative to its competitors, replacing the board of directors or selling all or part of the Company to give new management an opportunity to right the ship would, if anything, have caused the market to increase the value of the Company's shares held by the Plan.  Plaintiffs, as vested participants in the Plan with accounts that contained Company stock, would have seen increases in the value of their individual accounts by virtue of the increased value of the Company's stock.

**ANSWER:**  The Piggly Wiggly Defendants admit that, if the value of Company stock had increased, Plaintiffs, as vested participants in the Plan with accounts that contained Company stock, would have seen increases in the value of their individual accounts.  The Piggly Wiggly Defendants deny the remaining allegations in paragraph 255.  Plaintiffs' characterization of the Piggly Wiggly Defendants as the "Defendant Plan Fiduciaries" implies a legal conclusion, which the Piggly Wiggly Defendants deny.

256.    As set forth in detail above, as a result of these breaches, the Plan, the Plaintiffs, and the Plan's Participants and Beneficiaries have suffered financial losses and damages.

**ANSWER:**  The Piggly Wiggly Defendants deny the allegations in paragraph 256.

257.    Pursuant to ERISA §§ 409 and 502(a), 29 U.S.C. §§ 1109 and 1132(a), the Defendant Plan Fiduciaries are personally liable to restore to the Plan the losses it experienced as a result of these breaches of fiduciary duty.

**ANSWER:**  The Piggly Wiggly Defendants deny the allegations in paragraph 257.

Plaintiffs' characterization of the Piggly Wiggly Defendants as the "Defendant Plan Fiduciaries" implies a legal conclusion, which the Piggly Wiggly Defendants deny.

258.    Pursuant to ERISA §§ 409 and 502(a), the Defendant Plan Fiduciaries are personally liable for any other available and appropriate equitable relief, including prospective injunctive relief, declaratory relief, and attorney's fees.

**ANSWER:** The Piggly Wiggly Defendants deny the allegations in paragraph 258.

Plaintiffs' characterization of the Piggly Wiggly Defendants as the "Defendant Plan Fiduciaries"

implies a legal conclusion, which the Piggly Wiggly Defendants deny.

<u>**Count Two**</u>
**(Breach of Fiduciary Duty Against the Defendant Plan Fiduciaries – Failure to Bring Derivative Actions)**

259.    The foregoing allegations are incorporated herein by reference.

**ANSWER:** The Piggly Wiggly Defendants reassert their responses to paragraphs 1

through 258 and incorporate the same as if fully set forth herein.

260.    As set forth above, the Defendant Plan Fiduciaries owe to the Plan, its
Participants and Beneficiaries, and the Class extensive fiduciary duties.

**ANSWER:** Paragraph 260 alleges legal conclusions to which no response is required.

To the extent a response is required, the Piggly Wiggly Defendants deny the allegations in

paragraph 260. Plaintiffs' characterization of the Piggly Wiggly Defendants as the "Defendant

Plan Fiduciaries" implies a legal conclusion, which the Piggly Wiggly Defendants deny.

261.    As set forth above, there was substantial overlap between the identities of the
Defendant Plan Fiduciaries and inside management and directors of the Piggly Wiggly Group,
such that Defendant Plan Fiduciaries were aware of the corporate actions and inactions of the
Piggly Wiggly Group Board of Directors and management, including the mismanagement,
overcompensation to management, and insider deals hereinabove alleged, as well as such other
misconduct to be proven at trial.

**ANSWER:** The Piggly Wiggly Defendants admit that certain individuals held multiple

positions within the Company, including director, officer, Plan Committee member, and Trustee

of the Piggly Wiggly ESOP, but deny the remaining allegations in paragraph 261. Plaintiffs'

characterization of the Piggly Wiggly Defendants as the "Defendant Plan Fiduciaries" implies a

legal conclusion, which the Piggly Wiggly Defendants deny.

262.    Despite having full knowledge of corporate action and inaction by Piggly
Wiggly Group directors and officers giving rise to various derivative claims, the Defendant Plan

Fiduciaries, in their capacities as members of the Plan Committee and Plan Trustees, failed to exercise their authority to bring derivative actions on behalf of the Piggly Wiggly Group against the management and Board of the Piggly Wiggly Group on the basis of the following, among other conduct to be proven at trial:

a.  The overcompensation and excessive benefits paid to Company management and directors;

b.  The entry into and/or continuance of Piggly Wiggly Group long-term leases at above-market rates in order to benefit lessors controlled or indirectly owned by Company insiders and the beneficiaries of payments from the Dallas Cotton Club;

c.  The failure of the Piggly Wiggly Group to seek to modify the related-party long- term leases;

d.  The mismanagement that caused the Company to incur large financial losses;

e.  The mismanagement that led the Piggly Wiggly Group to enter into high interest rate loans in order to fund Company operations and payments to insiders;

f.  The Board of Directors' failure to nominate qualified independent directors to serve on and control the Board of Directors;

g.  The Board of Directors' failure to select competent and independent new management;

h.  The Company's failure to hire a financial consultant regarding the strategic alternatives available to the Company, including sale of the company assets, until September 2012, by which time the Company's value had already declined substantially from its value on March 31, 2008;

i.  The involvement of Company management and directors in providing false information for stock appraisals;

j.  The mismanagement in the site selection of new stores; and

k.  The entry into the transaction by which the Defendant Note Holders were overpaid by the Company for the Notes Payable, in violation of ERISA.

**ANSWER:**  The Piggly Wiggly Defendants admit that they did not bring a derivative action against the Company but deny the remaining allegations in paragraph 262.  Plaintiffs' characterization of the Piggly Wiggly Defendants as the "Defendant Plan Fiduciaries" implies a legal conclusion, which the Piggly Wiggly Defendants deny.

263.    Based on the egregious self-dealing and gross mismanagement by the Company's officers and directors, any such derivative claims would have been successful. Had such derivative claims been pursued, the Company would have recovered damages from the responsible corporate officers, directors and third parties and put a stop to similar misconduct in the future. Such relief would have brought significant assets (in an amount to be determined at trial) into the Company's coffers, would have greatly improved the Company's financial outlook, and would concomitantly have increased the value of the Company stock held by the Plan. Plaintiffs, as vested participants in the Plan with accounts that contained Company stock, would have seen increases in the value of their individual accounts by virtue of the increased value of the Company's stock.

**ANSWER:**  The Piggly Wiggly Defendants deny the allegations in paragraph 263.

264.    Such failures to bring derivative actions constituted a breach of fiduciary duty.

**ANSWER:**  The Piggly Wiggly Defendants deny the allegations in paragraph 264.

265.    Bringing such derivative actions was an alternative course of action that was available to the Defendant Plan Fiduciaries that would have benefitted, and not harmed, the Plan. No prudent and loyal fiduciary in the same position as the Defendant Plan Fiduciaries could have concluded that bringing the derivative actions would have done the Plan more harm than good. The derivative actions could have been prosecuted at no out of pocket cost to the Plan for attorneys' fees, and even if the derivative actions were unsuccessful, there would have been no material adverse impact on the value of the Plan's shares or other assets. On the other hand, had the derivative actions been litigated through trial to a successful recovery, the Company (and, derivatively, the Plan as a shareholder) would have obtained significant monetary recoveries and other relief which would have greatly benefitted the Plan.  No prudent and loyal fiduciary in the position of the Defendant Plan Fiduciaries would have concluded otherwise with even a minimal investigation.

**ANSWER:**  The Piggly Wiggly Defendants deny the allegations in paragraph 265. Plaintiffs' characterization of the Piggly Wiggly Defendants as the "Defendant Plan Fiduciaries" implies a legal conclusion, which the Piggly Wiggly Defendants deny.

266.    As set forth in detail above, as a result of these breaches, the Plan, the Plaintiffs, and the Plan's Participants and Beneficiaries have suffered financial losses and damages.

**ANSWER:** The Piggly Wiggly Defendants deny the allegations in paragraph 266.

267.    Pursuant to ERISA §§ 409 and 502(a), 29 U.S.C. §§ 1109 and 1132(a), the Defendant Plan Fiduciaries are personally liable to restore to the Plan the losses it experienced as a result of these breaches of fiduciary duty.

**ANSWER:** The Piggly Wiggly Defendants deny the allegations in paragraph 267.

Plaintiffs' characterization of the Piggly Wiggly Defendants as the "Defendant Plan Fiduciaries"

implies a legal conclusion, which the Piggly Wiggly Defendants deny.

268.    Pursuant to ERISA §§ 409 and 502(a), the Defendant Plan Fiduciaries are personally liable for any other available and appropriate equitable relief, including prospective injunctive relief, declaratory relief, and attorney's fees.

**ANSWER:** The Piggly Wiggly Defendants deny the allegations in paragraph 268.

Plaintiffs' characterization of the Piggly Wiggly Defendants as the "Defendant Plan Fiduciaries"

implies a legal conclusion, which the Piggly Wiggly Defendants deny.

## Count Three
### (Co-Fiduciary Liability Under ERISA § 405 Against Defendant Plan Fiduciaries)

269.    The foregoing allegations are incorporated herein by reference.

**ANSWER:** The Piggly Wiggly Defendants reassert their responses to paragraphs 1

through 268 and incorporate the same as if fully set forth herein.

270.    Pursuant to § 405 of ERISA, 29 U.S.C. § 1105, Defendant Plan Fiduciaries are also liable as co-fiduciaries with respect to the above and below-described violations where they participated knowingly in their co-fiduciaries' breaches, knowingly undertook to conceal those breaches, enabled their co-fiduciaries to commit the breaches and failed to make any reasonable efforts to remedy the breaches. As alleged above, the Defendant Plan Fiduciaries were all members of the Board of Directors of the Company, members of the Plan Committee and (for most of the Class Period) Plan Trustees, and each Defendant Plan Fiduciary had knowledge of the conduct of each other Defendant Plan Fiduciary alleged in this Amended Complaint to be actionable, and no Defendant Plan Fiduciary took any action to remedy or address the others' breaches of their duties of loyalty and prudence.

**ANSWER:** The Piggly Wiggly Defendants deny the allegations in paragraph 270.

Plaintiffs' characterization of the Piggly Wiggly Defendants as the "Defendant Plan Fiduciaries"

implies a legal conclusion, which the Piggly Wiggly Defendants deny.

271.    As a proximate result thereof, the Plan has been damaged in an amount to be determined at or before trial, to the financial detriment of the Plan and its Participants and Beneficiaries, including the Plaintiffs.

**ANSWER:** The Piggly Wiggly Defendants deny the allegations in paragraph 271.

272.    Pursuant to ERISA § 409, 29 U.S.C. § 1109, each of said Defendants are jointly and severally liable to restore to the Plan any losses of the Plan resulting from their co-fiduciary breaches and/or for restitution or disgorgement of the unjust benefits received and all profits generated from their wrongdoing.

**ANSWER:** The Piggly Wiggly Defendants deny the allegations in paragraph 272.

## Count Four
**(Prohibited Transactions Under ERISA § 406 Against Defendant Plan Fiduciaries)**

273.    The foregoing allegations are incorporated herein by reference.

**ANSWER:** The Piggly Wiggly Defendants reassert their responses to paragraphs 1

through 272 and incorporate the same as if fully set forth herein.

274.    ERISA categorically prohibits certain types of transactions that are especially likely to harm plans or their participants—so called "prohibited transactions." ERISA § 406(a)-(b), 29 U.S.C. § 1106(a)-(b).

**ANSWER:** Paragraph 274 alleges legal conclusions to which no response is required.

To the extent a response is required, the Piggly Wiggly Defendants admit that paragraph 274

purports to paraphrase, quote, and/or cite to ERISA § 406 but rely on ERISA § 406 to speak for

itself and deny the remaining allegations in paragraph 274.

275.    ERISA § 406(a) prohibits "direct or indirect" transactions between plans (such as the Plan) and "parties in interest." Parties in interest include fiduciaries, trustees and plan sponsors, amongst others, as well as entities controlled by parties in interest and their families. *See* ERISA § 3(14), 29 U.S.C. § 1002(14).

**ANSWER:** Paragraph 275 alleges legal conclusions to which no response is required. To the extent a response is required, the Piggly Wiggly Defendants admit that paragraph 275 purports to paraphrase, quote, and/or cite to ERISA § 406 but rely on ERISA § 406 to speak for itself and deny the remaining allegations in paragraph 275.

276.    Each of the Defendant Plan Fiduciaries was a party in interest to the Plan under ERISA § 3(14). In addition, Defendant Note Holders Newton, Burton Schools and Marion Newton Schools, ACDC and the Dallas Cotton Club were parties in interest with respect to the Plan.

**ANSWER:** Paragraph 276 alleges legal conclusions to which no response is required. To the extent a response is required, the Piggly Wiggly Defendants deny the allegations in paragraph 276. Plaintiffs' characterization of the Piggly Wiggly Defendants as the "Defendant Plan Fiduciaries" implies a legal conclusion, which the Piggly Wiggly Defendants deny.

277.    Defendant Plan Fiduciaries caused the following "direct or indirect" transactions between the Plan and parties in interest to occur:

a.  The settlement of the Notes Payable with the Defendant Note Holders;

b.  The entry into and/or the continuance of leases with ACDC and entities controlled by ACDC and the Dallas Cotton Club;

c.  Excessive compensation and benefits paid to the Defendant Plan Fiduciaries; and d.  Payment of certain of the Defendant Plan Fiduciaries for a covenant not to compete in connection with the 2014 Asset Sales as hereinabove alleged.

**ANSWER:** The Court dismissed the claims in sections (b) and (c) (to the extent any alleged excessive compensation pre-dated September 5, 2014) of paragraph 277 in its September 19, 2017 order granting in part and denying in part Defendants' motions to dismiss the FAC, Dkt. 91, and therefore no response is required to the allegations in those sections. To the extent a response is required, the Piggly Wiggly Defendants deny the allegations in sections (b) and (c) of paragraph 277. The remainder of paragraph 277 alleges legal conclusions to which no response

is required.  To the extent a response is required, the Piggly Wiggly Defendants deny the

remaining allegations in paragraph 277.  Plaintiffs' characterization of the Piggly Wiggly

Defendants as the "Defendant Plan Fiduciaries" implies a legal conclusion, which the Piggly

Wiggly Defendants deny.

278.    ERISA § 406(b) prohibits certain self-dealing transactions where a fiduciary: (a) deals with assets of the plan in his own interest or for his own account; (b) in his individual or in any other capacity acts in any transaction involving the plan on behalf of a party (or represents a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries; or (c) receives any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.

**ANSWER:**  Paragraph 278 alleges legal conclusions to which no response is required.

To the extent a response is required, the Piggly Wiggly Defendants admit that paragraph 278

purports to paraphrase, quote, and/or cite to ERISA § 406 but rely on ERISA § 406 to speak for

itself.

279.    As set forth above, the Defendant Plan Fiduciaries caused to occur numerous "direct or indirect" prohibited transactions under both § 406(a) and § 406(b), did this in their own interest or for their own account, and/or in their individual or other capacities (such as in their capacities as members of the Company's Board of Directors) acted in transactions involving the Plan on behalf of or representing parties whose interests were adverse to the interests of the Plan or the interests of the Participants or Beneficiaries.

**ANSWER:**  The Piggly Wiggly Defendants deny the allegations in paragraph 279.

Plaintiffs' characterization of the Piggly Wiggly Defendants as the "Defendant Plan Fiduciaries"

implies a legal conclusion, which the Piggly Wiggly Defendants deny.

280.    As a direct and proximate result thereof, the Plan has been damaged in an amount to be determined at or before trial, to the financial detriment of the Plan and its Participants and Beneficiaries, including the Plaintiffs.

**ANSWER:**  The Piggly Wiggly Defendants deny the allegations in paragraph 280.

281.    Pursuant to ERISA § 409, 29 U.S.C. § 1109, each of said Defendant Plan Fiduciaries is jointly and severally liable to restore to the Plan any losses of the Plan resulting from the prohibited transactions and/or for restitution or disgorgement of the unjust benefits received and all profits generated from their wrongdoing.

**ANSWER:** The Piggly Wiggly Defendants deny the allegations in paragraph 281.

Plaintiffs' characterization of the Piggly Wiggly Defendants as the "Defendant Plan Fiduciaries"

implies a legal conclusion, which the Piggly Wiggly Defendants deny.

## Count Five
### (Equitable Relief Under ERISA § 502(a)(3) Against All Defendants)

282.    The foregoing allegations are incorporated herein by reference.

**ANSWER:** The Piggly Wiggly Defendants reassert their responses to paragraphs 1

through 281 and incorporate the same as if fully set forth herein.

283.    ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), provides that plan participants—like
Plaintiffs here—have standing to bring a civil action "to enjoin any act or practice which violates
any provision of this subchapter or the terms of the plan, or … to obtain other appropriate
equitable relief … to redress such violations or … to enforce any provisions of this subchapter or
the terms of the plan."

**ANSWER:** Paragraph 283 alleges legal conclusions to which no response is required.

To the extent a response is required, the Piggly Wiggly Defendants admit that paragraph 283

purports to paraphrase, quote, and/or cite to ERISA § 502 but rely on ERISA § 502 to speak for

itself.  The Piggly Wiggly Defendants deny the remaining allegations in paragraph 283.

284.    Defendant Plan Fiduciaries engaged in, caused the Company to engage in,
and/or did nothing to prevent the Company from engaging in transactions or activity that violated
ERISA.

**ANSWER:** The Piggly Wiggly Defendants deny the allegations in paragraph 284.

Plaintiffs' characterization of the Piggly Wiggly Defendants as the "Defendant Plan Fiduciaries"

implies a legal conclusion, which the Piggly Wiggly Defendants deny.

285.    Defendant Note Holders either knowingly participated in transactions that
violated ERISA and/or knowingly participated as parties in interest in prohibited transactions, or
in the alternative should have known that such conduct violated ERISA.

**ANSWER:** The Piggly Wiggly Defendants deny the allegations in paragraph 285.

286.    On information and belief, Defendants' misconduct is ongoing and threatens to

further deplete the Company's assets and otherwise irrevocably harm the Plan.

**ANSWER:** The Piggly Wiggly Defendants deny the allegations in paragraph 286.

287.     And, as set forth above, each of the Defendants received benefits from or were otherwise transferees of ill-gotten assets that in good conscience belonged to the Plan.

**ANSWER:** The Piggly Wiggly Defendants deny the allegations in paragraph 287.

288.     Plaintiffs are therefore entitled to all appropriate injunctive and equitable relief to prevent such further injury and to recover for the Plan the ill-gotten gains obtained by the Defendants, including the imposition of a constructive trust, disgorgement, restitution, surcharge, and any other appropriate remedy.

**ANSWER:** The Piggly Wiggly Defendants deny the allegations in paragraph 288.

## **PRAYER FOR RELIEF**

In response to Plaintiffs' Prayer for Relief and each subpart thereof, the Piggly Wiggly Defendants deny that Plaintiffs are entitled to any of the relief requested or to any relief whatsoever and request that the FAC be dismissed with prejudice.

## **THE PIGGLY WIGGLY DEFENDANTS' AFFIRMATIVE DEFENSES**

### FIRST DEFENSE

The FAC fails, in whole or in part, to state a cause of action upon which relief can be granted.

### SECOND DEFENSE

Plaintiffs' claims are or may be barred, in whole or in part, by Plaintiffs' lack of standing to assert such claims.

### THIRD DEFENSE

Plaintiffs' claims are or may be barred, in whole or in part, by the applicable statutes of limitations or repose or by the doctrine of laches.

96

## FOURTH DEFENSE

Plaintiffs' claims are or may be barred, in whole or in part, because the Court lacks

subject matter jurisdiction over such claims.

## FIFTH DEFENSE

Plaintiffs' claims are or may be barred, in whole or in part, because Plaintiffs waived or

released their claims.

## SIXTH DEFENSE

Plaintiffs' claims are or may be barred, in whole or in part, because the alleged prohibited

transactions are exempted by ERISA § 408, 29. U.S.C. § 1108, or other exemptions to ERISA's

prohibited transaction rules.

## RESERVATION OF DEFENSES

The Piggly Wiggly Defendants reserve the right to assert any additional affirmative

defenses and matters in avoidance that may be discovered or disclosed during the course of

additional investigation and discovery.


Dated:  October 3, 2017                        Respectfully submitted,


**GROOM LAW GROUP, CHARTERED**        **JANIK, LLP**

Lars C. Golumbic (*pro hac vice*)
D.C. Bar No. 452143                               */s/ Monica. B. Towle*
Sarah M. Adams (*pro hac vice*)              STEVEN G. JANIK
D.C. Bar No. 490158                            MONICA B. TOWLE
Mark L. Bieter (*pro hac vice*)               Fed. Bar No. 11301
D.C. Bar No. 475820                            Fed. Bar No. 12364
Sean C. Abouchedid (*pro hac vice*)          1000 William Hilton Parkway, Suite 103
D.C. Bar No. 978049                            Hilton Head Island, SC 29928
Natasha S. Fedder (*pro hac vice*)           Phone: 843-715-9311
D.C. Bar No. 1000853                           Fax:  440-740-3061
Andrew D. Salek-Raham (*pro hac vice*)       Steven.Janik@Janiklaw.com
D.C. Bar. No. 1024246                          Monica.Towle@Janiklaw.com

97

1701 Pennsylvania Ave., N.W.
Suite 1200
Washington, D.C. 20006
Phone: 202-861-0620
Fax: 202-659-4503
lgolumbic@groom.com
sadams@groom.com
mbieter@groom.com
sabouchedid@groom.com
nfedder@groom.com
asalek-raham@groom.com

LOVIC A. BROOKS, III
Fed. Bar No. 1495
1122 Lady Street, Suite 1025
P.O. Box 136
Columbia, SC 29202
Phone: 803-254-5300
Fax:  803-254-5353
Lovic.Brooks@Janiklaw.com

*Attorneys for Defendants David R. Schools,
William A. Edenfield, Jr., Robert G. Masche,
Joseph T. Newton III, Burton R. Schools, and
the Piggly Wiggly Carolina Company, Inc.
and Greenbax Enterprises, Inc. Employee
Stock Ownership Plan and Trust Committee*